IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JEFFREY J. SPERRY,
     plaintiff

     V.

LINDSEY WILDERMUTH,
ANDREW LUCHT,
CHRISTOPHER ROSS,
KEVIN BOSCH,
(F.N.U.) HUNT,
COLLETTE WINKLEBAUER,
REX PRYOR,
K. LEE,
LARRY HOSHAW,
DANIEL JACKSON,
PHILLIP PATTERSON,
ROBERT SAPIEN,
HANNAH BOOTH,
JAMES HEIMGARTNER,
JOHNNIE GODDARD,
DOUGLAS BURRIS,
BILL SHIPMAN,
RAYMOND ROBERTS,
CORIZON, INC.,
REBECCA (L.N.U.),
(F.N.U.) BRUNDAGE,
UNION SUPPLY GROUP, INC,
JACK CAUBLE,
DON RAYMOND,
     defendants

Case No. 16-3222-SAC-DJW

JURY TRIAL DEMANDED

## COMPLAINT

### Jurisdiction

This Court has jurisdiction over plaintiff's federal claims under 42 U.S.C. §§ 1331 and 1343; and over the state law claims via 28 USC. § 1332 (diversity jurisdiction), 28 USC. § 1367 (supplemental jurisdiction); K.S.A. Chap. 1.e0 and Kansas Tort Claims Act.

### Parties

1. Plaintiff Jeffrey J. Sperry #47031, is an Missouri resident in the custody of the Kansas Department of Corrections (KDOC), currently housed at the El Dorado Correctional Facility (EDCF), 1737 S.E. Hwy. 54, El Dorado, KS 67042, since January 22, 2016, but he was previously housed at the Lansing Correctional Facility (LCF), 301 E. Kansas Ave., Lansing, KS 66043, from 1997 to January 22, 2016.

2. Defendant Lindsey Wildermuth is a Unit Team Manager at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043 at all relevant times, is sued in her individual and official capacities.

3. Defendant Andrew Lucht is an officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043 at all relevant times and is sued in his individual and official capacities.

4. Defendant Christopher Ross is the property claim and grievance officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in his individual and official capacities.

5. Defendant Kevin Bosch is a disciplinary hearing of-

2

ficer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in his individual and official Capacities.

6. Defendant (F.N.U.) Hunt is a disciplinary hearing officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in his individual and official Capacities.

7. Defendant Collette Winklebaur is a deputy Warden at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in her individual and official capacities.

8. Defendant Rex Pryor (retired) was the Warden at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in his individual and official capacities.

9. Defendant K. Lee, works in the mailroom at the Lansing Correctional Facility, 301 E Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in her individual and official capacity.

10. Defendant Larry Hoshaw (retired) was a Unit Team Manager at the El Dorado Correctional Facility, 1737 SE. Hwy 54, El Dorado, KS 67042, at all relevant times, is sued in his individual and official capacities.

11. Defendant Daniel Jackson is a Unit Team Manager at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at all relevant times, is sued in his individual and official capacities.

3

12. Defendant Phillip Patterson is a Unit Team Counselor at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at all relevant times, is sued in his individual and official capacities.

13. Defendant Robert Sapien is an officer at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at all relevant times, is sued in his individual and official capacities.

14. Defendant Hannah Booth works in the mailroom at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at all relevant times, is sued in her individual and official capacities.

15. Defendant James Heimgartner is the warden at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at all relevant times, is sued in his individual and official capacities.

16. Defendant Johnnie Goddard works for the Kansas Department of Corrections, 714 S.W. Jackson, Topeka, KS 66603, at all relevant times, is sued in his individual and official capacities.

17. Defendant Douglas Burris works for the Kansas Department of Corrections, 714 S.W. Jackson, Topeka, KS 66603, at all relevant times, is sued in his individual and official capacities.

18. Defendant Bill Shipman is a deputy warden at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at all relevant times, is sued in his individual and official capacities.

4

19. Defendant Raymond Roberts (retired) was the Secretary of Corrections for the State of Kansas, 714 S.W. Jackson, Topeka, KS 66603, at all relevant times, is sued in his individual and official capacities.

20. Defendant Corizon Health, Inc., 103 Powell Court, Brentwood, TN 37027, is a Tennessee corporation with a resident office at 714 S.W. Jackson, Topeka, KS 66603, is contracted with the Kansas Department of Corrections to give health care services to inmates, is a person under Kansas law and is sued in its individual and official capacities.

21. Defendant Rebecca (L.N.U.), was the infection control coordinator for Corizon at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043 at all relevant times, is sued in her individual and official capacities.

22. Defendant (F.N.U.) Brundage is the infection control coordinator for Corizon at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042 at all relevant times, is sued in her individual and official capacities.

23. Defendant Union Supply Group, Inc., is a California corporation with a residential office at 714 S.W. Jackson, Topeka, KS 66603 that is contracted with the Kansas Department of Corrections to provide canteen services to inmates, is a person under Kansas law and is sued in its individual and official capacities.

24. Defendant Jack Cauble is a Union Supply employee at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042 at all relevant times, is sued in his individual and official capacities.

25.  Defendant Don Raymond is the director of Brothers-In-Blue, a Christian organization, at the Lansing Correctional Facility, 301 E Kansas Ave, Lansing, KS 66043 at all relevant times, is sved in his individual and official capacities.

26.  All defendants were acting under the color of state law at all relevant times.

## Jury Trial Demand

27.  Plaintiff hereby demands that this case be tried to a jury as provided by the Seventh Amendment of the United States Constitution.

## Facts

28.  Plaintiff is a Missouri State resident who was arrested in Missouri on November 27, 1995, and extradited to Wyandotte County, Kansas to face criminal prosecution on January 21, 1996.

29.  Plaintiff was convicted on a felony charge and remanded to the Kansas Department of Corrections (KDOC) in April, 1997.

30.  Plaintiff was transferred to the Lansing Correctional Facility (LCF) in October, 1997, on a hardship transfer, as his family lives in Kansas City, Missouri, and he was housed at LCF continuously until January 22, 2016.

31.  Plaintiff was transferred to the El Dorado Correctional Facility (EDCF) on January 22, 2016, where he remains in segregation housing to date.

32.  Due to the extensive number of claims presented in this action, plaintiff will separate the facts into their

6

relevant sections.

## Illegal Administrative Segregation

33.  Plaintiff has been incarcerated in the Kansas Department of Corrections (KDOC) continuously since March 19, 1997, and during that 19+ years has received several disciplinary violations.

34.  Plaintiff's disciplinary violations have never been for acts of violence, weapons, or anything else that would constitute a threat to the safety or security of the facility. The most serious disciplinary infractions were for trivial amounts of tobacco, synthetic marijuana, and cell phones

35.  Plaintiff's infractions were considered so trivial that he has only received disciplinary segregation three times in over 19 years: (1) for relationship with staff in December, 2000, (2) first cell phone in February, 2010, and (3) broken syringes and tobacco in September, 2015.

36.  Plaintiff has studied law for the entirety of his incarceration and has helped hundreds of inmates challenge improper disciplinary conviction or abuses suffered at the hands of staff members.

37.  In 2014, Defendant Wildermuth tried to force inmate Del Ludlam into sex offender treatment even though he was not a sex offender. Plaintiff assisted Ludlam in successfully challenging her erroneous classification and Wildermuth became extremely disenchanted with plaintiff and expressed her animosity openly.

38. In January, 2014, plaintiff assisted inmate Michael Cote (a New Mexico prisoner who'd been at LCF for 20 years) file a civil action against medical and prison staff. [Cote v. Dozier, et al., 5:14-cv-03058]. In April, 2014, defendant Wildermvth illegally barred plaintiff from helping him and by May, 2014, LCF officials shipped Cote back to New Mexico, in the middle of the night, from his hospital bed.

39. Plaintiff has a major asbestos-exposure suit against L.C.F. and KDOC officials. On June 5, 2015, the Court of Appeals ruled in plaintiff's favor and remanded the case for trial. [Sperry v. McKune, et al., 112, 455.]

40. Defendant Lucht had a family member house at LCF, where he works, which violates policy. This family member abused drugs and ran afoul of the prison gangs, which caused him to finish his sentence in protective custody. Somehow, Lucht blames plaintiff for this.

41. Defendant Lucht has always had a strong dislike for plaintiff, even though plaintiff has never interacted with him much. The two parties have had disagreements over Lucht's use of inmates who are willing to lie about or set up other inmates just to get out of their own disciplinary troubles. In fact, such improper tactics led to petitioner receiving a disciplinary report for contraband in April, 2014. Defendant Lucht attempted to have plaintiff prosecuted for this contraband. Charges were filed, however, once the real facts started coming to light surrounding the incident, the prosecutor dismissed the charges in August, 2015.

42. A few weeks later, on September 23, 2015, officers were sent to target plaintiff's cell for a search. During that search the officers found some broken syringes and a small amount of tobacco (about 5 cigarettes worth) and plaintiff was taken to segregation.

8.

43. Inmates are rarely sent to segregation for a contraband disciplinary report for broken syringes and small amounts of tobacco, and it never constitutes a threat to the safety or security of the facility that would warrant administrative segregation.

44. Plaintiff pled guilty to the disciplinary report (D.R.) and received 30 days disciplinary segregation as punishment.

45. The day after plaintiff was taken to segregation, September 24, 2016, he attended a segregation review hearing in front of Defendant Wildermuth, Defendant Lucht, and mental health counselor Chahine. Wildermuth and Lucht were rude and disrespectful towards plaintiff and Wildermuth told plaintiff, "Get comfortable because you belong to me now!"

46. After plaintiff was taken back to his cell, Ms. Chahine asked Wildermuth and Lucht why they treated plaintiff so poorly and Lucht said, "Why, do you like him?" Then they told her that it was none of her business, even though plaintiff was on her workload.

47. On October 6, 2015, thirteen days into his disciplinary segregation term, unit team counselor Ball released plaintiff from disciplinary segregation. However, before plaintiff could be kicked out of segregation, Lucht called ball and told him not to release plaintiff saying, "We are going to O.S.R. him."

48. Several weeks later, defendant Wildermuth sent plaintiff an Administrative Segregation Report (A.S.R.) that covered twelve alleged incidents from 1997 to September 23, 2015, as the basis for placing him in long term segregation:
    A. On 8-11-99, sent to segregation for relationship with staff.

9

B. On 11-2-05, sent to seg. for asking another inmate to look up books about starting a non-profit organization.

C. On 9-27-07, sent to seg. a third time for a debt sheet with other inmates names on it.

D. On 1-9-08, sent to seg. a fourth time for inappropriate use of a computer.

E On 2-23-10, sent to seg. a fifth time for possession of cellphone, cash, K-2, and tobacco.

F. On 8-12-12, sent to seg. a sixth time because contraband found in library where he worked.

G. On 9-27-12, E.A.I received anonymous information That Sperry was handing "things" out in the library where he worked.

H. On 7-31-13, sent to seg. a seventh time for investigation of doing legal work for prison staff.

I. On 4-14-14, sent to seg. an eighth time for K-2 and methamphetamine found in cell.

J. On 5-6-14, sent to seg. a ninth time for sexual activity.

K. On 9-25-15, sent to seg. a tenth time for two "loaded" syringes that inmate admitted was methamphetamine.

L. E.A.I Department has two cases pending against Sperry, CO-14-0037-01 and CO-15-0115-01.

49.   Defendant Wildermuth was the person initiating the administrative segregation proceeding and acted as the supervising agent for it. Plaintiff immediately sent her a form-9 informing her that over half of the facts alleged were false:

A. Went to seg. for undue familiarity on 12-13-00 not 8-12-99.

B. Never went to seg. and no D.R. about asking anyone to look up non-profit books.

C. Never went to seg. and no D.R. for debt sheet.

10

D. Was moved from medium facility to max facility for using education department computer in library, but never sent to seg.

E. Did go to seg. for only the second time ever on 2-23-10, but only for cellphone and cash, no K-2 or tobacco.

F. Never went to seg. and no D.R. for contrab and found in common area in the prison library on 8-12-12, but staff laid Sperry in from his law library job for no reason.

G. Any allegation that Sperry was handing "things" out in the library where he worked on 9-27-12 is a blatant lie as the staff took his library job on 8-12-12.

H. Never went to seg. and no D.R. for suspicion of doing legal work for staff member, ever.

I. Never went to seg. on 4-14-14, but did receive a D.R. for a minor amount of alleged K-2 and methamphetamine. Did not even get disciplinary seg. time when pled no-contest to D.R.

J. Was taken to seg. on 5-6-14 for alleged sexual activity but only held 24 hours until E.A.I. Zamora determined that allegation was unfounded.

K. There were no "loaded" syringes found on 9-23-15 and no drugs were involved, and Sperry never admitted to any drugs.

L. There are no cases pending against Sperry. The attempted prosecution in CQ-14-0037-01 based on the contraband from 4-14-14 was dismissed by the district attorney and there never was a CO-15-0115-01.

50. Defendant Wildermuth did not deny that her entire A.S.R. was false, she simply told plaintiff that he would have to take it up with E.A.I. because that is what is written in their file. She refused to correct it even though facility records prove it is all false.

11

51. Defendant Lucht was in charge of E.A.I. for several years leading up to 9-23-15, so presumably he is the person responsible for loading plaintiff's file with lies.

52. Defendant Wildermuths A.S.R. claims to put plaintiff in administrative segregation for "other security risk" but nowhere does she claim plaintiff was a "threat to the safety or security of the facility," which is required under IMPP 20-104(I)(B)(13). Nor could she because no one has ever been placed on administrative segregation for a couple of broken syringes and five cigarettes.

53. What defendant Wildermuth does state in her A.S.R. is that due to plaintiff's "malicious and maladaptive behavior" he is being sent to long term lockdown. However, that is covered by IMPP 20-104(I)(B)(12) consistent bad behavior, which specifically require three separate D.R.s over the last 12 months, and each D.R. requires conduct that constitutes a threat to the safety or security of the facility. The A.S.R references the 9-23-15 contraband D.R. but doesn't mention another D.R. until May 5, 2014, more than 12 months prior.

54. Placement of an inmate for "other security risk" under 20-104(I)(B)(13) can only be made by the warden and no one else, period. Placement for consistent bad behavior under 20-104(I)(B)(12) requires prior approval of the warden and no one else, period. The warden, defendant Pryor, has never signed or approved anything related to plaintiff's unlawful placement in administrative segregation. In fact, no warden anywhere has ever authorized the placement, ever.

55. The conspiracy to illegally put plaintiff in long-term segregation

12

was the brainchild of defendants Wildermuth and Lucht, but defendant Pryor became a co-conspirator once plaintiff submitted a form-9 to him regarding the unlawful classification and he refused to take action.

56. On January 22, 2016, plaintiff was transferred to the El Dorado Correctional Facility [EDCF.] where the KDOC. operates its long-term segregation facilities.

57. Plaintiff immediately notified defendants Hoshaw and Patterson about the unlawful classification, explained in detail all the ways it was unlawful, and requested that he be taken off administrative segregation.

58. Defendant Hoshaw told plaintiff to come to the next scheduled seg. review hearing to discuss it, while Patterson responded that the classification was proper.

59. Plaintiff sent another form-9 to Patterson requesting him to explain specifically how they determined the classification to be proper and Patterson responded that he was still doing it under IMPP 20-104(I)(B)(13)'s a.s.r. provision, but that he was using three disciplinary convictions in the previous 12 months provision of 20-104(I)(B)(12), which appears nowhere in the a.s.r. that is the basis of plaintiff's illegal classification.

60. Plaintiff objected to their attempt to reclassify his illegal segregation using three D.R.s from 9-23-15, 7-12-15, and 12-31-14 because: (a) their classification on 2-16-16 could only go back 12 months to 2-16-15 and there were not three separate D.R.s in that time, (b) none of those D.R.s involved activities that constituted a threat to the safety or security of the prison, (c) the warden never authorized the classification and, if

They were sticking to their argument that the classification was under 20-104(E)(B)(13) O.S.R., The warden was the only person who could make the classification. The defendants abandoned this approach.

61.   Plaintiff sent multiple form-9's to defendant Heimgartner, EDCF warden, regarding the illegal classification and he refused to respond or otherwise take action to remove plaintiff from the illegal classification.

62.   Plaintiff did attend seg. review on March 11, 2016, and the first thing defendant Hoshaw did was ask plaintiff, "what do you have for me?" Plaintiff ask him to elaborate and Hoshaw intimated that the only way to get out of administrative segregation was to start snitching on people. Plaintiff rejected his proposal.

63.   Plaintiff explained, again, all of the reasons why his placement in administrative segregation was illegal and insisted that he be released from it. Defendant Hoshaw told plaintiff that lots of inmates were illegally classified to administrative segregation, but that he couldn't do anything about it. He further stated, "it doesn't matter. If someone wants you to be here you are going to be here, no matter what."

64.   When defendant Jackson replaced defendant Hoshaw as plaintiff's unit team manager, plaintiff sent him form-9s and attended his seg. review hearing explaining the illegal classification and requested relief. Defendant Jackson refused to take any corrective action.

65.   On February 23, 2016, plaintiff filed an injury claim

14

form demanding $1,000⁰⁰ per day for every day he was subjected to the illegal segregation classification under the defendants conspiracy to violate his rights. The defendants refused to process it and, thereby, waived any objection to exhaustion via the injury claim process.

66. Plaintiff did take heed to defendant Hoshaw's brazen admission that a lot of inmates were illegally classified to administrative segregation and started interviewing other inmates in the unit with him. After reviewing 20 different A.SR's plaintiff determined almost every one of them were illegal in that they were not initiated by or preapproved by a warden, or were for conduct that did not implicate the safety or security of the facility, or had become arbitrary after the inmates co-segregants had been released from seg. months or years before. It was also revealed that defendant asked every inmate who attended seg review to snitch on someone to earn their release.

67. Another common theme coming out of the seg. review hearings is the staff members telling inmates unequivocally that they have not done enough time. This can mean one thing, and one thing only, that they are using administrative segregation for the unlawful purpose of punishment.

68. Numerous studies have established that "supermax" prisons like EDCF. where inmates are housed in long-term segregation cause physical and mental harm. Plaintiff's segregation is extremely punitive in that it denies him the following non-exclusive list of privileges enjoyed by general population inmates: (a) 24-hour lockdown with no human interaction, (b) subjected to 24-hour lighting, (c) no visitation with family and friends, (d) no fresh air or access to outdoors except four 1-hour sessions per week in a dog kennel if the weather permits, (e) no incentive pay, (f) only 3 15-minute showers

15

per week, (g) no access to the law library, (h) no access to news – papers, magazines or reference materials in general library, (i) no religious callouts or programs, (j) no mental health programs, (K) plaintiff cannot participate in any rehabilitation programs or work release in preparation for his 2020 parol hearing, (l) plaintiff is cuffed behind his back and put on a dog leash every time he comes out of his cell, (m) cannot participate in fund raisers that permit purchase of special meals from restaurants or Aramark, (n) cannot access his jpay account which contains emails and pictures he and his family paid for, (o) cannot access the MP3/MP4 Kiosk which means he cannot enjoy the music he has invested hundreds of dollars in, and (p) cannot purchase a large portion of commissary items on canteen list.

## Inhumane Living Conditions

69. From September 23, 2015 until early December, 2015, plaintiff was house in the segregation unit of C-1 cellhouse at the LCF. where the cockroach infestation was out of control. Anywhere from 3 to 20 roaches would be crawling across the cell at any given time, and plaintiff was awakened almost every single night by roaches crawling on him.

70. Plaintiff filed form-9's and a grievance requesting that the facility either eradicate the roaches or remove the inmates from C-1. Defendant Wildermuth merely stated that the exterminator sprays regularly but it doesn't do any good.

71. After ten-plus weeks of these inhumane living conditions defendant Wildmuth finally moved plaintiff to the segregation unit in A-1 cellhouse.

72. Defendants Pryor, Goddard, Roberts, refused to take any

16

Steps to eradicate the roach infestation in C1- cellhouse.

## Sleep Deprivation

73. The staff at E.D.C.F. purposely arrange their schedule to ensure that plaintiff is awakened every few hours to prevent him from getting a proper nights rest every single day.

74. Using military time, the schedule is as follows:
   (a) 00:00 - 03:00 Cleaning crew is in the unit.
   (b) 02:00 - 03:00 Sheet exchange, sweat turn-in, blanket exchange (Mon, Tue, Wed., respectively).
   (c) 04:00 - 04:30 breakfast is served.
   (d) 05:00 - 05:30 breakfast trays collected.
   (e) 06:30 - 08:30 yard (Sun.- Thu.), cell cleaning (Sun.), barber (Sat)
   (f) 06:30 - 08:30 ice is passed out.
   (g) 10:30 - 11:00 lunch is passed out.
   (h) 12:00 - 14:00 Unit Team and Mental Health make rounds.
   (i) 14:30 - 16:30 Showers are run three days a week.
   (j) 17:00 - 17:30 dinner is passed out.
   (k) 17:30 - 18:00 dinner trays collected.
   (l) 18:00 - 22:00 sheets, sweats, blankets, toilet paper passed out.
   (m) 22:30 - 23:00 Standing I.D. Count.

75. As obviated from that schedule, there is not a block of time that would ever permit plaintiff to get more than five hours of sleep, and that is only the four morning a week that sheets, sweats, and blankets are not picked up.

76. Plaintiff is subjected to light shining in his cell 24-hours a day, although the night-light is only half as bright as the regular fluorescent light. However, the night-light is completely unnecessary because every officer has a flash-light for looking into cells during rounds.

17

77. Numerous scientific studies, including those conducted by Harvard Medical School's Division of Sleep Medicine, clearly establish that the human body requires 8-hours of uninterrupted sleep every night to function properly. They prove to a scientific certainty that extended periods of sleep deprivation causes severe physical and mental damage.

78. Numerous health and nutrition studies conclusively establish that it is detrimental to one's health to go to bed within 4 hours of the evening meal

79. Plaintiff has not had a proper night's sleep since January 21, 2016, and counting. This cronic sleep deprivation is causing serious and mental harm to plaintiff. He has no energy and is cronically tired, which prevents him from exercizing. This decline in physical health is exascerbating his untreated hepatitus-C infection and relapsing his untreated diabetic condition. Plaintiff is also suffering extreme stress and irritation, which causes inflamation of his neck and joints. It also severely interferes with his ability to concentrate on his legal work.

80. Plaintiff submitted several form-9's and a grievance to defendants Patterson, Jackson, Heimgartner, Goddard, and Roberts, explaining about the studies regarding sleep deprivation and case authorities establishing that it is an Eighth Amendment violation, but they refuse to modify the schedule to allow the inmate population to get an 8-hour block of uninterrupted sleep time.

## Medical Indifference

81. In June, 2014, the healthcare staff at L.C.F. did

18

a routine blood test on plaintiff and determined that he had contracted the hepatitus C virus, but they neglected to inform plaintiff about it for over a year. Needless to say, they did not treat it during that year either.

82. In June, 2015, during plaintiff's annual physical, the nurse brought the hep-C diagnosis to his attention and asked him if anyone had treated him for it. Plaintiff told her that no one had ever bothered to tell him about it.

83. Defendant Rebecca (LNU) was the infection control coordinator for Corizon, Inc., at that time and she failed to take any steps to treat the infection.

84. Plaintiff demanded defendants Corizon, Inc. and Rebecca (LNU) give him the 12-week treatment cycle of Harvoni to cure him of the hep-C virus. They have refused this treatment stating it cost too much, even though K.D.O.C. pays them something like $25 million dollars a year to pay for the treatment.

85. Defendant Rebecca (LNU), the infection control coordinator who took her place at LCF, and the one at EDCF, all claim that plaintiff is on something called "cronic care" to monitor his health, but plaintiff has never received any treatment, or even been seen by any doctor for that matter, since.

86. It is the strategy of all these healthcare defendants to wait until the hep-C virus causes irreparable harm to plaintiff before they take any measures to treat it, rather than spend some of the millions they are paid to treat it.

19

## Censorship

87. In April, 2014, plaintiff received a shipment of books he had ordered, which included two Janet Evanovich titles: "Full Bloom" and "Full Blast." These two books were part of a drama-comedy trilogy that are typical PG rated Evanovich and absolutely do not contain any graphic sex scenes.

88. Someone in the LCF mailroom seized "Full Blast" claiming that it contained sexually explicit material pursuant to K.A.R. 44-12-313 which bans, as it relates to novels, "any description of sexual intercourse or sodomy, including genital-genital, oral-genital, anal-genital, and anal-oral, whether between persons of the same or differing gender; masterbation; bestiality; or sado-masochistic abuse." The book "Full Blast" does not contain any language that even comes close to being sexually explicit.

89. The name on the seizure notice was defendant Winkle-bauer's, but defendant Lee's was on the form-9 response to plaintiff's objection to the seizure. KDOC's headquarters did not return plaintiff's appeal form.

90. On December 11, 2015, someone in the LCF mailroom seized plaintiff's December 21, 2015 issue of Us Weekly because it con- tained "drink recipes." Defendant Shipman's name appears on the seizure notice and defendant Burris' approved the absurd censorship for K.D.O.C. headquarters.

91. Also in December, 2015, someone in the LCF mailroom seized plaintiff's January, 2016 issue of Wired Magazine, a technology periodical. They refused to say what the alleged offending material was, but plaintiff's family could find no ma- terial in it that would constitute a threat to the security

of the prison. Defendant Shipmans name appeared on the seizure form and KDOC never returned the appeal form to plaintiff.

92. On April 5, 2016, after being transferred to E.D.C.F, plaintiff received a seizure notice from defendant Booth, of the E.D.C.F. mailroom, that she was seizing plaintiff's April, 2016 issue of Wired Magazine. Defendant Shipman's name appears on the seizure notice.

93. Plaintiff sent a form-9 to the mailroom demanding the name of the person who actually seized the magazine and an explanation as to what the alleged offending material was, so he could file a lawsuit. This, apparently offended defendants Booth and Sapien.

94. On April 8, 2016, defendants Booth and Sapien sent plaintiff another seizure notice saying they were seizing a photograph he had received in the mail from a Texas company called Pulchritudinous Assets, which specializes in pornographic and non-pornographic photography. The photo in question was a non-pornographic photo of a woman.

95. This seizure notice contained defendant Sapiens name.

96. On May 23, 2016, defendants Booth and Sapien sent plaintiff another seizure notice saying they were seizing his book by David Baldacci titled "The Target." Again, they refused to state what the offending material was but they did list the pages (2, 6, 16, 41-42).

97. Plaintiff knew this was another act of malicious retaliation by these two defendants so he obtained copies of

The allege offending pages which contained the following:

(a) Page 2 is dialog between two death row inmates in a medical ward of a fictional Alabama prison.

(b) Page 6 is dialog between one of the inmates and a nurse about how long he had been incarcerated.

(c) Page 16 is dialog between a fictional president and his fictional CIA director about vetting agents.

(d) Page 41-42 is about two CIA agents meeting up to discuss why they were selected for a mission.

Clearly, defendants Sapien and Booth purposely lied about the contents of this book for unlawful purposes.

98. All three of these EDCF seizures were appealed to the Secretary of Corrections office where defendant Burris approved them.

99. Plaintiff had purchased all of these magazines, books, and photograph and had a property interest in them.

## Access to Law Library

100. Plaintiff has numerous legal actions pending in the Courts [Sperry v. McKune, etal., 14-112455-AS; Sperry V. LCF, 16-CV-2; Sperry V. State, 14-112143-AS], plus he is researching the law and preparing this case.

101. Plaintiff is pro-se on all of his cases.

102. Defendant Heimgartner and his staff at EDCF do not provide inmates with legal advisors or access to persons trained in the law. To comply with the constitutional mandate of Bounds V. Smith, they provide the inmate population with a law library that consists of Lexis Nexis computer terminals.

22

103. EDCF does not train their law library clerks to do even basic legal research. These clerks have responded to plaintiff's form-9s saying they cannot do even basic research.

104. Because plaintiff is unlawfully housed in administrative segregation, defendants Heimgartner, Jackson, and Patterson will not permit him physical access to the law library. As it is, plaintiff has to send form-9s to the untrained library clerks and request copies of cases, statutes, regulations, etc. Each request takes a week and quite often they respond that their resources are not unlimited and don't send anything.

105. Plaintiff's various litigations cover more than three dozen claims that encompass hundreds of legal points. All of these legal points must be properly researched which requires reviewing thousands of caselaws, statutes, regulations and other resources. Moreover, all of this research must be accomplished within stringent time limits.

106. Defendants have a strong incentive for purposely and vexatiously interfering with plaintiff's access to the law library, that is, to impede his successful litigation against them and their co-workers.

107. Plaintiff grieved this issue to defendants Patterson, Jackson, Heimgartner, Goddard, and Roberts, and every one of them refused to take corrective action.

## Property Limits and Legal Property

108. As previously stated, plaintiff has been incarcerated on this case continuously since his arrival at the KDOC

23

Reception and Diagnostic Center in Topeka in March, 1997.

109. Plaintiff has amassed a significant amount of legal files over the years as he has challenged an unconstitutional murder conviction via jury trial, direct appeal, KSA. 60-1507 action, 1507 appeal, federal habeas corpus, habeas appeal, a second 1507 action, and second 1507 appeal. Plus the files of dozens of civil actions.

110. Plaintiff has always removed case files from the facility once the case was over, but from 1998 to present plaintiff has always had four legal boxes of case files for active litigation. A legal box is only 18"long x 12"wide x 6"deep, so they only contain less than one cubic foot of files.

111. From October, 1997 through January 21, 2016, the amount of legal property plaintiff maintained was never an issue with the staff at LCF.

112. When plaintiff arrived at E.D.C.F., staff members seized all of his legal files and told him he had to get rid of all of them except one little box. Plaintiff proved to them that he had four active cases [Sperry v. McKune, et al, 14-112455-AS; Sperry v. LCF, 16-CV-2; Sperry v. State, 14-112143-AS; and Cope v. Dozier, et al, 14-CV-03058-SAC] plus all of the administrative documentation for this case, and they still refused to turn his files back over to him.

113. Defendants Hoshaw, Patterson, and Jackson adamantly refused to give plaintiff his legal files. Defendant Helmgartner made a determination that the extra case files would be stored and plaintiff would have to work with Patterson to access them so he can have the files on hand that he

needs at any given time. However, Patterson, Hoshaw and Jackson refused to honor his decision and Heimgartner refused to force them to.

114. Defendants' refusal to give plaintiff access to his legal files prevented him from filing a proper response to prison officials' motion to dismiss in Sperry V. LCF, and from filing an appeal brief in Sperry V. State, which resulted in dismissal and denial, respectively, in those cases.

115. Defendants' have an incentive for purposely interfering with plaintiff's legal files in that K.D.O.C. and its employees are defendants in the multimillion dollar suit in Sperry V. McKune, et al., and in Sperry V. LCF. and this suit.

116. Also, K.D.O.C. and its individual facilities generate millions of dollars in revenues each year by selling inmates all manner of property (e.g. clothes, shoes, televisions, radios, MP3/MP4 players, food products, hygiene items, monthly gift packages, etc.)

117. Their policy on property outlines all of the property that inmates may purchase and own, and the amounts of each item they may possess at one time (e.g. 2 pairs of boots, 1 pair of tennis shoes, 12 books, 10 magazines, sweat top, sweatpants, shower shoes, hot pot, alarm clock, 2 pair gym shorts, $150.00 worth of food and hygiene, $150.00 worth of arts and craft materials, to list a few).

118. Hidden in their policy, IMPP12-120, is a provision that says inmates must limit their property to what will fit into one 15" long x 13¾" wide x 21" deep (3½ cubic feet) box. This limitation is not enforced stringently. In fact, almost every inmate possesses more property than will fit in

25

one of these small boxes.

119. K.D.O.C staff, including defendants, do not restrict inmates from purchasing all of the stuff they offer to them. Nor do they check to see how much property the inmates possess before selling them more. This is because it would cost each facility tens of thousands of dollars in revenue each week as no inmates would be allowed to go spend their $50°° at the store or buy more shoes, boots, etc.

120. For over 18 years at L.C.F. plaintiff always had at least two property boxes full of personal property and four legal boxes and was never required to get rid of any of it. However, once defendants Wildermuth and Lucht decided to target plaintiff for abuse they started holding some of his legal files and personal property.

121. Once plaintiff arrived at E.D.C.F. defendant's Patterson, Hushaw, and Jackson seized all of his property and told him he had to get rid of everything that won't fit in one packout (property) box and one legal box.

122. Plaintiff objected to being forced to throw out property that he had paid K.D.O.C. good money for. Plaintiff was forced to throw away expensive shoes, sweats, gym shorts, and brand new cosmetics. He was also forced to mail out books and other items which deprives him of that property.

## Stolen, lost or destroyed property

123. When plaintiff was taken to segregation on September 23, 2015, half of his property was taken with him and

26

The other half was taken to the property room.

124. Plaintiff did receive the property inventory sheets and, upon reviewing them, noticed that none of his personal reading books and one of his fans were listed. Plaintiff filed a property claim on these books and fan, defendant Ross found the books but not the fan, yet the claim was still denied.

125. Defendant Ross falsely stated that plaintiff signed the property sheets when he had not. In fact, plaintiff had immediately filed the property claim.

126. In retaliation for plaintiff filing that property claim, and in collusion with defendants Wildermuth and Luchts conspiracy to violate plaintiff's civil rights, defendant Ross seized several of plaintiff's legal manuals and a novel manuscript.

127. Plaintiff had bound his loose-leaf legal manuals and the manuscript to keep them neat and tidy. Defendant Ross called them "homemade books" and said they were contraband. Plaintiff sent him a form-9 informing him there was no rule against binding my legal materials or the manuscript, that it was no different than stapling them together, but he refused to return them.

128. Plaintiff filed a property claim for one million dollars for the illegally seized property and defendants denied it.

129. In November, 2015, plaintiff turned in his laundry bag in C-1 segregation with 2 pairs of boxers, 2 T-shirts,

27

and 2 pairs of sock, all of which he had purchased from the prison store (canteen). The laundry bag was never returned to plaintiff. Plaintiff reported the missing bag to the officer on shift who admitted that he put it in the wrong cell, couldn't remember which one, and refused to go search for it.

130. Plaintiff filed a property claim for the property lost by prison employees. Defendant Ross admitted that plaintiff had turned in the bag of clothes, and that they were lost, but that KDOC should not be responsible. He falsely states that store bought underclothes cannot be laundered when no such rule exists. Defendants denied the claim.

131. LCF. has strict living unit rules that prohibits inmates from washing any clothes in their cells. The prison laundry is the only way to launder the underclothes that the prison sells to the inmate population.

## Embezzlement of interest on Inmate Account

132. Kansas law mandates that K.D.O.C. maintain the money of the inmate population separate from K.D.O.C.'s revenues.

133. Kansas law also mandates that inmate money be placed into interest bearing account and that the interest be distributed proportionately to each inmate monthly.

134. From March, 1997 to February, 2012, the interest on plaintiff's account was credited to his account every single month.

135. In February, 2012, K.D.O.C. officials hatched the scheme

To embezzle the interest earned on the inmates money and divert it to fund the Kansas Department of Corrections.

136. Prison officials told the inmate population a lie about the account maintenance fees being more than the interest earned. This is not possible because K.D.O.C. accountants earn a salary paid out of its annual budget and banks do not rob their investors' interest in the name of management fees.

137. Plaintiff owns his money and the interest paid on it, and he has not authorized anyone to steal it or borrow it for any purpose whatsoever.

138. Defendant Wildermuth acknowledges in her response to plaintiff's grievance that K.D.O.C. has been taking the one dollar per month from every inmates account the entire time they have been embezzling the interest, and she claims those funds are for "System Maintenance."

139. This one dollar per month is netting K.D.O.C. more than $100,000.00 a year for "maintenance." There are no set of account maintenance fees that could possibly run in excess of $100,000.00. Not legally, anyways.

## Biased Disciplinary Hearings

140. K.A.R. 44-13-502a requires a "complete written record shall be made of the disciplinary hearing."

141. Kansas disciplinary proceedings are quasi-judicial in nature and are strictly for punitive purposes. These proceedings always have negative effects on the prisoner, such as extending his incarceration by forfeiting good time, loss

of money from fines, and loss of property (most often permanently) by loss of incentive level.

142. The United States and Kansas Constitutions, and K.A.R. 44-13-105 (b) mandate that prison disciplinary hearing officers be unbiased and that the hearings be fair.

143. Plaintiff has been incarcerated for over 20 years on his current sentence, and during that time he has received over 25 disciplinary reports. Each one required a disciplinary hearing to either plead no contest, but most ofter to fight the allegations.

144. In every single hearing, the hearing officer was always another prison guard who was good friends with the guard who had written the D.R. Also, at every hearing that plaintiff fought the allegations against him the hearing officer would tell him that it does not matter what he says because he is going to be found guilty. These hearing officers included defendants Bosch and Hunt.

145. In every disciplinary hearing, except one, the hearing officer, including defendants Bosch and Hunt, refused to make a complete record of the proceedings, plaintiff's legal arguments, or witness testimony. They only record what suits their predetermined finding of guilt and adamantly refuse to record their erroneous rulings, like Bosch's "I don't have to follow the regulations" and "Those procedural regulations are meaningless," or Hunt's "yeah, I believe you, but I have to find you guilty or I'll lose my job."

146. The only time a hearing officer ever made a complete record was in 2012, when Lt. Ayala conducted plaintiff's

hearing personally, even though she was not a hearing officer. She altered the testimoney of each witness from what they had actually said to circumvent plaintiff's valid legal challenges.

147. On two occasions, December, 2014 and July, 2015, defendant Bosch decided to forego any formal hearing by employing the coercion tactic of informing plaintiff from the start, "you're going to be found guilty and the only question is if I'm going to send you to the hole or not."

148. Plaintiff has assisted hundreds of inmates with their disciplinary cases over the years and in every single case the inmate had similar experiences with the hearing officers, including defendants Bosch and Hunt.

149. It is impossible for plaintiff, or any other inmates, to challenge this corrupt and biased behavior because the hearings are conducted in secret and the record says what the hearing officer wants it to say. Needless to say, the courts always take the side of the state officials over the word of 20 inmates.

150. Plaintiff filed a grievance against the corrupt and biased disciplinary system, not against any of his disciplinary cases, requesting that KDOC start using neutral, unbiased civilian hearing officers and that they start audio/video recording all disciplinary proceedings. These are simple provisions that would not cost KDOC. anything to implement and are required under contemporary standards of fair and open governance.

151. Defendants refused to process the grievance, but plaintiff appealed in to the Secretary of Corrections.

## CORRUPT AND UNLAWFUL GRIEVANCE SYSTEM

152. Under Kansas law (K.S.A. 75-5251), The Secretary of Corrections is required "To examine and inquire into all matters connected with the government and discipline of the correctional institutions."

153. To this end a grievance system was created decades ago to allow inmates to address illegalities, improprieties, and abuses by prison employees. The grievance system should, in theory, act as a deterent for official abuses, but when it is not enforced it becomes a meaningless charade.

154. The grievance process, and other administrative review procedures, are more crucial and essential in the prison setting than other governmental agencies because the health and welfare of thousands of incarcerated citizens is left in the hands of grossly unqualified and incompetent state employees.

155. More importantly, the federal and Kansas governments have created statutory barriers that prevent inmates from seeking protection and relief from the courts until after they have traversed the months long and technical administrative review process.

156. In the 19+ years spanning from March 1997 through August 2016 plaintiff has witnessed tens of thousands of abuses committed by state employees against inmates. These abuses run the gamut from being rude and disrespectful, denying privileges, destroying personal property, erroneous classifications, violating civil rights, retaliatory acts, unlawful segregation, battery, and even wrongful death, just to name a few.

157. During that 19+ years, as a jailhouse lawyer and law library clerk, plaintiff has observed the filing of thousands upon thousands of grievances and other ad-

ministrative review actions by inmates seeking redress of abuses. However, not a single time has plaintiff heard of corrective measures being taken as a result of an inmate-initiated grievance, and rarely via any other administrative review process.

158. Over that 19+ years plaintiff has observed several hundred instances where an inmate, himself and others, have threatened to file a grievance and the staff member would snidely retort, "go ahead, that won't do anything."

159. Over that 19+ years plaintiff has filed over a hundred grievances and other administrative remedies, including all of those preparing for this litigation, and KDOC officials have never taken corrective/remedial action. Plaintiff has never filed a frivolous or baseless administrative remedy.

160. K.D.O.C. and its employees, including the defendants, only create and abuse their multiple administrative review procedures to obstruct, hinder, delay, or otherwise vex plaintiffs, and other inmates' access to the courts.

161. Defendants have unnecessarily created separate administrative review procedures for disciplinary, property claims, personal injury claims, censorship claims, classification claims, etc., even though each one has to go through the exact same set of people. Moreover, these procedures have different unreasonable, and sometimes unlawful, restrictions (3-days for grievance to warden, 10-calendar days for injury claim, 15-business days for property claim, etc.) that serve no purpose other than to trip up the undereducated inmate population.

162. As plaintiff's administrative remedies reveal, every

one of his claims constitutes a violation of constitutional, statutory, or regulatory law that should have been addressed and remedied by the defendants, yet they all refused to take any action at all.

## Denial of Rights and Privileges

163. I.M.P.P. 20-105 (II) is very succinct in its provisions:
   IV. Privileges and Rights in Administrative Segregation
   A. Each offender in administrative segregation shall be treated as nearly as possible like any other offender in the general population of the institution or facility.
   B. When possible, the offender shall retain such privileges, property, and programs as are commensurate with the particular circumstances or conditions for which the offender was placed in administrative segregation.
      1. When privileges, property, and/or programs are restricted, the following needed to be documented:
      a. The opportunities that have been limited;
      b. The reason for the limitation; and
      c. The duration of the limitation.
   C. Administrative segregation shall not be used or considered as punishment.

164. Plaintiff has been unlawfully held in administrative segregation since October 6, 2015.

165. Since October 6, 2015, plaintiff has been unlawfully denied the following rights and privileges that are enjoyed by the general population without any justification:
   A. Contact visits with family and friends;
   B. access to law library and ability to conduct research on all four active cases;

34

C. access to general library, its newspapers and reference materials;

D. incentive pay;

E. access to the rec yard and track where 53-year old plaintiff can get appropriate and necessary exercise;

F. access to all personal property (lamp, boots, pencils, pens, nail clippers, tweezers, etc.);

G. access to all store/canteen items (under clothes, greeting cards, baby oil, toilet paper, emery boards, and dozens of other items);

H. access to shower every day;

I. access to jpay financial and email account paid for;

J. access to mp3/mp4 player and kiosk paid for;

K. access to monthly fundraiser meal programs;

L. access to Aramark's weekly meal programs;

M. access to activities and self-help programs

166. Plaintiff has never been written up for any acts of violence, possession of weapons, causing any disturbances, disrespect, or any other misbehavior that would warrant restricting his rights and privileges.

167. Defendants placed plaintiff in administrative segregation and have denied him all of his rights and privileges to prevent him from accessing the law library and to punish him for his successful litigation against them and their friends.

## Union Supply - Canteen

168. In 2013, defendants decided to abandon the prison operated Canteen (store) that effectively served the inmate population and generated a lot of revenue for K.D.O.C., and contracted with a California based corporation called Union Supply to provide the Canteen service.

169. The contract entered into by Union Supply for the benefit of plaintiff requires that they supply plaintiff with an equal selection of items, of comparable quality and price as what was previously provided by the prison operated canteen.

170. In breach of the contract, defendant Union Supply has dropped the quality of the products and/or increased the prices of them drastically. Some prima facie examples are:
   A. discontinued Dial (65¢) and Tone (80¢), and replaced them with generic Level 10 soaps for ($1.20), and raised the Irish Spring from 73¢ to $1.32.
   B. discontinued Bic ink pens for 12¢ each an' replaced them with generic Simlines of same size for 50¢ each, and they now charge 50¢ each for half size safety flex pens that prison has always given away free to segregation inmates.
   C. Ramen soups went from 13¢ to 28¢ each.
   D. Hane's boxer shorts for $3.50 a pair went to generic Great Sport boxers for $4.00 a pair.
   E. Brushy Creek hot pots went from $12 to $25.
   F. Cologne oil went from 1 ounce for $4 to ½ ounce for $4.

171. Strangely, and probably unlawfully, Deputy Warden Kyle Deere quit K.D.O.C. and took a job with Union Supply for a large increase in pay, which indicates impropriety and criminality.

172. In 2015, Union Supply started charging plaintiff, and all inmates, sales tax on all of their purchases.

173. Plaintiff, as a prison inmate, is a ward of the state which makes him part of the state and the imposition of the sales tax is an unlawful taxation of the state.

174. If it should be determined that plaintiff is not

36

part of the state exempt from sales tax then the state will owe him back pay at the rate of Kansas prevailing wage for all of the years he was forced to work for the state.

175. Plaintiff requested defendants Patterson, Heimgartner, and Roberts to intervene and enforce the "equal quality at comparable price" provisions of the contract, and to put a stop to the illegal taxation, but they refused. They benefit from both of these illegalities.

## Brothers - In - Blue

176. Defendant Raymond, in league with the Christian faith organization Prison Fellowship Ministries, created a Christian faith based prison program called the Innerfaith Freedom Initiative (I.F.I.) in the Iowa prison system in the late 1990's.

177. Defendant Raymond and his religious organization entered into unlawful contracts with officials with the Iowa Department of Corrections to receive taxpayer funds to establish and operate his religious organization to convert inmates to Christianity.

178. In the mid-2000's, Don Raymond and his organization lost their case when a federal district court ruled that they were illegally accepting government funds in violation of the First Amendments separation of church and state doctrine, and that ruling was affirmed by the federal court of Appeals.

179. Upon being evicted from the I.D.O.C., defendant Raymond and his organization (I.F.I.) came to Kansas and entered into a similar unlawful agreement to set up I.F.I. in the Kansas Department of Corrections (K.D.O.C.) with defendant Ray

Roberts, who was then the Warden at the El Dorado Cor-
rectional Facility (E.D.C.F.).

180. After a couple of years they got the blessing of
Kansas Governor Sam Brownback and moved the program
from E.D.C.F. to the Lansing Correctional Facility (LCF)
which is near Metropolitan Kansas City.

181. Within the first couple of years at LCF, defendant
Raymond learned that inmates had access to legal resour-
ces and knew that he and I.F.I. had been sued out of
the I.D.O.C. so they changed the name of the program to
Brothers In Blue.

182. The program absolutely mandates that the inmates con-
vert to Christianity, even if they are already identified with
another religion (eg. Muslim, Jewish, Native American, Buddhist,
etc.). Any inmate who appeared to challenge any of the programs
indoctrination are summarily dismissed from it.

183. The program is not open to everyone. People with a history
of litigation experience, a documented Muslim, et cetera, are
automatically rejected. Plaintiff's request was automatically
rejected because of his litigation history.

184. KDOC staff give support to, and their Prisoner Review
Board grants, parole for those inmates who participate
in this Christian conversion program, but routinely
deny parole to inmates who are atheist or identify
with other religions.

185. Defendant Raymond and his program illegally accepts
funding, resources, and manpower from the KDOC and its
staff members. Not just monetary support, but also tables

38

chairs, desks, computers, buildings, security staff for their special parties and functions, et cetera.

186. K.D.O.C. and its staff have given entire sections of the prison to defendant Raymond and his program. Currently they have the entire third floor of Q-Cellhouse, almost all of the medium education department, they were given the entire medium facility visitation building and inmate visitation was moved to a very small room (⅓ the size of previous area), and they have complete control of the medium inmate assembly area.

187. Inmates who join this Christian conversion program are granted extra privileges and benefits that the rest of the inmate population do not get. Such as:
   A. Their family and friends get to come in for extra visits, parties, dinners, and other events.
   B. They get access to new computers and special training programs.
   C. They have access to mental health programs, career and job training programs, and other rehabilitation programs.
   D. They get special parties, meals, etc. every month.
   E. They are given the private industry jobs upon completion of the program.
Just to name a few.

188. Other religious and non-religious programs are not permitted to do any of the special projects and parties, or bring in outside visitors, family, and friends, or access the state resources, like Brothers-In-Blue does.

## CLAIMS FOR RELIEF

189. The actions of defendants Wildermuth, Lucht, Winklebaver,

39

Pryor, Patterson, Hoshaw, Jackson, and Heimgartner in illegally placing and restraining plaintiff in administrative segregation is a violation of his Eighth Amendment right to be free from cruel and unusual punishment; his Fourteenth Amendment rights to Equal protection and due process of law; his First Amendment right to association and consortium with his family and friends; constitutes a criminal conspiracy to violate his civil rights; and constitutes the torts of outrageous conduct, mistreatment of a confined person, breach of fiduciary relationship, and negligence, under Kansas law.

190. The actions of defendants Wildermuth, Pryor, Burris, Goddard, and Roberts, in exposing plaintiff to roach infested cells for three months is a violation of his Eighth Amendment right to be free from cruel and unusual punishment; and the torts of battery, outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence, under Kansas law.

191. The actions of defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts, in depriving plaintiff of sleep every single day is a violation of his Eighth Amendment right to be free from cruel and unusual punishment; constitutes a conspiracy to violate his civil rights; and constitutes the torts of battery, outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence, under Kansas law.

192. The actions of defendants Corizon, Inc., Rebecca (LNU), Brundage, Ross, Pryor, Burris, Goddard, and Roberts, in failing to notify plaintiff regarding his Hepatitus-C infection, and in failing to treat it, constitutes a violation of of his Eighth Amendment right to be free from cruel and unusual punishment; constitutes a conspiracy to violate

his civil rights; constitutes medical malpractice; and the torts of outrageous conduct, battery, mistreatment of a confined person, breach of fiduciary duty, and negligence, under Kansas law, and breach of contract.

193. The actions of defendants Lee, Booth, Sapien, Shipman, Winklebauer, Pryor, Heimgartner, Burris, Goddard, and Roberts, in seizing and censoring plaintiff's non-pornographic publications, books, and photos based on incompetence and/or retaliation for filing complaints, constitutes a violation of his First Amendment rights; his Fourteenth Amendment rights to due process and equal protection of the law; constitutes a conspiracy to violate his civil rights; and constitutes the torts of property deprivation, outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence, under Kansas law.

194. The actions of defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts, in denying plaintiff access to the law library, based on incompetence and re-taliation, constitutes a violation of his First Amendment right to access the courts; and his Fourteenth Amendment rights to due process and equal protection of the laws; constitutes a conspiracy to violate his civil rights; and constitutes the torts of outrageous conduct, breach of fiduciary duty, and negligence, under Kansas law.

195. The actions of defendants Ross, Pryor, Patterson, Jackson, Hoshaw, Heimgartner, Burris, Goddard, and Roberts, in unlaw-fully seizing plaintiff's personal and legal property, and in op-erating a racket of selling him property that they later seize so they can sell him more, constitutes a violation of his First Amendment right to access the courts; his Fourteenth Amendment rights to due process and equal protection of the

law; a violation of the Racketeer Influence and Corrupt Organization Act; it constitutes a conspiracy to violate his Civil rights; and the Torts of conversion, outrageous conduct, breach of fiduciary duty, and negligence, under Kansas law.

196. The actions of defendants Roberts, Goddard, Burris, Pryor, Heimgartner, and Wildermuth, in embezzling, or permitting the embezzlement of, the interest from plaintiff's financial accounts constitutes a violation of his Fifth Amendment protection from governmental taking; and his Fourteenth Amendment rights to due process and equal protection of the law; it Constitutes embezzlement under the R.I.C.O. Act; a conspiracy to violate his civil rights; and the torts of conversion, outrageous conduct, breach of fiduciary duty, and negligence, under Kansas law.

197. The actions of defendants Bosch, Hunt, Pryor, Goddard, and Roberts in failing to give plaintiff fair, unbiased, and properly documented disciplinary hearings are a clear violation of his First Amendment right to access the courts; his Fourteenth Amendment rights to due process and equal protection of the laws; a conspiracy to violate his civil rights; it constitutes the torts of outrageous conduct, mistreatment of a confined person, and negligence; and also violates Kansas law, statutory and regulations; also, breach of fiduciary duty.

198. The actions of defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts in making a meaningless mockery out of the grievance system violated plaintiff's First Amendment right to access the courts; constituted a conspiracy to violate his civil rights; constitutes the torts of outrageous conduct and negligence under Kansas law; and also violates other Kansas statutes and regulations; also a breach of fiduciary duty.

42

199.  The actions of defendants Patterson, Jackson, Heimgartner, Goddard, Burris, and Roberts, in denying plaintiff all of his rights and privileges have violated his First Amendment rights of freedom of association and access to the courts; and his Fourteenth Amendment rights to due process and equal protection of the laws; constitutes a conspiracy to violate his civil rights; the torts of outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence; and is a clear violation of Kansas statutory and regulatory law.

200.  The actions of defendants Union Supply, Guble, Heimgartner, Burris, Goddard, and Roberts in privatizing the prison canteen service for the benefit of private individuals, and in dropping the quality of products and increasing their prices, constitutes an unlawful monopoly and a conspiracy pursuant to the R.I.C.O. Act; a breach of contract; the torts of outrageous conduct and breach of fiduciary duty; violates Kansas statutory and regulatory law; and they are unlawfully charging sales tax.

201.  The actions of defendants Raymond, Pryor, Burris, Goddard, and Roberts in setting up, supporting, promoting, and funding the Christian based Brothers In Blue program clearly violates the First Amendments separation of church and state provision; violates plaintiff's Fourteenth Amendment rights to equal protection of the laws and due process; and the torts of outrageous conduct and breach of fiduciary duty.

## Exhaustion of Administrative Remedies

202.  Plaintiff has exhausted his administrative remedies on each of the issues raised in this complaint by way of form-9s, grievances, or property/injury claim forms, as required by administrative regulations.

43

<u>Relief Requested</u>

A. Plaintiff seeks injunctive relief from the Court ordering the defendants to:

1. release plaintiff from the unlawful administrative segregation;

2. immediately implement protocols to allow plaintiff at least 8-hours of uninterrupted sleep;

3. immediately treat plaintiff's Hepatitis-C with Harvoni;

4. stop seizing plaintiff's books, magazines, and pictures that are not labeled as pornography under federal law;

5. make arrangements for plaintiff to physically access the prison law library at least 10-hours each week while in administrative segregation;

6. immediately store all of plaintiff's legal materials in his cell;

7. immediately start pay plaintiff interest on his inmate trust accounts;

8. implement changes to the institutional disciplinary system to employ independent hearing personnel and to audio/video record all disciplinary proceedings;

9. implement sweeping changes to all administrative review proceedings so that they are legitimate and effective;

10. to immediately grant plaintiff all of the rights and privileges enjoyed by general population inmates;

11. discontinue the illegal sales tax collection; and

12. immediately remove the Brothers In Blue program from LCF.

B. Plaintiff seeks a declaratory judgment from a jury stating that defendants have his rights and the law, federal and state, as outlined in paragraphs 189 through 201 above.

C. Compensatory damages awarded by the jury in the following amounts:

1. $1,000.00 per day for every day plaintiff is unlawfully held in administrative segregation against defendants Wildermuth, Lucht, Ross, Winklebaver, Pryor, Patterson, Hoshaw, Jackson, and Heimgartner, jointly and severally.

2. $1,000.00 per day for each day plaintiff was subjected to the extreme roach infestation against defendants Wildermuth, Pryor, Ross, Burris, Goddard, and Roberts, jointly and severally.

3. $1,000.00 per day for each day plaintiff was deprived of sleep against defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts, jointly and severally.

4. $1,000,000.00 against defendants Corizon, Inc., Rebecca (LNU), Brundage, Ross, Pryor, Burris, Goddard, and Roberts for the irreparable damage caused by their failure to treat his hepatitis-C, jointly and severally.

5. $10,000.00 against defendants Lee, Booth, Sapien, Shipman, Winklebaver, Pryor, Heimgartner, Burris, Goddard, and Roberts for the unlawfully seizing plaintiff's books, magazines, pictures, and chilling the future exercise of his First Amendment rights, jointly and severally.

6. $50,000.00 against defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts for lost litigation, and the additional work created thereby, by their denial of access to the law library or people trained in the law, jointly and severally.

7. $1,000,000.00 against defendants Ross, Pryor, Patterson, Hoshaw, Jackson, Heimgartner, Burris, Goddard, and Roberts for the seized, converted, lost or destroyed property, jointly and severally.

8. The amount of interest embezzled from plaintiff's trust accounts against defendants Wildermuth,

Pryor, Heimgartner, Burris, Goddard, and Roberts, jointly and severally.

9. $10,000.00 against defendants Bosch, Hunt, Pryor, Patterson, Jackson, Heimgartner, Burris, Goddard and Roberts for the cost and labor of having to litigate court cases because they refused to resolve disciplinary cases and administrative review procedures appropriately, jointly and severally.

10. $50,000.00 against defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts for deprivation of consortium between plaintiff and his family, and loss of enjoyment of rights and privileges, jointly and severally.

11. $1,000.00 against defendants Union Supply Group, Cauble, Heimgartner, Burris, Goddard, and Roberts for unlawful enrichment and illegal sales tax taken through illegal canteen service and breach of contract, jointly and severally.

D. Punitive damages in the amount of $1,000,000.00 against all defendants, jointly and severally.

E. Cost and attorney fees for filing and litigating this action.

F. Any other awards the court or jury deem just and fair.

JEFFREY J. SPERRY

VERIFICATION

46

I, Jeffrey J. Sperry, hereby swear, under the threat of penalty for perjury pursuant to 28 U.S.C. §1746, that I have read the foregoing complaint, that I know the contents thereof, and the matters therein stated are true.

JEFFREY J. SPERRY

Jeffrey J. Sperry 47031
E.D.C.F., P.O. Box 311
El Dorado, KS 67042

47