JEFFREY J. SPERRY 47031
E.D.C.F., P.O. BOX 311
EL DORADO, KS 67042

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

**JEFFREY J. SPERRY,**
      plaintiff

    V.

**LINDSEY WILDERMUTH,**
**RAYMOND ROBERTS,**
**JOHNNIE GODDARD,**
**DOUGLAS BURRIS,**
**BILL SHIPMAN,**
**REX PRYOR,**
**COLLETTE WINKLEBAUER,**
**ANDREW LUCHT,**
**CHRISTOPHER ROSS,**
**KEVIN BOSCH,**
**(FNU) HUNT,**
**K. LEE,**
**JAMES HEIMGARTNER,**
**ROBERT SAPIEN,**
**PHILLIP PATTERSON,**
**LARRY HOSHAW,**
**DANIEL JACKSON,**
**HANNAH BOOTH,**
**CORIZIN HEALTH, INC.,**
**REBECCA (LNU),**
**(FNU) BRUNDAGE,**
**UNION SUPPLY GROUP, INC.,**
**JACK CAUBLE, and**
**DON RAYMOND,**
        defendants      /

Case No.  **16-3222-SAC-DJW**

AMENDED CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 U.S.C. §1983

## JURY TRIAL DEMANDED

### A. JURISDICTION

1) Plaintiff Jeffrey J. Sperry, is a citizen of Missouri, who is presently incarcerated in the Kansas Department of Corrections at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042.

2) Defendant Lindsey Wildermuth, is a citizen of Lansing, KS, and was employed as a Unit Team Manager at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at

the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in her individual and official capacity.

3) Defendant Raymond Roberts was a citizen of Topeka, KS, and was employed as the Secretary of Corrections at 714 S.W. Jackson, Topeka, KS 66603, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

4) Defendant Johnnie Goddard is a citizen of Topeka, KS, and was employed as a Deputy Secretary of corrections at 714 S.W. Jackson, Topeka, KS 66603, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

5) Defendant Douglas Burris is a citizen of Topeka, KS, and was employed with the Kansas Department of Corrections, 714 S.W. Jackson, Topeka, KS 66603, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

6) Defendant Bill Shipman is a citizen of Topeka, KS, and was employed as a Deputy Secretary of Corrections at 714 S.W. Jackson, Topeka, KS 66603, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

7) Defendant Rex Pryor was a citizen of Lansing, KS, and was employed as the Warden of the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

8) Defendant Collette Winklebauer was a citizen of Lansing, KS, and was employed as the Deputy Warden of Programs at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in her individual and official capacity.

9) Defendant Andrew Lucht was a citizen of Lansing, KS, and was employed as a correctional officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sue in his individual and official capacity.

10) Defendant Christopher Ross was a citizen of Lansing, KS, and was employed as the Grievance and Property Claims Officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

11) Defendant Kevin Bosch was a citizen of Lansing, KS, and was employed as the disciplinary hearing officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

12) Defendant (FNU) Hunt was a citizen of Lansing, KS, and was employed as the disciplinary hearing officer at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

13) Defendant K. Lee was a citizen of Lansing, KS, and was employed as a mail room clerk at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in her individual and official capacity.

14) Defendant James Heimgartner was a resident of El Dorado, KS, and was employed as the Warden of the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

15) Defendant Robert Sapien was a resident of El Dorado, KS, and was employed as the compliance officer at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

16) Defendant Phillip Patterson was a resident of El Dorado, KS, and was employed as a unit team counselor at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in is individual and official capacity.;

17) Defendant Larry Hoshaw was a resident of El Dorado, KS, and was employed as a unit team manager at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

18) Defendant Daniel Jackson was a resident of El Dorado, KS, and was employed as a unit team manager at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

19) Defendant Hannah Booth was a resident of El Dorado, KS, and was employed as a mail room clerk at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in her individual and official capacity.

20) Defendant Corizon Health, Inc. was a resident of 103 Powell Court, Brentwood, Tennessee, 37027, and was contracted as the health care provider for the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in its individual and official capacity.

21) Defendant Rebecca (LNU) was a resident of Lansing, KS, and was employed as a nurse by Corizon Health, Inc. to provide health care services to inmates at the Lansing Correctional Facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in her individual and official capacity.

22) Defendant (FNU) Brundage was a resident of El Dorado, KS, and was employed as a nurse by Corizon Health, Inc. to provide health care services to inmates at the Lansing Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in her individual and official capacity.

23) Defendant Union Supply Group, Inc., is a resident of California, with a Kansas office at 714 S.W. Jackson, Topeka, KS 66603, and was contracted with the Kansas Department of Corrections, 714 S.W. Jackson, Topeka, KS 66603 to provide commissary services to the inmate population at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in its individual and official capacity.

24) Defendant Jack Cauble is a resident of Hutchinson, KS, and was employed by Union Supply Group, Inc., to manage the commissary services to inmates at the El Dorado Correctional Facility, 1737 S.E. Hwy. 54, El Dorado, KS 67042, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

25) Defendant Don Raymond was a resident of Lansing, KS, and was employed as the president of the Brothers in Blue religious program at the Lansing Correctional facility, 301 E. Kansas Ave., Lansing, KS 66043, at the time the claims alleged in this complaint arose, and was acting under the color of state law. Defendant is sued in his individual and official capacity.

26)     Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3); 42 U.S.C. §1983; 42 U.S.C. §1331; 28 U.S.C. §1332; 28 U.S.C. §1367; K.S.A. Chapter 60 and Kansas Tort Claims Act.

## B. NATURE OF THE CASE

1)     Briefly state the background of your case: Plaintiff has been held in the custody of the Kansas Department of Corrections since April 1997. Over this two decades, plaintiff has watched the steady decline of the KDOC into incompetence and corruption. Also during that time, plaintiff assisted hundreds of inmates process legal challenges to violations of their civil rights. Numerous times plaintiff has had to litigate violations of his own civil rights. In September 2015, prison officials started targeting plaintiff for mistreatment and retaliation. The KDOC has a system established where every member in the administration conspires with every other member to violate the constitutional and civil rights of plaintiff and every other inmate. Former Secretary of Corrections Ray Roberts and Deputy Secretary Johnnie Goddard are defendants in every claim stated in this complaint as they are personally involved in directing and permitting every violation alleged. They perpetuate a system that permits every staff member to violate the rights of prisoners knowingly, and those violations remain unchecked throughout the administrative review process, all the way to Roberts and Goddard.

## C. CAUSE OF ACTION

1) I allege that the following of my constitutional rights, privileges or immunities have been vio-

lated and that the following facts form the basis for my allegations:

(A)(1) Count I: Defendants Roberts, Goddard, Wildermuth, Lucht, Winklebauer, Pryor, Patterson, Hoshaw, Jackson, and Heimgartner, maintained an illegal system of placing inmates into long-term administrative segregation when the inmates did not qualify for such placement pursuant to state regulation. These defendants specifically targeted plaintiff for such illegal placement in retaliation for his successful litigation against KDOC and its staff members, which is a clear violation of plaintiff's rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution, and further constitutes a conspiracy to violate plaintiff's civil rights; plus it constitutes the torts of outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence, under Kansas law.

(2) Supporting Facts: In the 19+ years leading up to September 2015, plaintiff had never had a disciplinary report for any violent acts, weapons, or anything else that would be considered a

threat to the safety and security of the facility. In fact, in that 19+ years, plaintiff had only been taken to segregation twice. Once in December 2000 for relationship with staff and once in February 2010 for possession of a cellphone.

In 2014, plaintiff assisted inmate Del Ludlam in litigating an illegal "sex offender" classification claim against defendant Wildermuth. She had refused to remove the illegal classification from Mr. Ludlam and went out of her way to make sure that she took all of his privileges, good time credit, and his property. Then she became extremely angry at Mr. Ludlam and plaintiff when the Leavenworth District Court issued an order declaring that Wildermuth was wrong.

Also in 2014, plaintiff assisted inmate Michael Cote in filing a lawsuit against KDOC and some of the medical staff for poisoning him and almost killing him. Defendant Wildermuth had initially ap- proved plaintiff going to the clinic and assisting Mr. Cote in that matter. Then, once the lawsuit was actually filed [COTE V. DOZIER, et al., 5:14-CV-03058 (D. Kan.)], Wildermuth and several of the other defendants decided to bar plaintiff from assisting Mr. Cote any further. In fact, they went to the extreme measure of pulling a van up to the clinic doors one night and shipping an extreme sick Cote back to the New Mexico Department of Corrections. Mr. Cote had been incarcerated in the KDOC on a corrections compact for over 20 years at the time.

Then, in June 2015, the Court of Appeals issued an order in plaintiff's appeal in SPERRY V. MCKUNE, et al., 112,455 (asbestos/lead paint exposure case] remanding the case back to the district court for trial. This greatly upset KDOC officials who stand to lose millions of dollars in a judgment because the evidence in plaintiff's favor is overwhelming.

Finally, Defendant Lucht had tried to have plaintiff prosecuted for trafficking contraband in a penal institution in Leavenworth District Court in the Spring of 2015. Once the district attorney learned that the allegations leveled by Lucht were suspect, the district attorney immediately dismissed the case against plaintiff. The dismissal occurred August of 2015, just a couple of weeks before the defendants targeted plaintiff for the illegal placement into long-term administrative segregation.

September 23, 2015, officers were sent to target plaintiff's cell for a search and they allegedly found a couple of broken syringes and about 5 cigarettes worth of tobacco, for which plaintiff was taken to segregation and issued a disciplinary report. Plaintiff went to segregation review the next day where defendants Wildermuth and Lucht conducted the hearing, along with mental health counselor Chahine. During this review, Wildermuth made the comment to plaintiff, "get comfortable, you belong to me now!"After the review, counselor Chahine asked Wildermuth and Lucht why they were treating plaintiff so poorly, to which Lucht asked her, "why, do you like him?" They further told her it was none of her business, even though she was plaintiff's mental health counselor.

Plaintiff pled no contest to the D.R. and receive 30 days disciplinary segregation. 13 days into this sentence, Unit Team counselor Ball ordered plaintiff to be released from disciplinary segregation and defendant Lucht told him not to release plaintiff from seg because they were going to keep him in administrative segregation. Several weeks later, Wildermuth issued a Administrative Segregation Report (ASR) as her basis for placing plaintiff into administrative segregation as Other Security Risk (OSR).In this report, she alleged:

    a. On 8-11-99, inmate was sent to segregation for relationship with staff,

    b. On 11-2-05, inmate was sent to segregation for asking another inmate to look up books about starting a non-profit organization,

    c. On 9-27-07, inmate was sent to seg a third time for a debt sheet with other inmates names on it,

    d. On 1-9-08, inmate was sent to seg a fourth time for inappropriate use of a computer,

    e. On 2-23-12, inmate was sent to seg a fifth time for possession of a cellphone, cash, K-2, and tobacco,

    f. On 8-12-12, inmate was sent to seg a sixth time because contraband was found in the library where he worked,

    g. On 9-27-12, E.A.I. received anonymous information that inmate was handing "things" out in the library where he worked,

    h. On 7-31-13, inmate was sent to seg a seventh time for investigation of doing legal work for a prison staff member,

    i. On 4-14-14, inmate was sent to seg an eighth time for K-2 and methamphetamine found in his cell,

    j. On 5-6-14, inmate was sent to seg a ninth time for sexual activity,

    k. On 9-25-15, inmate was sent to seg for a tenth time for two "loaded" syringes that inmate admitted was methamphetamine, and

    l. E.A.I. department has two cases pending against Sperry, CO-14-0037-01 and CO-15--115-01.

Because this ASR was full of falsehoods, plaintiff immediately sent a form-9 to Wildermuth informing her of the falsehoods and demanding that she correct it. The falsehoods were:

    a. went to seg for relationship with staff on 12-13-00, not 8-12-99,

    b. never went to seg and no D.R. for asking anyone to look up non-profit books,

    c. never went to seg and no D.R. for debt sheet,

    d. was move from the medium facility to the max facility for using education computer in library, but never went to segregation,

    e. did go to seg for second time ever on 2-23-10, but only for cellphone and cash, not for K-2 or tobacco,

    f. never went to seg and no D.R. for contraband found in common area of library, staff did lay inmate in from his law library job for now reason,

g. any allegation that Sperry was "handing things out" in the library where he worked on 9-27-12 is a blatant lie as the staff took his library job on 8-12-12,

h. never went to seg, and no D.R. for suspicion of doing legal work for staff member,

i. never went to seg on 4-14-14, but did receive a D.R. for a minor amount of alleged K-2 and methamphetamine. Did not receive any seg time when inmate pled guilty to the contraband,

j. was taken to seg on 5-6-14 for alleged sexual activity, but only held 24 hours until E.A.I. Zamora determined the allegation to be unfounded,

k. there were no "loaded" syringes found on 9-23-15, no drugs were involved, and Sperry never admitted to any drugs, and

l. there were no cases pending against Sperry. The one attempted prosecution for what was apparently CO-14-0037-01 had been dismissed a few weeks before the defendants targeted plaintiff for retaliatory attacks, and there never was any case under the alleged CO-15-0115-01.

Incredibly, Wildermuth never refuted that the ASR was full of falsehoods. Rather, she simply said it was the fault of E.A.I., which had been run by defendant Lucht for the previous several years. Nevertheless, the defendants refused to correct the document.

Not only was it full of falsehoods, it failed to allege a legal basis for the placement into administrative segregation. While the report claims that plaintiff was being place there as Other Security Risk (OSR), nowhere does it assert that plaintiff posed a "threat to the safety or security of the facility," which is required for OSR classification under IMPP 20-104(I)(B)(13). Plaintiff can list at least 50 inmates who have been caught with syringes, and, at least 500 who have been caught with tobacco, and were never placed on OSR status. Moreover, at the conclusion of her ASR, Wildermuth states that, "due to inmate Sperry's malicious and maladaptive behavior" he is being placed into long- term segregation. "Malicious and maladaptive behavior" would be exactly the same thing as "consistent bad behavior," which is covered by subsection (12) of IMPP 20-104(I)(B). However, defendants could not avail them- selves of that subsection because it requires them to cite three separate disciplinary infractions within the previous 12 months, each of which constituted a threat to the safety and security of the facility. Plaintiff argued these points administratively to defendants Wildermuth, Lucht, and Pryor at the Lansing Correctional Facility before being transferred to El Dorado.

Upon being transferred to El Dorado Correctional Facility (EDCF) for long-term segre- gation, plaintiff immediately notified defendant Hoshaw that plaintiff was illegally place in ad- ministrative segregation and demanded to be released immediately. Hoshaw ultimately told plaintiff that lots of inmates are placed in administrative segregation illegally and, "if someone wants you to be in long-term segregation, you are going to be in long-term segregation, no matter what." Plaintiff further addressed this issue with defendants Patterson and Jackson, but both of them ignored his pleas. In fact, Patterson tried to argue that plaintiff was being held under the three disciplinary actions in twelve months, which is the consistent bad behavior pro- vision found under subsection (12), and plaintiff requested a copy of the amended ASR because there were not sufficient facts in the original one to make such an amendment. Patterson sent plaintiff a copy of the original ASR and there was never any amended ASR.

In grieving the issue of the illegal administrative segregation placement, plaintiff was emphatic and clear that the defendants were placing him in long-term segregation in violation of their own rules and regulations. None of the defendants heeded plaintiff's pleas and simply agreed that as long as someone, in this case, defendants Wildermuth and Lucht, wanted plaintiff in long-term segregation, he was going to remain in long-term segregation. Plaintiff exhausted

this issue to the wardens of both, Lansing and El Dorado, but received no relief. Plaintiff further exhausted the issue all the way to defendants Roberts, Goddard, and Burris, by filing an injury claim procedure for the harm suffered due to the illegal placement into long-term seg, which went to each of them.

Taking defendant Hoshaw's statement that numerous inmates were being placed into long-term segregation illegally, plaintiff started interviewing some of the inmates being held in the same long-term segregation unit that he was being held in. As it turns out, at least 20 of the 60 inmates in the same pod as plaintiff were also classified for long-term seg in violation of the rules and regulations. The Defendants, from Secretary of Corrections Roberts and his deputy Secretaries, all the way down to the unit team counselors at the various facilities, work in a unified conspiracy to arbitrarily violate the civil rights of any inmate that falls into disfavor with them, just as they did with plaintiff when he fell into disfavor with defendants Wildermuth and Lucht. They acted with vindictive and retaliatory intent in making the original illegal placement and expanded the conspiracy to violate plaintiff's civil rights when the other defendants refused to intervene and prevent the unlawful act.

Numerous studies have established that "supermax" prisons like the one that was maintained by defendants at El Dorado where inmates are housed in long-term seg for months or years at a time, cause extensive physical and mental harm. Plaintiff's segregation was extremely punitive in that it denied him the following, non-exhaustive, list of privileges enjoyed by general population inmates: (a) 24-lock down with no human interaction; (b) lights on in cell 24 hours per day; (c) no visitation with family or friends; (d) no fresh air or access to outdoors, except for four 1-hour sessions per week where the inmate can stand outside in a dog kennel; (e) no incentive pay; (f) no regular showers, just three 15-minute showers per week; (g) no access to the law library; (h) no access to newspapers, magazines, or other reference material from the library; (i) no religious call out; (j) no mental health programs; (k) plaintiff could not participate in any rehabilitation programs, or work release, in preparation for his 2020 parole hearing date; (l) plaintiff was cuffed behind his back and put on a dog leash every time he came out of his cell for any reason; (m) could not participate in fund raisers that permit purchase of special meals from restaurants or Aramark, or specialty items sold as fundraisers for the various organizations like the Jaycees, Reaching Out From Within, et cetera; (n) could not access his Jpay account, which contained numerous letters and photos sent to him by his family that had to pay to do so; (o) could not access the MP4 kiosk which meant he could not enjoy his MP4 player which held hundreds of songs that defendants had sold to him for $2 a piece; and (p) could not purchase a large portion of the commissary items on the canteen list.

(B)(1) Count II: Defendants Roberts, Goddard, Burris, Pryor, and Wildermuth, violated plaintiff's Eighth Amendment right to not be subjected to cruel and unusual punishment, engaged in a conspiracy to violate plaintiff's civil rights, and committed the torts of battery, outrageous conduct, mistreatment of a confined person, breached their fiduciary duty to plaintiff, and committed the tort of negligence, all under federal and Kansas law.

(2) Supporting facts: From September 23, 2015 until early December 2015, plaintiff was held in C-1 Cellhouse (the segregation unit) at the Lansing Correctional Facility. The entire cellhouse was infested with roaches and anywhere from 3 to 20 roaches could be observed crawling across the floor, walls, desk and cabinets at any given time. Every single night plaintiff was awakened by roaches crawling over his body as he slept. Plaintiff filed form-9 requests and grievances to staff members, starting with Wildermuth, in an effort to get the cellhouse closed

down until it could be rid of roaches and made habitable again. Wildermuth responded by simply saying that the exterminator sprays regularly but it doesn't do any good. No other measures were taken to remedy the infestation.

Plaintiff appealed the grievance to Warden Pryor to no avail. It was then appealed to defendants Burris, Goddard and Roberts, again, to no avail. All of the defendants were keenly aware of the conditions and failed to take any corrective measures. Finally, after more than ten weeks of being subjected to these cruel and unusual conditions, Wildermuth finally moved plaintiff to A-1 Cellhouse, which had far fewer roaches. The defendants were all part of a continuing conspiracy to violate plaintiff's civil rights and subject him to tortious acts.

(C)(1) Count III: Defendants Roberts, Goddard, Burris, Heimgartner, Jackson, and Patterson violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, they conspired to violate plaintiff's civil rights by failing to prevent or correct the sleep deprivation, and their actions constitute the torts or battery, outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence, all under federal and Kansas law.

(2) Supporting facts: The staff at El Dorado Correctional Facility go out of their way to prevent the inmate population from getting an 8-hour period of sleep. They purposely awaken every in-mate every few hours to assure that his sleep is disrupted. From January 25, 2016 through March 28, 2017, plaintiff was subjected to the following schedule:

      a. 00:00-03:00 cleaning crew was in unit sweeping, mopping and buffing floors,
      b. 02:00-03:00 sheet exchange, sweats turn-in, or blanket exchange,
      c. 04:00-04:30 breakfast is served,
      d. 05:00-05:30 breakfast trays collected,
      e. 06:30-08:30 yard, cell cleaning, or barber,
      f. 06:30-08:30 ice passed out,
      g. 10:30-11:00 lunch is served,
      h. 11:30-12:00 lunch trays collected,
      i. 12:00-14:00 unit team and mental health counselors make rounds,
      j. 14:30-16:30 showers are run,
      k. 17:00-17:30 dinner is served,
      l. 17:30-18:00 dinner trays collected,
      m. 18:00-22:00 sheets, sweats, blankets, and toilet paper passed out,
      n. 22:30-23:00 standing I.D. count.

Even since his release from administrative segregation, plaintiff is still subject to the same sort of schedule where he has to take breakfast at 05:00, work from 07:00-13:00, take dinner between 16:30-18:30, yard time from 18:30-20:00, and still a standing I.D. count between 22:30 and 23:30. Again, there is absolutely nowhere in the schedule for plaintiff, or any inmate, to get the recommended 8 hours sleep that is required for good physical and mental health. To make things worse, every cell is equipped with a fluorescent night light that shines 24 hours a day, which is unnecessary as every officer carries a flashlight for seeing into cells at night.

Numerous scientific studies have established that the human body requires 8 hours of uninterrupted sleep every night to function properly Consistent and extended sleep deprivation or interruption is extremely detrimental to the human body, both emotionally and physically. This has caused plaintiff to lose weight, made him irritable, caused extreme stress, and exacer-bates his untreated Hepatitis-C infection and caused onset diabetes, and causes inflammation of his joints.

Plaintiff submitted form-9s and grievances to defendants Patterson, Jackson, Heimgartner, Burris, Goddard, and Roberts, presenting them with copies of studies from Harvard Medical School's Division of Sleep Medicine, and requested that they adjust the schedule to allow plaintiff an 8-hour block of time to get continuous sleep. They ignored the information and refused to take any corrective measures. They are working as a unit to purposely and intentionally violate plaintiff's rigthts.

(D)(1) Count Four: Defendants Roberts, Goddard, Burris, Pryor, Ross, Brundage, Rebecca (LNU), and Corizon, Inc.,in failing to notify plaintiff of his Hepatitis-C infection, and then failing to give him the treatment to cure the infection, constitutes a violation of his Eighth Amendment right to be free of cruel and unusual punishment, constitutes a conspiracy to violate his civil rights; constitutes medical malpractice; and is the torts of outrageous conduct, battery, mistreatment of a confined person, breach of fiduciary duty, and negligence, under federal and Kansas law.

(2) Supporting Facts: In June 2014 the health care staff at the Lansing Correctional Facility conducted a routine physical of plaintiff, which included a blood test. This test showed positive for Hepatitis-C, however, none of the nurses or doctors bothered informing plaintiff about his positive test. Over a year later, in June or July of 2015, one of the nurses at Lansing finally informed plaintiff that he had contracted Hep-C and that they had messed up by not informing him or having him on chronic care for the previous year. Defendant Corizon, Inc. has been the health care provider for the KDOC since before that time, and defendant Rebecca was the Infection Control Coordinator at the Lansing Correctional Facility at that time.

Plaintiff immediately demanded that he be give Harvoni, the drug treatment that cures Hep-C. Rebecca told plaintiff that he would not be getting the Harvoni treatment, but that they would have him on chronic care so they can monitor his infection and, if he gets close to dying from it, then they will put him in for the treatment. Plaintiff filed grievances and injury claim forms demanding that he get the treatment to cure his Hep-C, and Defendants Pryor, Burris, Goddard, Roberts, and Corizon, Inc., all failed to take steps to get plaintiff's treatment.

Plaintiff was transferred to El Dorado Correctional Facility in January 2016, and immediately requested the Infection Control Coordinator, defendant Brundage, to get him the Harvoni treatment. She too ignored his demands. According to Registered Nurse Martel, it is the position of Corizon to only treat the very sickest of offenders and that plaintiff probably would not receive any treatment until permanent damage was done to him. Defendant Corizon receives approximately sixty million dollars a year to provide medical treatment for inmates in Kansas, and their refusal to treat plaintiff's diagnoses infection is a clear violation of their contract. The fact that the other defendants, who have authority to enforce the contract and make Corizon and its employees give plaintiff his treatment, refuse to so means that they are in a conspiracy with Corizon to violate plaintiff's civil rights, and to violate the listed torts.

(E)(1) Count Five: Defendants Roberts, Goddard, Burris, Pryor, Heimgartner, Winklebauer, Sapien, Shipman, Booth, and Lee, in conspiring to seize and censor plaintiff's non-pornographic publications, books and photographs in retaliation for his complaints and litigation and/or based upon incompetence, is a clear violation of his First and Fourteenth Amendment rights; constitutes a conspiracy to violate his civil rights; and constitutes the torts of property deprivation, outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence under federal and Kansas law.

(2) Supporting Facts: In April 2014, plaintiff received a shipment of books which included two Janet Evanovich titles, "Full Bloom" and "Full Blast." These two books are part of a drama-comedy trilogy that are typical PG rated Evanovich fare that contained absolutely no graphic sex scenes. Defendant Lee seized the "Full Blast" title, but put sent the "Full Bloom" title on to plaintiff. "Full Blast" has absolutely no graphic sex scenes and plaintiff immediately filed an ap peal of the illegal seizure, which went to Defendants Winklebauer, Pryor, Burris, Goddard, and Roberts, all of which refused to correct the illegal seizure, which makes them knowing conspir-ators to the illegal seizure. They also destroyed the book.

On December 11, 2015, defendant Lee seized plaintiff's December 21, 2015 issue of Us Weekly because it contained drink recipes. Defendant Shipman's name appears on the seizure notice. This seizure was absurd because there is no rule against publications containing drink recipes and numerous other publications allowed in also contained the same advertisements in question. Plaintiff appealed this illegal seizure to defendants Winklebauer, Pryor, Burris, Goddard, and Roberts, all of who refused to take measures to correct the illegal seizure, thereby, becoming coconspirators in the civil rights violation. Defendants destroyed the magazine.

Also in December 2015, Defendant Lee seized plaintiff's Wired Magazine (a technology periodical) without stating why they were seizing it, other than an arbitrary statement to the ef-fect that the magazine posed a threat to the security of the facility. Plaintiff's family went online and reviewed the publication in question and could not find anything contained in the magazine that would remotely constitute a threat to the security of the prison. Defendant Shipman's name appeared on the seizure form and plaintiff appealed the illegal seizure to defendants Winkle-bauer, Pryor, Burris, Goddard and Roberts, all of who failed to take measures to correct the ille-gal seizure, thereby, becoming co-conspirators in the civil rights violation. The magazine was destroyed.

After being transferred to the El Dorado Correctional Facility, Defendant Booth seized plaintiff's April 2016 issue of Wired Magazine without saying why it was being seized. Plain-tiff sent a form-9 back to the mailroom demanding to know the name of the person who illegal-ly seized the magazine and specifically why they had seized it. Defendant Sapien responded that they did not have to give a reason and plaintiff appealed the illegal seizure to defendants Heim-gartner, Burris, Goddard and Roberts, all of who failed to correct the illegal seizure, thereby be-coming co-conspirators to the civil rights violation. The magazine was destroyed.

On April 8, 2016, after plaintiff had stirred up the stink about the seizure of his Wired Magazine and apparently angered defendants Lee and Sapien, these two defendants seized a photograph that plaintiff had ordered out of a magazine of a sexily dressed woman, but it was not nude or otherwise pornographic. Again, plaintiff appealed this illegal seizure to defendants Heimgartner, Burris, Goddard, and Roberts, and again they refused to correct the matter, thereby becoming co-conspirators in the violation of plaintiff's civil rights. This photo was destroyed.

Again, on May 23, 2016, defendants Booth and Sapien seized a David Baldacci book plaintiff had ordered, "The Target," and refused to say why they were seizing it, but they did list the allegedly offending pages. Plaintiff is well read in Baldacci books and knew for a fact that there would be no sexually explicit or otherwise inappropriate-for-prison writing in the book, so he obtained a copy of the allegedly offensive pages, which contained the following:

    a. page 2 is a dialog between two death row inmates in the medical wing of
       a fictional Alabama prison.
    b. page 6 is a dialog between one of the inmates and a nurse about how long he

        had been incarcerated.
    c. page 16 is dialog between a fictional president and his fictional CIA director
       about vetting agents.
    d. page 41-42 is about two CIA agents meeting up top discuss why they were
       selected for a mission.

Clearly, the defendants lied about the contents of this book for unlawful purposes, specifically to violate plaintiff's civil rights. Plaintiff appealed the unlawful seizure to defendants Heimgartner, Burris, Goddard, and Roberts, all of which refused to correct the illegal seizure and thereby became co-conspirators to the civil rights violations. This book was destroyed.

      All of these books, periodicals, and photographs were the personal property of plaintiff and he did not authorize anyone to seize or destroy his property. The defendants worked as one unitary entity, and in collusion, to retaliate against plaintiff and to violate his rights.

(F)(1) Count Six: Defendants Roberts, Goddard, Burris, Heimgartner, Jackson and Patterson, in denying plaintiff access to the law library in retaliation, and based upon incompetence, violated his First and Fourteenth Amendment rights to access the courts, Due Process, and Equal Protection of the laws; constituted a conspiracy to violate his civil rights; and constituted the torts of outrageous conduct, breach of fiduciary duty, and negligence, under federal and Kansas law.

(2) Supporting Facts: From the time plaintiff was transferred to El Dorado Correctional Facility on January 25, 2016, until he was released from the illegal administrative segregation classification in March 2017, he had numerous cases pending in the courts. [Sperry v. McKune, et al., 112,455; Sperry v. L.C.F., 16-CV-2; Sperry v. State, 112,143, and Cote v. Dozier, 14-CV-03058-SAC], plus he was trying to research the law in preparation for filing this case. Plaintiff is pro se on all of his cases

      During the time in question, defendants Heimgartner, Jackson, and Patterson, did not provide inmates housed in long-term segregation housing with legal advisors or access to persons trained in the law. To comply with the constitutional mandate issued by the United States Supreme Court in BOUNDS V. SMITH, the KDOC provides the inmates at their various facilities with law libraries that now only consist of Lexis Nexis computer terminals. To make matters even worse, EDCF does not even hire inmates trained in legal research to work as law library clerks. During the time in question, plaintiff was not given access to the law library facilities and could only obtain some copies of cases or statutes via form-9 to the library that took several days to process and often resulted in no response as the library workers could not figure out how to find the requested materials. There was absolutely no reason that plaintiff could not have been escorted to the library for several hours a week, other than it being an inconvenience to defendants.

      Plaintiff lost the appeal of his K.S.A. 60-1507 motion [SPERRY V. STATE, 112,143] because he was unable to get to the library and prepare the requisite amended brief or petition for review. This resulted in plaintiff having to spend another five years, at least, in prison. Defendants have a strong incentive for interfering with plaintiff's access to the library as it prevents him from being able to work on his successful litigation against them in SPERRY V. MCKUNE and SPERRY V. L.C.F.

      Plaintiff grieved and otherwise administratively exhausted this issue all the way through defendants Burris, Goddard and Roberts, which makes them co-conspirators in the intentional violation of his civil rights and the above referenced torts. These defendants have long been aware that they were violating the rights of the long-term seg inmates and purposely created the

circumstances that allow it to occur.

(G)(1) Count Seven: Defendants Roberts, Goddard, Burris, Heimgartner, Hoshaw, Jackson, Patterson, Pryor and Ross, in unlawfully seizing plaintiff's legal property and personal property, and in operating a racket of selling him property that they later come and illegally seize just so they can sell him more stuff, constitutes a violation of his First Amendment right to access the courts; his Fourteenth Amendment rights to due process and equal protection of the laws; it is a violation of the Racketeer Influence and Corrupt Organization Act; it constitutes a conspiracy among the defendants to violate plaintiff's civil rights; and constitutes the torts of conversion, outrageous conduct, breach of fiduciary duty, and negligence, all under federal and Kansas law.

(2) Plaintiff has been continuously in the custody of KDOC since March 1997. During that time he has amassed a significant amount of legal files ranging from his direct appeal, postconviction actions, appeals, federal habeas actions, and numerous civil suits for serious violations of his constitutional and civil rights. He has amassed tens of thousands of pages of documents for these cases. Plaintiff has always removed unnecessary case files once a case was completed and finished. The legal box authorized by IMPP 12-120 only contains less than one cubic foot of space and would not hold the documentation generated from one of plaintiff's cases, let alone all of them. From March 1997 through January 25, 2016, plaintiff always maintained several (4-5) boxes of legal files in his cell and it was never an issue.

Also during that time, KDOC has generated millions of dollars in revenue by selling inmates all manner of personal property (e.g. clothing, shoes, televisions, radios, MP4 players, food products, hygiene items, monthly give packages, etc.). Their policy on property (IMPP 20-120) outlines all of the property that an inmate is allowed to possess at one time, which includes two pairs of boots, one pair of tennis shoes, 12 books plus a dictionary and thesaurus, 10 magazines, sweat top, sweat pants, shower shoes, hot pot, alarm clock, two pairs of gym shorts, $150 worth of food and hygiene items, and $150 worth of arts and craft supplies, just to list a few. As is apparent from this list, just $150 worth of food and hygiene items would more than fill up a pack-out box, which is only 3.5 cubic feet. All of the property owned by plaintiff at the time in question was sold to him by defendants and was within the regulations amount limits.

However, buried within another section of IMPP 12-120, is a provision that states that inmates shall limit their property to what will fit into one 15" x 13.75" x 21" box (also known as a pack-out box). This part of the regulation is never enforced, that is, officers never go cell to cell and order inmates to pack all of their property into two boxes and confiscate the rest. They certainly don't check the inmate's amount of property before they sell him more property that will generate them more revenues. Even when someone goes to segregation, the property room generally just stores their many boxes of property and gives it back to them when they get back out. However, if you get transferred to another facility, or if an officer has a vendetta against you, then they target you for enforcement of this single pack-out box rule.

In September 2015, when plaintiff was taken to segregation at LCF, half of his property was sent to segregation with him and half was sent to property. The division of property was arbitrary as all of it should have been sent to segregation with him except the few items that are not allowed in segregation (e.g. razors, tweezers, hot pot and pens). However, a large majority of plaintiff's legal work was taken to property and plaintiff immediately started complaining about that and demanding that his property be returned to him. This is at the same time that defendants Wildermuth and Lucht hatched their unlawful conspiracy to illegally place plaintiff into long-term segregation in retaliation for his successful litigation. Incredibly, defendant Ross

told plaintiff that he had to reduce his property and refused to return his legal materials to him. Plaintiff grieved this problem to defendants Pryor, Burris, Goddard and Roberts, all of which refused to take action to remedy that seizure of plaintiff's property.

On January 25, 2016, plaintiff was transferred to EDCF where defendants Hoshaw and Patterson seized all of his personal and legal property. When plaintiff demanded the return of his property, they placed him in a room with his property and told him he could keep one small legal box and one pack-out box worth of property and that the rest of it had to be mailed out or destroyed. Plaintiff took what he could and refused to sign any documents authorizing the disposition of the rest of his property. He even filed grievances and property claims against the seizure of his other legal files and personal property that went to defendants Jackson, Heimgartner, Burris, Goddard, and Roberts, all of which failed to correct the illegal seizure. Defendant Heimgartner did issue a memo to plaintiff stating that they would hold his other boxes of legal files in property and give him access to them as needed, but defendants Hoshaw, Patterson and Jackson refused to allow plaintiff to have any access to them. Defendants' actions caused plaintiff to lose his appeal in his K.S.A. 60-1507 motion, which has caused him to spend several additional years in prison, because he had no access to his case files.

All of these defendants were aware of a memorandum issued by Dave Riggins, a top KDOC official in Topeka, that advised all the facility heads that the property limits set forth in IMPP 12-120 did not include the consumable property (e.g. food, cosmetics, etc.), yet these defendants counted the consumable property. In fact, they wound up seizing and destroying a pair of tennis shoes, a pair of sweats (top and bottoms), two fans, several bottles of condiments (ketchup, mustard, sriracha sauce, bar-b-que sauce), two bottles of baby powder, several bags of cereal, bags of potato chips, and several books.

Defendants illegally seized and destroyed this property for malicious, vindictive and retaliatory purposes, and they did so as an ongoing conspiracy to violate plaintiff's rights. Their practice of selling inmates millions of dollars worth of property each year under one set of property limits, then using the pack-out box rule to seize a large part of that property, and then selling him more property again, is a clear violation of commerce laws and the RICO act.

(H)(1) Count Eight: The actions of defendants Roberts, Goddard, Burris, Pryor and Ross, in unlawfully seizing or losing plaintiff's personal property constitutes a violation of his Fourteenth Amendment due process and equal protection rights; constitutes a conspiracy to violate his civil rights; and constitutes the torts of conversion, outrageous conduct, breach of fiduciary duty, and negligence, under federal and Kansas law.

(2) Supporting facts: On September 23, 2015, plaintiff was taken to segregation at the Lansing Correctional Facility. Half of his property was taken to seg with him and the rest was taken to the property department. Once plaintiff received his property inventory sheets he notice that several of his personal books and one of his fans were not listed on them. He immediately filed a property claim. Defendant Ross found the books, but not the fan, yet he denied the claim by falsely stating that plaintiff had signed the property inventory sheets. When plaintiff sent him copies of the inventory sheets showing he had not signed any of them, defendant Ross retaliated by colluding with the other defendants to violate plaintiff's rights by seizing several of his legal manuals and a book manuscript. After several communiques trying to get the manuals and manuscript returned, it turns out that Ross was alleging that because plaintiff had bound the items to keep them neat and orderly, he was classifying them as "homemade books" and declared them illegal. There is no rule against binding paperwork together, or that states only

certain forms of binding (e.g. staples, paper clips, etc.) are allowed. Plaintiff filed a property claim for one million dollars for the manuals and manuscript, which was denied.

In November 2015, plaintiff turned in his laundry bag with 2 pairs of store purchased boxer shorts, 2 store purchased t-shirts, and 2 pairs of store purchased socks. The laundry bag was never returned. Plaintiff inquired about the status of his laundry bag with the officer on duty and the officer checked to see what he could find out. That officer later admitted that he had placed plain-tiff's laundry bag in another inmate's cell and could not recall which one. The property was never recovered and plaintiff filed a property claim for it. Defendants conspired to deny this claim by falsely stating that personal clothing cannot be laundered in the facility laundry, which is false as the facility laundry is the only one available. In fact, Lansing has strict cellhouse rules that prohibit inmates from washing any clothing in their cell.

Plaintiff's property claims went all the way through defendants Pryor, Burris, Goddard, and Roberts, all of which failed to intervene and correct the situation. This makes them liable for the civil rights violations as if they had committed them theirselves.

(I)(1) Count Nine: The actions of defendants Roberts, Goddard, Pryor, Heimgartner, and Wildermuth, in embezzling the interest from the plaintiff's financial accounts constitutes a violation a violation of plaintiff's Fifth Amendment protection under the "takings clause," his Fourteenth Amendment due process and equal protection rights, constitutes embezzlement under the R.I.C.O. Act, is a conspiracy to violate plaintiff's civil rights; and constitutes the torts of conversion, outrageous conduct, breach of fiduciary duty, and negligence, under federal and Kansas law.

(2) Supporting facts: Kansas law mandates that the warden of each facility keep every inmate's money in an interest bearing, federally insured, bank account and that the interest accrued be added to the inmate's account. K.S.A. 75-5257. From 1997 up to February 2012, plaintiff received the interest accrued added to his account every month. Starting in February 2012, the defendants started embezzling the interest accrued on plaintiff's account and quit adding it to his account. Plaintiff owns the money in his inmate account, and he owns the interest accrued from that account. He has never authorized anyone to take the interest accrued on his account and the defendants' actions in embezzling these funds is clearly theft.

(J)(1) Count Ten: The actions of defendants Roberts, Goddard, Pryor, Hunt, and Bosch, in failing to give plaintiff fair, unbiased, and properly documented disciplinary hearings are a clear violation of his First Amendment right to access the courts; his Fourteenth Amendment right to due process and equal protection of the laws; constitutes a conspiracy to violate his civil rights; and constitutes the torts of outrageous conduct, mistreatment of a confined person, and negligence, under federal and Kansas law.

(2) Supporting Facts: In the 18 years between 1997 and September 23, 2015, plaintiff had received over 25 disciplinary infractions. Each one required a disciplinary hearing to resolve, and Kansas considers these hearings "quasi-judicial." In every single hearing the hearing officer was just another prison guard that did not have any special training and was highly biased in favor of his friends and coworkers who were writing the disciplinary report against plaintiff. Though Kansas law requires that there be a clear and accurate record be made of the proceedings, only once did any hearing officer ever make a complete record of the proceedings. In 2012, then Lt. Ayala conducted the hearing and made a complete record, but she falsified

testimony and evidence to suit her findings. In every other hearing the hearing officer refused to make a complete record even though plaintiff demanded that they do so. This sort of impropriety occurs because the defendants refuse to apply current technological capabilities, as they do every other security aspect of the facility operations, like recording all of the disciplinary proceedings digitally.

In December 2014 and July 2015, defendant Bosch simply implemented coercion to get plaintiff to plead no contest to the disciplinary charges. He flat out told plaintiff that he was going to be found guilty and the only thing to determine was whether or not plaintiff was going to segregation or not, implying that if he fought the d.r. he would be sent to seg. Naturally, this was not included in his "record of the proceedings." In June 2014, plaintiff was sent to seg under investigation for an alleged rule violation. The reporting officer issued a d.r. within two hours of sending plaintiff to seg, but E.A.I. officers released him from seg 24 hours later and issued a report that the allegations were unfounded. A week later, plaintiff was called to the disciplinary office where defendant Bosch conducted the hearing on the d.r. Even though E.A.I. stated that their investigation determined that the allegation was unfounded, Bosch stated that he didn't care, his friend had written the d.r. and he was finding plaintiff guilty. He even took it a step further and refused to impose a fine to prevent plaintiff from challenging the guilty finding in court. In every hearing plaintiff ever had before Bosch and Hunt, they made arbitrary rulings such as "I don't have to follow the regulations" (Bosch), "those regulations are meaningless" (Bosch), and "I believe you but I have to find you guilty or I will lose my job" (Hunt). Naturally they never documented these rulings, even when plaintiff demanded that they do so.

As a "jailhouse lawyer," plaintiff has assisted hundreds of inmates with thousands of disciplinary cases over the years. He knows for a fact that this sort of "kangaroo court" disciplinary proceedings are so common that they virtually appear to some degree in every single case, which is approximately 24,000 times a year, on average, in the KDOC. The prison guard hearing officers are never neutral and unbiased, always use coercive tactics, routinely deny prisoners their due process rights during the hearings, and invariably always find the prisoners guilty whether they are or not. Plaintiff does not need to cite every single K.S.A. 60-1501 action that was remanded by the state appellate courts because of these unconstitutional tactics for the court to know that they are significant in number. Considering that 90% of the inmate population lack the capacity to avail themselves of the courts, and 90% of the remaining 10% are procedurally barred from filing such actions, the number of unconstitutional disciplinary actions is massive.

The defendants here conspired together to violate plaintiff's rights in every disciplinary action ever instituted against him. Defendants Roberts, Goddard and Pryor had the opportunity to prevent these violations and chose not to. In fact, they are the parties responsible for developing the system and keeping the proceedings so rudimentary that it is easy for them to get away with violating the rights of every prisoner that comes up for a disciplinary hearing.

(K)(1) Count Eleven: The actions of defendants Roberts, Goddard, Burris, Pryor, Heimgartner, Wildermuth, Jackson, and Patterson, in making a meaningless mockery out of the prison grievance system violated plaintiff's First Amendment right to access the courts; constituted a conspiracy to violate his civil rights; constitutes the torts of outrageous conduct, negligence, and breach of fiduciary duty, and violates several statutes and regulations, all under federal and Kansas law.

(2) Supporting facts: K.S.A. 75-5251 mandates that the Kansas

Secretary of Corrections is requried "to examine and inquire
into all matters connected with the government and discipline
of the correctional institutions." Regulations were promulgat-
ed [K.A.R. 44-15-101 et seq.] to give the inmate population a
procedure by which to seek redress of wrongs and abuses done
to them by prison staff. Unfortunately, having prison staff
manage the grievance system implemented to correct and punish
their own misconduct is equivalent to having  the fox manage
the hen house.

Over the years, KDOC administrators (including all of the
defendants being sued here) have conspired together to manip-
ulate this grievance procedure to automatically deny all re-
lief, to create multiple obstacles between prisoners and legi-
timate judicial review of the wrongs and abuses, and to delay
relief indefinitely. In the 19+ years spanning from March 1997
thru August 2016, plaintiff has filed over a hundred grievan-
ces and other administrative actions for wrongs and abuses done
to him by prison staff. Also during that period, as a promi-
nant "jailhouse lawyer," plaintiff assisted in the filing of
thousands of administrative proceedings by hundreds of other
inmates for wrongs and abuses done to them by staff members.
This includes all of the grievances and administrative review
proceedings implemented for the purpose of exhausting all of
claims raised in this civil action. Not a single time has the
proceeding resulted in a finding in favor the the inmate and
agaisnt the reviewer's coworkers. While plaintiff is sure that
some inmate in the history of the KDOC may. have received some
sort of relief at some time, he has never seen it. To the con-
trary, in virtually every instance, including all of the pro-
ceedings used to exhaust the claims raised in this complaint,
the reviewing officials have summarily denied relief, refused
to respond in a timely manner, simply did not respond at all,
destroyed or "lost" the filings, or rubber-stamped a lower of-
ficial's summary denial of relief without reviewing it.

To put this into perspective, only one in a thousand ad-
ministrative proceedings filed by an inmate ever makes it to
judicial review. However, every year the ocurts grant relief
in a large number of the few cases to do make it to the court.
At the same time, the large majority of the cases that make it
to court are dismissed based on some sort of procedural default
that the prison officials were able to force the inmate into.
The 999 out of 1,000 that don't make it to court are not any
less valid, rather , prison officials manage to completely de-
rail the administrative proceedings, or they delay it so long
that the original harm caused has already run its course, or
the inmate lacks the skills to file a legal action. It is be-
yond  absurd that here in the 21st Century our prison systems
are still so archaic and unjust. Almost seven decades after
the "sunshine laws," for the purpose of preventing governmen-
tal abuses (actually, to bring them to light), the sunshine
has not reached behind the prison walls in this country.

Prison officials, especially the defendants in this ac-
tion, are incompetent, abusive, and routinely commit crimes

against plaintiff and the rest of the inmate population. The defective administrative review system is wholly controlled by the very people committing the abuses and these defendants work as a unit to manipulate and undermine the system. These administrative review systems have become a sham and mockery that serves no purpose other than to prevent inmates from receiving relief from abuses committed on them by prison staff.

(L)(1) Count Twelve: The actions of defendants Roberts, Goddard, Burris, Heimgartner, Jackson, and Patterson, in denying plaintiff all of his rights while illegally housed in administrative segregation, violated his First Amendment rights to freedom of association and access to the courts; his Fourteenth Amendment rights to due process and equal protection of the law; constituted a conspiracy between the defendants to violate his civil rights; constituted the torts of outrageous conduct, mistreatment of a confined person, breach of fiduciary duty, and negligence; all under federal and Kansas law.

(2) Supporting facts: Kansas law, IMPP 20-105(IV) states:
"IV. Privileges and rights in Administrative Segregation:
A. Each offender in administrative segregation shall be treated as nearly as possible like any other offender in the general population of the institution or facility.
B. When possible, the offender shall retain such privileges, property, and programs as are commensurate with teh particular circumstances for which the offender was placed in administrative segregation.
1. When privileges, property, and/or programs are restricted, the following need to be documented:
a. the opportunities that have been limited,
b. the reason for the limitation, and
c. the duration of the limitation.
C. Administrative segregation shall not be used or considered as punishment.

Plaintiff was held inlawfully in administrative segregation From October 6, 2015 thru March 2017. From January 25, 2016 to March 2017 he was held there by the defendants listed in (L)(1) above, who denied him (a) contact visits with family and friends, (b) access to law library and the ability to conduct research on his four pending cases, (c) access to general library its newspapers and reference materials, (d) incentive pay, (e) access to the rec yard and track with basic exercise equipment, (f) access to all his personal property (e.g. lamp, boots, pencils, pens, nail clippers, tweezers, etc.), (g) access to all store items (e.g. under clothes, greeting cards, baby oil, toilet paper, emery boards, and dozens of other items), (h) access to daily showers, (i) access to Jpay financial and email accounts, (j) access to MP4 player and kiosk he had paid for, (k) access to monthly fundraiser meals and

items, (l) access to Aramark's weekly meal programs, and (m) access to activities and self-help programs, to name a few. All of these are available to the general population.

Because plaintiff has never been disciplined for any acts of violence, possessing any weapons, causing disturbances or any other misbehavior that would warrant restricting his rights or privileges, he should have enjoyed all of them. Plaintiff argued to the defendants that his "particular circumstances" for being placed into administrative segregation did not warrant any limitations or restrictions, but they continued to illegally use his illegal placement as punishment and to prevent him from being able to properly prepare his litigation.

(M)(1) Count Thirteen: The actions of defendants Roberts, Goddard, Burris, Heimgarner, Guble, and Union Supply, in privatizing the prison canteen service for the benefit of private individuals, and indropping the quality of products available to plaintiff, and in charging him greatly inflated prices for these products, constitutes an illegal monopoly; a conspiracy pursuant to the R.I.C.O Act; constitutes a conspiracy to violate plaintiff's civil rights; constitutes the torts of outrageous conduct, breach of contract, and breach of fiduciary duty; violates Kansas statutory and regulatory law, and they are illegally taxing prisoners, in violation of federal and Kansas law.

(2) Supporting facts: In 2013, defendants decided to abandon the prison operated canteen service that effectively served the inmate population with quality merchandise for reasonable prices and generated considerable resources for the inmate benefit fund. In its place they contracted with a California corporation named Union Supply Group, Inc., to provide the canteen services. The canteen service is solely for the benefit of the inmate population and the contract entered into with Union Supply clearly required them to supply plaintiff with the same quality of merchandise for the same price as what he was receiving from the prison operated canteen.

Immediately, Union Supply started replacing quality products with far inferior generic brands and doubled the prices they were charging the inmates for them. Some prima facie examples of this are: (a) they discontinued Dial (65¢) and Tone (80¢) soaps and replaced them with generic Level 10 bars for $1.20, and doubled the price of Irish Spring from 73¢ to$1.32, (b) discontinued Bic ink pens for 12¢ each and replaced them with generic simline pens for 50¢, and these pens malfunction almost every time without fail, (c) They double the price of the Ramen soups from 13¢ to 28¢, (d) They discontinued quality Hanes boxer shorts at $3.50 a pair and replaced them with generic polyester state issued boxers for $4.00 a pair, (e) Brushy Creek hot-pots went from $12 to $25, and (f) cologne oil went from a 1 ounce bottle for $4 to a ½ ounce bottle for the same $4, just to list a few. Plaintiff requested the KDOC defendants to enforce the "equal quality and equal price" provisions of the contract and they all refused to do thier fi-

duciary duty. Thus, they all became coconspirators with Union
Supply in violating plaintiff's civil rights.

Then, in 2015, the defendants started charging plaintiff
and the rest of the inmate population sales tax on all of their
purchases. Inmates are wards of the state and cannot file tax
returns based on the state stipend they receive for performing
their prison jobs. Equally important, because plaintiff is
considered part of the state, he cannot for the prison to pay
him minimum wage for his labor either. Taxing the inmates is
the same as taxing the state, which is illegal and cannot be
done. Should the courts rule that inmates are not part of the
state, then they must start compensating plaintiff for sever-
al years of back wages for labor he performed for the state
without receiving minimum wage.

(N)(1) Count Fourteen: The actions of defendants Roberts, God-
dard, Burris, Pryor and Raymond, in illegally setting up, pro
moting, and funding with state resources, the religious based
(Christian) Brothers in Blue program violates the First Amend-
ments separation of church and state provision; plaintiff's
Fourteenth Amendment right to due process and equal protection
of the law; constitutes an illegal conspiracy to embezzle funds
from the inmate benefit fund in violation of the R.I.C.O. Act;
and constitutes the torts of outrageous conduct and breach of
fiduciary duty, all in violation of federal and Kansas law.

(2) Supporting facts: Defendant Don Raymond and the Prison Fel-
lowship Ministries created a Christian faith based prison pro-
gram in the Iowa Correctional System in the 1990s. When it was
revealed through a federal lawsuit that this defendant and
certain IDOC officials were funneling state funds into this
faith based program, a civil judgment was rendered against Mr.
Raymond and his program, and they were removed from the IDOC.
Defendants Raymond and Roberts (then the warden at the El Dor-
ado Correctinal facility) hatched a plan to bring this faith
based program, the Innerfaith Freedom Initiative, into the KDOC
at EDCF, and did just that.

In 2017, plaintiff uncovered some documentation proving
that the defendants illegally funneled $400,000.00 out of the
Inmate Benefit Fund and into the coffers of the Innerfaith
Freedom Initiative. This embezzled money has never been repaid
to the IBF.

For some reason, the IFI group was moved from EDCF to the
Lansing Correctional Facility. Not long after relocating to
LCF, a few inmates started filing complaints about resources
being directed to this faith based program. IFI also ran into
financial troubles. Out of the blue, the organization renamed
itself the Brothers in Blue program, but still maintains its
Christian based curriculum. This program is not open to all
inmates and mandates that anyone applying to it must convert
to Christianity, regardless of what their religious beliefs
are. No other religious organizations are permitted to set up
programs in the KDOC.

Defendants funnel funding, resources, and manpower from
state resources. Along with financial support, defendants give

the program tables, chairs, desks, computers, buildings, and security staff, for their program, parties, and other functions. They gave the program the entire third floor of Q-unit, one of the cellhouses at LCF. They also took the inmate populations nice visitation building and crammed visitation into a small space less than half the previous size, just so they could relinquish the visitation building to Brothers in Blue. They took the visitation food court away from LCF Activities who used it to generate funds for the inmate benefit fund and gave it to Brothers in Blue to raise funds for their illegal faith based program. Here again, this constitutes embezzlement of millions of dollars away from the IBF and into the faith based program.

Defendants grant special favors and benefits to Brothers in Blue inmates that the general inmate population, including plaintiff, do not get. These include: (a) their family and friends get to come into the facility for extra visits, parties, dinners and events, (b) access to new computers and special training programs, (c) special mental health programs, career and job training programs, and other rehabilitation programs, (d) numerous special meals and events every month, and (e) private industry jobs upon completion of the program so the inmate can donate funds to the program from his check, just to name a few. Also, these inmates are given special consideration for parole based upon their participation in the program. No other programs or organizations are given these sort of extra privileges and benefits.

After the federal lawsuit in Iowa, these defendants knew full well that they could not fund and support this faith based program with state funds and property. Their conspiracy to do just that here in Kansas, therefore, is a criminal conspiracy to embezzle funds for an illegal purpose, which is clearly in the wheelhouse of the R.I.C.O. Act. They also knew this was going to work to the detriment of plaintiff and other inmates who lose out on the embezzled funds, the loss of programs and rehabilitation opportunities, and who are discriminated against based on their religious belief, or lack thereof.

### D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to thie conditions of your imprisonment: YES ___

   NO _X_. If your answer is "YES" describe each lawsuit. N/A.

   a) Parties to previous lawsuit: N/A.

   b) Name of court and docket number: N/A.

   c) Disposition: N/A.

   d) Issues raised: N/A.

e) Approximate date of filing lasuit: N/A.

f) Approximate date of disposition: N/A.

2) I have previously sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in Part C: YES X  NO ___ . If your answer is "YES," briefly describe how relief was sought and the results. If your answer is "NO," briefly explain why administrative relief was not sought.

> Plaintiff exhausted all of the claims presented in this complaint via form-9, grievance, property/injury claim form, or other procedure, as mandated by KDOC regulation or policy. Each administrative proceeding was exhausted all the way to the Secretary of Corrections when required to do so.

### E. REQUEST FOR RELIEF

1) I believe that I am entitled to the following relief:

   a. Injunctive relief from the court ordering the defendants to:
      (1) implement protocols to allow plaintiff at least 8-hours of uninterrupted sleep every night,
      (2) stop seizing plaintiff's books, magazines, pictures, and legal files, that are not actually classified as pornographic material pursuant to federal law,
      (3) immediately store all of plaintiff's legal materials in his cell,
      (4) immediately start paying plaintiff his proper interest on his inmate trust accounts,
      (5) implement changes to the institutional disciplinary procedure, to include, but not limited to, independent hearing personnel that are not part of the KDOC, and mandatory audio-video recording of the entire proceedings,
      (6) implement changes to all administrative review procedures, to include, but not limited to, independent hearing personnel that are not part of KDOC and the availability of full-time experts in administrative procedure to assist inmates in filing and processing their complaints,
      (7) discontinue the illegal sales tax on inmates, and
      (8) immediately remove the Brothers in Blue program from the KDOC, and
      (9) any other injunctive relief that may be required to resolve this litigation.

b. Declaratory judgment stating that the defendants have violated plaintiff's rights, and federal and state law, as stated at the beginning of each count under section C of this complaint, and in any other ways that may come to light during this litigation.

c. Compensatory damages in the following amounts:

(1) $1,000.00 per day for every day plaintiff was illegally held in administrative segregation, against defendants Roberts, Goddard, Pryor, Heimgartner, Winklebauer, Hoshaw Jackson, Patterson, Lucht, and Wildermuth, jointly and severally,

(2) $1,000.00 per day for each day plaintiff was exposed to the extreme roach infestation at LCF, against defendants Roberts, Goddard, Burris, Ross, Pryor, and Wildermuth, jointly and severally,

(3) $1,000.00 per day for every day plaintiff is deprived of his sleep, against defendants Roberts, Goddard, Burris, Heimgartner, Jackson, and Patterson, jointly and severally,

(4) $1,000,000.00 against defendants Corizon, Inc, Rebecca (LNU), (FNU) Brundage, Roberts, Goddard, Burris, Pryor, and Ross, for the irreparable damage caused by their failure to treat his hepatitis-C, jointly and severally,

(5) $10,000.00 against defendants Roberts, Goddard, Burris, Heimgartner, Pryor, Winklebauer, Shipman, Sapien, Booth, and Lee, for the unlawful seizure of plaintiff's books, magazines, legal files, and chilling the exercise of his First Amendment right, jointly and severally,

(6) $50,000.00 against defendants Roberts, Goddard, Burris, Heimgartner, Jackson, Patterson, for the lost litigation and additional work created thereby, due to the denied access to the law library and/or access to people trained in law, jointly and severally,

(7) $1,000,000.00 against defendants Roberts, Goddard, Burris, Heimgartner, Pryor, Ross, Hoshaw, Jackson, and Patterson, for the seized, converted, lost or destroyed property, jointly and severally,

(8) the total amount of interest embezzled from every inmates' trust account, against defendants Roberts, Goddard, Burris, Heimgartner, Pryor, and Wildermuth, jointly and severally,

(9) $10,000.00 against defendnats Roberts, Goddard, Burris, Heimgartner, Jackson, Pryor, Jackson, Patterson, Bosch, and Hunt, for the cost and labor in having to litigate court cases because they refused to properly administer the disciplinary cases entrusted to them, jointly and severally,

(10) $50,000.00 against defendants Roberts, Goddard, Burris, Heimgartner, Jackson, and Patterson, for the loss of consortium between plaintiff and his family, and the loss of enjoyment of his rights and privileges, jointly and severally,

dants Raymond,
 for all of
bezzled and
inmate benefit

,000.00 against

itigating this

just and fair.

,

_____
SPERRY

he threat of
 that I have
ntents thereof,

_____
SPERRY