UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

**JEFFREY J. SPERRY,**      )
      Plaintiff      )
      )
      v.      )      Case No. **16-CV-3222-JAR**
      )
**LINDSEY WILDERMUTH, et al.** )
      Defendants      )   /

**PLAINTIFF'S RESPONSE OPPOSING DEFENDANTS'
SUCCESSIVE MOTION FOR SUMMARY JUDGMENT**

COMES NOW, JEFFREY J. SPERRY, plaintiff pro se, and hereby submits his response opposing defendants' successive motion for summary judgment. In support of this response, plaintiff states as follows:

**Opposition to Defendants' Material Facts**

1.    Plaintiff Jeffrey Sperry is an inmate in the custody of the Kansas Department of Corrections, has been at all relevant times, and is currently housed at the Lansing Correctional Facility, P.O. Box 2, Lansing, KS 66043.

2.    On September 23, 2015, Plaintiff was issued a disciplinary report (d.r.) for contraband and taken to segregation for prehearing detention.

3.    Plaintiff did plead no-contest to the d.r., was given time served (10 days) in segregation, and ordered released from segregation.

4.    Defendant Wildermuth held plaintiff in seg illegally for several weeks until finally issuing her false administrative segregation report on October 30, 2015. [attachment F].

5.    Defendant Wildermuth did use the language "malicious and maladaptive behavior," which is synonymous with "consistent bad behavior" not Other Security Risk. Per legal

1

definition under IMPP 20-104, Other Security Risk requires a single act that is so bad that it represents "a threat to the safety and security of the facility," whereas, Consistent Bad Behavior is defined as "three d.r.s in a 12-month period that constitute a threat to the safety and security of the facility."

6.   Defendant Wildermuth did reference plaintiff's twenty-six d.r.s over 18 years, which is not a legal reason for O.S.R. status under Kansas law.

7.   The change in status was based on defendant Wildermuth's false assertions that plaintiff had been placed in administrative segregation several times previously. As EAI Gift's affidavit states, defendant Wildermuth lied about plaintiff being placed in seg in 1999, 2005, 2007, 2013, and 2018. [doc.76, exh. 2]. Exhibit 1 of document 76 further proves that the false disciplinary actions alleged on those dates in Wildermuth's false A.S.R. never occurred either.

8.   The process for challenging classification issues is indeed form-9s to the unit team and warden [IMPP 11-106], which plaintiff did. (attachments C, D, E).

9.   There is apparently no limit to the number of LCF employees who are willing to lie about matters related to this case. Plaintiff absolutely submitted timely appeals to Defendant Wildermuth (attachment G) and the Warden (attachment C, #1, #2, & #4). Inmates are powerless to force staff members to return form-9s and keeping signed receipts from the form-9s we submit is our only evidence of proper submission.

10.  Defense counsel improperly uses the word "instead," because plaintiff filed a grievance against defendants Lucht and Wildermuth, in addition to the form-9 appeals of the illegal classification, for the abuse of process these two defendants were executing. Not only were these defendants illegally classifying plaintiff O.S.R., they were doing it purposely

2

with the intent to violate his civil rights, which is most definitely grievance material. Plaintiff was required to exhaust his civil rights claims via grievance process, which he did, as admitted by defense counsel.

11. Defendant Wildermuth did try to undermine the civil rights violation grievance but plaintiff exhausted it anyways.

12. The warden did follow in defendant Wildermuth's steps with the erroneous response to plaintiff's civil rights grievance, but plaintiff exhausted it anyways.

13. The Secretary of Corrections' office also gave an erroneous response to plaintiff's civil rights grievance, but the process was properly exhausted, just like the classification issue was properly exhausted via form-9s.

14. Plaintiff's *Us Weekly* magazine was improperly seized by defendants because of an ad that listed a drink recipe, which is not a lawful basis for censorship and shows that their actions were arbitrary.

15. Again, plaintiff's January 2016 issue of *Wired* magazine was improperly seized based on a false assertion that the magazine had an article on DIY weapons. A review of this issue revealed that no such article existed and the article about military weapons was not a basis for censorship.

16. Plaintiff's April 2016 issue of *Wired* magazine was improperly seized, but this time they didn't even bother listing a reason for the censorship. A review of the magazine found no reason for censorship.

17. Defendants did seize a photograph of a woman in a bikini sent from Pulchritudinous Assets, which is not a lawful basis for censorship. The photo contained no nudity, and

like all of the arbitrary censorships during that time was done in retaliation for the complaints and grievances plaintiff was filing.

18.   Defendants did seize plaintiff's David Baldacci book, *The Target*, in May 2016. The day after receiving the seizure notice, plaintiff sent a form-9 request to the prison library asking to check out that title and received the book two days later. The book is still in the facility's library and contained not a single line of content that this court would ever find objectionable or subject to censorship.

## Plaintiff's Uncontroverted Facts

19.   In 2014, while housed in D-Cellhouse, plaintiff assisted inmate Del Ludlum in fighting KDOC's illegal classification of him as a sex offender. Defendant Wildermuth was the unit team manager of D-Cellhouse and became very angry and hostile towards plaintiff and Mr. Ludlum over the issue. In 2015, the Leavenworth District Court ruled in Mr. Ludlum's favor.

20.   In 2014, plaintiff's cell was targeted for a search and officers claimed to have found a small amount of tobacco and drugs in the cell. Plaintiff was convicted of the disciplinary report but defendants Lucht and Wildermuth pressed to have plaintiff prosecuted for the alleged contraband. In 2015, right before defendants executed their illegal OSR classification, the Leavenworth District Attorney realized that something was amiss with the allegations made by defendant Lucht and dismissed the bogus prosecution.

21.   Also in 2014, plaintiff was assisting inmate Michael Cote with his lawsuit against a nurse and he healthcare provider for giving him the wrong medication and almost killing him. Defendant Lucht's fiancée was the head of nursing at LCF at the time. It was during this time that defendants sent officers to search plaintiff's cell as referenced in paragraph 20

above. Defendant Wildermuth used that disciplinary action to ban plaintiff from going to the clinic to assist Mr. Cote. Plaintiff continued assisting him and a few weeks later, LCF staff loaded Mr. Cote into a van and shipped him off to New Mexico to stop his lawsuit.

22.   Plaintiff had a civil suit against LCF and its staff members for exposure to asbestos and lead paint since 2012. In June 2015, the Kansas Court of Appeals remanded plaintiff's case for trial and within two months defendants executed their plan to illegally classify plaintiff as OSR and sent him to long-term segregation.

23.   KDOC policy strictly limits the authority of KDOC staff to place inmates in long-term segregation, IMPP 20-104. The only two sections applicable to Plaintiff's case are the ones dealing with Consistent Bad Behavior and Other Security Risk.

24.   Other Security Risk classification can only be done by the warden and requires a finding that the "resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility." Neither, defendant Wildermuth, Lucht, nor Winklebauer, were the warden at the time. Moreover, defendant Wildermuth's administrative segregation report (ASR) never states that plaintiff engaged in any behavior that threatened the maintenance, security or control of the correctional facility.

25.   The consistent bad behavior section would be more in line with what Wildermuth was trying to assert with her hyperbole, "malicious and maladaptive behavior," and reference to plaintiff's 25 disciplinary actions over a two decade period. She refused to cite to this subsection because it requires three separate disciplinary actions in the previous twelve months and each of those actions must constitute "a substantial threat to the safety and security of the institution or facility," which she could not establish.

5

26.   Wildermuth entered a lot of false information into the ASR. [doc. 76, exh. A]. She

      asserted that she only took the information off of EAI's database, but she was told by

      plaintiff that the information was false and she proceeded with it anyways. [see:

      attachment G].

27.   Defendant Lucht assisted Defendant Wildermuth in this illegal classification and was the

      head EAI officer at Lansing during the time all of the false information was entered into

      the database regarding plaintiff. All of the false information was entered by Mr. Lucht or

      with his knowledge. With a certainty, discovery will tell the court, and plaintiff, exactly

      who entered all of the false information about plaintiff into the database.

28.   On May 12, 2022, EAI Agent James Gift issued an affidavit confirming that a lot of the

      information in defendant Wildermuth's ASR was false. [doc. 76, exh. A]. Although Mr.

      Gift took pains to try to downplay these blatant lies, the fact is, defendants Wildermuth

      and Lucht knowingly perjured themselves in an official document.

29.   Between 1997 and 2016, Plaintiff only received 24 disciplinary reports. Each entry on the

      KASPER printout with the same date is but a single d.r.

30.   Plaintiff was not d in segregation or disciplined in 1999 for relationship with staff.

      [doc.76, exh. 1].

31.   Plaintiff was not placed in segregation on 11-2-2005, nor was there ever a disciplinary

      action of any sort, especially one related to inmate McGoldrick to look up books. [doc.

      76, exh. 1]. **EAI Gift should have stated this**.

32.   Plaintiff was not place in segregation on 9-21-2007, nor was there ever a disciplinary

      action regarding a debt sheet for Morris and McKay. [doc. 76, exh. 1]. **EAI Gift should**

      **have stated this**.

6

**Commented [U1]:**
IMPP 20-104
A. Consistent bad behavior:
1. Any resident may be placed in administrative restrictive housing indefinitely when the
resident's record has shown consistent bad behavior, as evidenced by three (3) single
events of documented bad behavior within the preceding 12 months, and when:
a. The instances are a substantial threat to the safety and security of the institution or
facility; and
b. The instances arise from separate fact situations.
2. Placement under this classification requires the prior written approval of the warden and is
to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B. Other security risk:
1. The Warden may place in administrative restrictive housing, or secure confinement in the
resident's own cell, any resident or group of residents, if the resident or residents have
engaged in behavior which has threatened the maintenance, security, or control of the
correctional facility.
a. The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement
under these circumstances to the Deputy Secretary of Facility Management.
(1) An exception to the extended planning and services required under long-
term restrictive housing placements may be requested with supporting
written justification by the Warden.
(2) A copy of this explanation and justification shall be provided to the
Secretary of Corrections.

**Commented [U2R1]:**

**Commented [U3R1]:**

33.   Plaintiff was not place in Segregation on 7-31-2013, nor was there ever a disciplinary action regarding his allegedly doing legal work for some unidentified KDOC employee. [doc. 76, exh. 1].**EAI Gift should have stated this.**

34.   Plaintiff was not placed in segregation on 8-12-2012, nor was there ever a disciplinary action regarding any contraband found in the law library. [doc. 76, exh. 1]. **EAI Gift should have stated this.**

35.   Plaintiff was never issued any disciplinary action for the alleged "confidential informant" reporting that he was passing out contraband in the library and Plaintiff was not working in the library at that time. [doc. 76, exh. 1]. **EAI Gift should have stated this**.

36.   On September 23, 2015, after a small knot of tobacco and two broken syringes were found in Plaintiff's cell, Captain Ayala told him he was not going to be place in segregation and she sent him to the recreation yard. A short time later she returned to get him and take him to segregation at the request of defendants Lucht and Wildermuth. The captain is the person in charge of deciding who gets placed in prehearing segregation because that is a security determination. The discovery process will reveal that inmates found in possession of tobacco or broken syringes at the Lansing Correctional Facility have not been placed in prehearing detention and defendants Lucht and Wildermuth exceeded their authority in placing Plaintiff in prehearing segregation and they did it so they could have complete control over him for the purpose of creating the false report and illegally classifying him for long-term segregation.

37.   Defendants Lucht and Wildermuth lied about all of the segregation placements, and their related rule infractions, because that is the only way they could try and establish that he posed a substantial threat to the safety and security of the facility.

38.   Plaintiff's family looked up the January 6, 2016 issue of *Wired* magazine and found no censorable material in the magazine.

39.   Plaintiff's family looked up the April 2016 issue of *Wired* magazine and found no censorable material in the magazine.

40.   Inmates receive thousands of pictures of women in sexy bikinis every year and they are not censored and Pulchritudinous Assets specializes in photographs that do not violate prison censorship rules. The photo that was seized was not censorable and was seized in retaliation.

41.   On May 25, 2015, a day after prison officials seized Plaintiff's David Baldacci book, *The Target,* Plaintiff requested the same title from the prison library and received it two days later. There was absolutely nothing in the book that was censorable.

42.   The Court can review these publications online, and the book at any library, and make these determinations for itself. Either the censorship process is arbitrary or the seizures were done in retaliation, both of which are unconstitutional and require a jury's determination.

**<u>Memorandum of Law</u>**

The first legal precedent that all courts should begin every ruling with are the ones that hold "our legal system strongly prefers to decide cases on the merits." Lee v. Max Int'l, LLC, 638 F.3d 1318, 1321 (10th Cir. 2011). "The judicial system should offer inexpensive and speedy justice to the citizens of this state and give a liberal construction to the statutes in order to insure that cases are decided on their merits and not to deny a party his or her day in court if the other party to the litigation has not been prejudiced. It eliminates a trap that attorneys and the ever increasing number of pro se litigants frequently fall into, costing litigants their day in court on

8

the merits of the case." Honeycutt by and through Phillips v. City of Wichita, 251 Kan. 451, 461 (1992). The State of Kansas employs dozens of attorneys, paralegals and secretaries, using millions of dollars of taxpayer funds (including Plaintiff's taxes), to fight this legal battle against Plaintiff, while Plaintiff has no help and very limited resources. Then, to add insult to injury, what was once a check against executive branch overreaching, the Judiciary, takes every opportunity to undermine the legitimate cases filed by pro se prisoners by granting bogus motions to dismiss and summary judgment.

"Pro se . . . pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005) (quoting Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)). Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Anderson, supra, at 255. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

9

At this point, the Court should be utterly disgusted with defense counsel for filing a motion for summary judgment when they were forced to attach the affidavit of EAI Gift that readily admitted that defendants Lucht and Wildermuth lied on the administrative segregation report to place Plaintiff into long-term seg illegally. That affidavit alone prevents summary judgment in their favor and actually mandates that the Court grant summary judgment in favor of Plaintiff sua sponte. (see: Holmes v. Utah, Dept. of Workforce Services, 483 F.3d 1057, 1066-67 (10th Cir. 2007)). Defendants lied purposely and knowingly. They cannot aver that they accidentally lied because Plaintiff told them that half of the information was false and they proceeded with it anyways. [attachment G].

A.      Plaintiff did exhaust his administrative remedies by filing the form-9 with unit team

Wildermuth [attachment D & G], and Warden Pryor [attachment E & C1, C2, C4]. This is all that is required under IMPP 11-106, which states:

> "Within 72 hours after receiving a custody classification decision, the offender may appeal the decision to the Warden by submitting the appeal through the Unit Team Counselor on a Form-9. a. If the Warden did not participate in the custody classification decision, the Warden must review the decision and the offender's written appeal and return a written response to the offender within 15 working days of receipt. b. If the Warden was a participant in the custody classification decision, the offender's appeal must be forwarded to the Deputy Secretary of Facilities Management or designee for review, who must return a written response to the offender within 15 working days of receipt. c. The decision of the Warden or Deputy Secretary or designee is final." [§III,B,3].

Plaintiff submitted his form-9s in a timely fashion and the claims were exhausted. The additional grievance procedure taken by Plaintiff was not about the classification specifically, but was about the defendants abusing their powers and not following the law as outlined in statute, regulation, and policy. Plaintiff covered every base to prevent the very actions being put forth by defense counsel now, trying to evade justice via some procedural defect.

10

B.      Plaintiff's was engaged in constitutionally protected activities. Contrary to defense counsel's assertion, prisoners do possess a constitutionally protected right to assist other inmates with their legal issues. Johnson v. Avery, 393 US 483 (1968). The Supreme Court's ruling in Shaw v. Murphy, 532 US 223 (2001) reaffirmed the constitutional right but merely held that it was also subject to the Turner v. Safley, 482 US 78 (1978) exception for legitimate penological interest. Brooks v. Colorado Dept. of Corrections, 762 Fed.Appx. 551 (10th Cir. 2019) is clearly bad law and a misinterpretation of Supreme Court precedent. Prisoners assisting prisoners has always been, and always will be, protected First Amendment activity. Plaintiff was not being denied the right to help inmates Ludlum and Cote. In fact, he had the facility's blessing in assisting these inmates access the courts and, therefore, was engaged in constitutionally protected conduct when defendants Wildermuth and Lucht decided to retaliate against him. Wildermuth and Luchts' girlfriend (Nurse Gift), were respondents in Ludlum's and Cote's cases, which more than makes out a case or retaliation.

        Plaintiff also was actively prosecuting his asbestos case that had just been remanded by the Kansas Court of Appeals (Sperry v. McKune, No. 112,455) 90 days, not 4 months, before the illegal classification. Moreover, defendant Lucht had pressed the Leavenworth District Attorney to file charges against Plaintiff (State v. Sperry, 15-CR-xxx) in May or June of 2015, and those charges were dismissed by the D.A. just a few days before the illegal classification in September 2015. The absurdity of defense counsel's argument constitutes direct disrespect, not only towards Plaintiff, but towards this Court. Plaintiff reiterates, "In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Anderson, supra, at 255. Hunt v. Cromartie, 526 U.S. 541, 552 (1999). The clear inference from the evidence before this court is

11

that these defendants retaliated against Plaintiff for his litigation actions that directly involved them or their girlfriend.

C.      Defense counsel makes a further erroneous assertion when he states that Plaintiff could have been placed into administrative segregation without the false statements created and entered by defendants. This is clearly wrong as Kansas law strictly regulates who may be placed into long-term segregation and by whom. [IMPP 20-104]. Under this IMPP, the following provisions clearly illustrate these limits:

Policy
The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff. Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment. Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate other-wise. Only residents who require restrictive housing are to be assigned there. Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control. When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

**Long-Term Administrative Restrictive Housing**: Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general population setting.

**IV. Guidelines for Use of Long-Term Restrictive Housing**
  A. In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete and submit a long-term restrictive housing referral to the Warden for review and approval.
  B. Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.
    1. Residents on long-term restrictive housing status are to have the

same housing standards, conditions of confinement for short-term restrictive housing, and opportunities for three (3) hours or more a day out of cell time.

2. Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

**V. Classification Categories and Independent Criteria for Placement in Long-Term Administrative**

Restrictive Housing

*A. Consistent bad behavior*:

1. Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

a. The instances are a substantial threat to the safety and security of the institution or facility; and

b. The instances arise from separate fact situations.

2. Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

*B. Other security risk:*

1. The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility.

a. The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

(1) An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

(2) A copy of this explanation and justification shall be provided to the Secretary of Corrections.

This regulation makes it clear that long-term segregation is to be used only when the inmate presents a threat of violence or can create the threat of violence to residents or staff. It further requires, under "consistent bad behavior," that the inmate had "three (3) single events of documented bad behavior within the preceding 12 months, and when the instances are a substantial threat to the safety and security of the institution or facility; and the instances arise

13

from separate fact situations. This fails because between September 23, 2014 and September 23, 2015, Plaintiff only received two disciplinary reports for non-weapons contraband (tobacco and cellphone), which do not constitute violence in any way.

To make the placement under Other Security Risk, there has to be a finding that Plaintiff acted with violence, or had the influence of violence, which has never been asserted. In fact, in 27 years of incarceration, Plaintiff has never been issued a disciplinary report for acts of violence, weapons, not even disrespect. More importantly, the only person who could move to classify Plaintiff as OSR, is the Warden himself. [IMPP20-104(V)(B)]. This classification and placement was not done by the warden and nowhere did he "explain in writing the threat to security and show justification for effecting secure confinement under these circumstances," as required by law.

"As a general rule an administrative agency may not violate or ignore its own rules, and where it fails to follow the rules which it has promulgated, its orders are unlawful." Murphy v. Nelson, 260 Kan. 589, 595 (1996) citing Kansas Commission on Civil Rights v. City of Topeka Street Dept., 212 Kan. 398, 401 (1973). Clearly, under Kansas law, Plaintiff did not qualify for classification to long-term segregation. Plaintiff cited the rule, chapter and verse to defendant Wildermuth and Warden Pryor, and informed them that half of the information contained in the Administrative Segregation Report was false. They cannot argue they didn't know or that it was an accident.

D.     Throughout his absurd and erroneous argument, the one thing that defense counsel never does is repudiate that defendants lied in the ASR, and that they did so knowingly.  Where the evidence establishes that the moving party "made a false statement of fact, the district court erred in granting summary judgment." Yazdianpour v. Safeblood Techs., Inc. 779 F.3d 530, 537 (8th

14

Cir. 2015); S.E.C. v. Jorissen, 470 F.Supp.2d 764, 774 (E.D.Mich. 2007)(a jury could find that a statement that the deal was "done" is unreasonable because terms such as the interest rate had not yet been finalized, and that making a false statement is inherently unreasonable. Because this dispute as to the reasonableness of Shiffman's actions exists, summary judgment on this issue must be denied). With EAI Gift's affidavit appended to defendant's motion, Plainitiff's affidavit and documents appended to this response, and the rest of the file evidence, the court has no other option than to deny summary judgment, schedule discovery, and prepare for this matter to go to trial on this issue.

**II.      Defendants Lee, Shipman, Booth and Sapien are not entitled to summary judgment.**

Defendants censored and seized magazines, books and photographs that did not meet any sort of standard of nudity or threat to the facility. The courts have long held that the government may not engage in arbitrary censorship based on the unfettered discretion of random people. Brown v. Glines, 444 U.S. 348 (1980)(Time and again, the Court has underscored the principle that restraints upon communication must be hedged about by procedures that guarantee against infringement of protected expression and that eliminate the play of discretion that epitomizes arbitrary censorship.) citing Southeastern Promotions, Ltd. v. Conrad, supra, at 558-562; Blount v. Rizzi, 400 U.S. 410, 416-417 (1971); Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 181 (1968); Freedman v. Maryland, 380 U.S. 51 (1965); Bantam Books, Inc. v. Sullivan, supra, at 70-71; cf. Schneider v. New Jersey, 308 U.S. 147 (1939).

The Supreme Court's holding in Procunier v. Martinez, 416 US 396 (1976), that prison regulations can render prison staff actions arbitrary and capricious when there are dozens of different staff members who get to independently decide what should be censored in their personal opinion, is still good law and controls here. True enough, the Turner v. Safley, 482 US

78 (1987) standard must be applied to censorship issues [Thornburgh v. Abbott, 490 US 401 (1989)], but arbitrary and capricious government actions cannot be sustained as a legitimate penological interest.

The absurdity of defense counsel's argument is easily illustrated. He asserts that it was okay for defendants to censor and seize a book that Plaintiff purchased when the prison library held, and still holds, this book on its shelves for inmates to check out and read (*The Target*, by David Baldacci). He also claims that a prison staff member has the unfettered right to censor and seize a magazine simply because it contains advertisements from a liquor company, when hundreds of magazines with such advertisements are permitted into the institution every week to every other inmate. He further argues that it was okay to censor and seize a photograph of a woman in a bikini, which is well within the regulations permitted photograph standards as it does not contain nudity. (see: K.A.R. 44-12-313). More importantly, there are literally tens of thousands of photographs in all KDOC facilities of women in bikinis that were permitted and authorized by mailroom personnel.

Defendants' actions in censoring the one I ordered cannot be based on anything but arbitrariness and capriciousness or in retaliation for Plaintiff filing grievances and suing their coworkers. That is something to be determined after discovery has been completed and the defendants answer their interrogatories. At this point in the litigation, it is clear that the censorship and seizures were unreasonable and arbitrary which prohibits the grant of summary judgment in defendants' favor.

Plaintiff has refuted that the censorships in question were reasonable and constitutional. It is a question for a jury to decide, not the court. "[I]f there is such a dispute, the factual questions [**40] must be resolved by the factfinder, see, e.g., Kerman II, 261 F.3d at 241;

16

Oliveira v. Mayer, 23 F.3d at 649; Calamia v. City of New York, 879 F.2d 1025, 1036 (2d Cir. 1989). Plaintiff has put the question into dispute, the Court can review the materials in question for itself to confirm what plaintiff has averred, and the motion for summary judgment must be denied at this point in time.

      For the foregoing reasons, Defendants' motion for summary judgment must be dismissed and the matter needs to move on to the discovery process. Once discovery is completed, Plaintiff will file his motion for judgment as a matter of law. There is no question that defendants lied on the ASR report to illegally punish him with long-term segregation. Likewise, there is no question that the censorships and seizures in question here were either arbitrary and capricious, or were the result of retaliation, both civil rights violations that only the violators can give explanations for.

      WHEREFORE, Plaintiff requests this honorable court to deny the motion for summary judgment and order discovery in this matter.

Respectfully Submitted,

Dated: November 8, 2022

JEFFREY J. SPERRY

**Verification**

      I, Jeffrey J. Sperry, sworn upon my oath, hereby swear under the threat of penalty for perjury pursuant to 18 U.S.C. §1623 and 28 U.S.C. §1746, that I have read the foregoing response, that I know the contents thereof, and the matters therein stated are true.

JEFFREY J. SPERRY

**\*\*Plaintiff verified this document in order to use all of his factual statements as his affidavit to save time and get the response to the court sooner.\*\***