**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JEFFREY J. SPERRY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )      **Case. No. 16-3222-JAR** |
| | ) |
| LINDSEY WILDERMUTH, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Lindsey Wildermuth, Andrew Lucht, K. Lee, Bill Shipman, Hanna Booth, and Robert Sapien respectfully submit, through Assistant Attorney General Matthew L. Shoger, this Reply in further support of their Motion for Summary Judgment (Doc. 76). Defendants assert that Sperry's late response fails to controvert the material facts set forth in Defendants' motion as required by D. Kan. Rule 56.1 and does not overcome the legal arguments that Defendants advance in support of their motion. Accordingly, Defendants' motion should be granted in its entirety.

### 1.  All of Defendants facts are admitted.

On August 19, 2022, this Court entered an order granting Plaintiff a third extension of time with which to respond to Defendants' motion. (Doc. 86.) The Court cautioned Plaintiff in the order: "Plaintiff is hereby provided one final extension of time to respond, up to and including 10/3/2022. If Plaintiff fails to respond by this deadline, the Court will deem the facts presented by Defendants' motion as admitted for purposes of deciding the summary judgment motion." (*Id.*) Plaintiff did not respond to Defendants' motion until November 18, well after the extension expired. As a result of this failure to respond in a timely manner, all of Defendants' facts presented in the motion are admitted by Plaintiff by order of this Court for purposes of deciding the motion.

**2.   Plaintiff fails to properly controvert Defendants' material facts.**

Should the Court find that Plaintiff should still be given a chance to dispute Defendants' facts, Defendants submit that Sperry's Response in Opposition has not complied with D. Kan. Rule 56.1(b)(1) or (b)(2), and therefore most of Defendants' facts should be admitted and most of Plaintiff's additional facts are not properly presented. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840-41 (10th Cir. 2005) (stating that courts do not assume the role of an advocate for a *pro se* litigant by searching the record because even *pro se* litigants must present an argument citing the record, following the same rules of procedure that govern other litigants). D. Kan. Rule 56.1(b)(1) requires for a "brief in opposition to a motion for summary judgment" that "[e]ach fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed." D. Kan. Rule 56.1(b)(2) provides: "If the party opposing summary judgment relies on any facts not contained in movant's brief, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record."

Defendants assume that Plaintiff meant Plaintiff's ¶¶ 1-18 to correspond to Defendants' ¶¶ 1-18, but Plaintiff mixes additional facts into many of these paragraphs, not putting them in separately numbered paragraphs. Further, Plaintiff's statement of facts rarely provides the required references to the record for facts in dispute or for additional facts. Plaintiff's failure to comply with these requirements makes it difficult for Defendants to understand which facts he is disputing, which of his facts are additional, and where those additional facts may be supported in the record. Plaintiff also repeatedly makes conclusory allegations without personal knowledge that various Defendants supposedly lied, had ill motives, or did something "illegal," none of which are allegations of fact properly supported in the record.

Defendants reply as follows to Plaintiff's allegations of fact:

1. Plaintiff's ¶ 1 does not contest any of the facts in Defendants' ¶ 1. Plaintiff's ¶ 1 contains an additional fact that he is currently housed at Lansing Correctional Facility, which is true.

2. Plaintiff does not contest Defendants' ¶ 2 with his ¶ 2, but merely restates part of it.

3. In Plaintiff's ¶ 3, it remains undisputed that Plaintiff pled no contest to the disciplinary report. Plaintiff fails to cite to the record to support his additional facts, which Defendants dispute, that he was given time served or that he was ordered released from segregation.

4. Plaintiff does not address any of the facts in Defendants' ¶ 4. Whether Plaintiff's initial detention was legal is a legal conclusion. In light of Plaintiff's ¶ 23, Plaintiff appears to be suggesting that pre-hearing detention is illegal. Plaintiff characterizes the Administrative Segregation Report (ASR) (Doc. 87-1 at 7; Doc. 48-4) as a "false administrative segregation report," but nowhere in Plaintiff's Reply does he allege anything specific in the ASR was false beyond what Defendants have already sought to correct. (*See* Doc. 76-2.) It remains undisputed that only those particular aspects of the ASR were incorrect.

5. Plaintiff does not contest Defendants' ¶ 5. Plaintiff instead presents a legal argument in his ¶ 5 that "malicious and maladaptive behavior" is synonymous with "consistent bad behavior" and incorrectly interprets what "Other Security Risk" and "Consistent Bad Behavior" mean in Kansas Department of Corrections (KDOC) Internal Management Policy and Procedure (IMPP) 20-104. Plaintiff did not attach IMPP 20-104,[1] so Defendants' have attached it as Exhibit A to this Reply. Malicious or maladaptive do not mean the same thing as consistent. Plaintiff correctly points out that both Other Security

---

[1] Plaintiff did appear to include a partial quotation from IMPP 20-104 using a comment. (Doc. 86 at 6.)

Risk (OSR) and Consistent Bad Behavior (CBB) classifications can involve threats to the security of the facility, although Plaintiff does not appear to be accurately quoting IMPP 20-104 in this paragraph. *See* Exhibit A at 6, 12, 18. Nothing in IMPP 20-104 says an OSR classification must be based on a "single act."

6. Plaintiff does not contest Defendants' ¶ 6, but only presents a legal conclusion with no reference to applicable law.

7. Regarding Plaintiff's ¶ 7, Defendants challenge that the change in status was "based on" the incorrect statements in the ASR. It remains uncontested that that Plaintiff was placed in restrictive housing 4 times between 2008 and 2015, on January 29, 2008, February 23, 2010, May 6, 2014, and September 23, 2015, and these classifications were correctly stated in the ASR. (Doc. 76-2 at 2). Contrary to Plaintiff's suggestion that Gift's affidavit "further proves that the false disciplinary actions alleged on [the other] dates in Wildermuth's false A.S.R. never occurred," Plaintiff himself states in his ¶¶ 30-35 that Gift's affidavit does not say that the disciplinary actions never occurred. (*See* Doc. 76-2.) Although the report had some inaccuracies, Defendants have been forthcoming with correcting the report. Furthermore, Defendant Wildermuth never mentioned and could not have mentioned Plaintiff being placed in segregation in 2018 because the report was completed in 2015. (*See* Doc. 48-4.)

8. Defendants' ¶¶ 8-13 remain uncontested. Each of Plaintiff's ¶ 8-13 attempts to controvert only one of Defendants' facts – contained in Defendants' ¶ 9 (citing Doc. 48-7 at ¶ 3) – that Plaintiff failed to properly appeal his custody classification.

    A.   Plaintiff's ¶ 8 appears to agree with Defendants' ¶ 8, but misstates the appeal process for custody classifications. The process is not through Form 9's "to the

unit team and warden" but through a Form 9 *to* the warden *through* the unit team counselor. (Doc. 48-5 at 4.) Plaintiff cites three exhibits (attachments C, D, and E to his Response) to support his allegation that he properly submitted Form 9's to the warden and unit team counselor.

   i.  Plaintiff's attachment C (Doc. 87-1 at 4) is a page of receipts of Form 9's, which do not show the contents of the Form 9's beyond Plaintiff's own description on the receipt.

   ii. Plaintiff's attachment D (Doc. 87-1 at 5) is a Form 9 addressed to Defendant Wildermuth, not to the warden, dated October 25, 2015. It remains uncontested that Plaintiff received the ASR on November 4, 2015. *See* Defendants' ¶ 9 (citing Doc. 48-4 at 1). Classification appeals must be filed after receiving the classification decision under IMPP 11-106: "Within 72 hours *after* receiving a custody classification decision, the offender may appeal the decision to the Warden by submitting the appeal through the Unit Team Counselor on a form 9." (Doc. 48-5 at 4 (emphasis added).) This Form 9 was submitted prior to receiving the classification decision, not after. Accordingly, in this Form 9, Plaintiff complained of not receiving documentation in a timely manner, and did not challenge his custody classification.

   iii. Similarly, Plaintiff's attachment E is an alleged Form 9 written *before* receiving the ASR. (Doc. 87-1 at 6.) Accordingly, it similarly only complained of not receiving paperwork, and did not challenge Plaintiff's custody classification. Plaintiff wrote: "I am still in admin. seg. but have

never been served with OSR papers." Further, Plaintiff could not have

appealed a classification decision before he had received the decision.

    iv.    Therefore, Plaintiff fails to controvert through his ¶ 8 the fact in

Defendants' ¶ 9 that Plaintiff failed to file a classification appeal.

B.  Plaintiff's ¶ 9 does not contest that Plaintiff received a copy of the ASR on

November 4, 2015. Plaintiff claims he "absolutely submitted timely appeals" and

cites his attachments G and C. Plaintiff's attachment G (Doc. 87-1 at 8) is a Form

9 submitted to UTM Wildermuth, not to the warden as required by IMPP 11-106

(Doc. 48-5 at 4). Plaintiff cites three Form-9 receipts in his attachment C (Doc 87-

1 at 4, receipts 1-2, 4) for Form 9's to the warden, but these do not show the

contents of those Form 9's.

C.  Plaintiff's ¶ 10 claims "Plaintiff was required to exhaust his civil rights claims via

the grievance process, which he did, as admitted by defendants." Although

Defendants' motion stated that "Sperry submitted a grievance form at each level

of review," it also stated that "each grievance was rejected as invalid, and . . . no

action could be taken through the grievance process." (Doc. 76 at 9.) This was

because "Sperry failed to comply with the proper . . . . KDOC procedure for

challenging his custody classification." (Doc. 76 at 9.)

D.  Defendants' ¶¶ 11-13 remain uncontested. Plaintiff merely suggests again as he

did in Plaintiff's ¶ 10 that he properly exhausted the grievance process.

9.  The facts in Defendants' ¶¶ 14-18 remain uncontested. Plaintiff makes conclusory

allegations and does not refute Defendants' assertions that Plaintiff was notified of the

censorship of various materials and that he was provided with reasons that cited K.A.R. § 44-12-601.

    A.  In Plaintiff's ¶ 15, although he states that the article about DIY weapons did not exist, he admits the magazine contained "the article about military weapons," so it remains undisputed that the magazine contained an article about weapons.

    B.  In Plaintiff's ¶ 16, Plaintiff alleges that Defendants failed to list a reason for the seizure in Defendants' ¶ 16, but Defendants stated a reason. Defendants stated that the magazine "was censored because it posed a threat to the safety and security of the correctional facility, pursuant to K.A.R. § 44-12-601."

    C.  In Plaintiff's ¶ 17, he claims that "[t]he photo contained no nudity." But it remains true that "[w]hile the woman may not have been nude in general, Sperry has produced no evidence showing that the woman in the photograph was not depicted or displayed in any state of undress in which her genitals, pubic region, buttock, or breast at a point below the top of the [areola] was less than completely and opaquely covered." (Doc. 76 at 14 (citing K.A.R. § 44-12-313(b)(1) (defining "nudity" legally for purposes of the regulation)).) Therefore, Sperry still "does not refute the prison officials' specific finding that the photograph was sexually explicit." (*Id.*)

    D.  Plaintiffs assertion in ¶18 that the book is in the facilities' library is new information unsupported by references to the record. Defendants dispute this assertion.

10. Plaintiff's ¶¶ 19-21 all make inadmissible allegations. They violate Federal Rule of Evidence 402 as irrelevant to this case, or, in the alternative, they violate Rule 403 as more prejudicial than probative. The facts are beyond the scope of this case and furthermore are beyond the statute of limitations and are non-responsive to Defendants' motion.

11. Regarding Plaintiff's ¶ 22, Defendants agree that Plaintiff had a civil suit against LCF and its staff members for exposure to asbestos and lead paint, and that the Kansas Court of Appeals issued a remand order in the case on June 5, 2015. *Sperry v. McKune*, No. 112,455, 2015 WL 3632752 (Kan. Ct. App. June 5, 2015). Defendants contest that they had a plan to illegally classify Plaintiff. Defendants also recognize that 110 days, or approximately four months, spanned between June 5 (6/5/2015) and September 23 (9/23/2015), not less than two months as Plaintiff suggests in this paragraph (which would be less than 60 days) or 90 days as Plaintiff suggests on page 11 of his Response.

12. Plaintiff's ¶ 23 incorrectly characterizes IMPP 20-104 as "strictly limit[ing] the authority of KDOC staff to place inmates in long-term segregation." KDOC has discretion in applying that policy, which courts give deference to. *See Thornburgh v. Abbott*, 490 U.S. 401, 407-408 (1989). Further, Plaintiff alleges that "the only two sections applicable to Plaintiff's case are the ones dealing with Consistent Bad Behavior and Other Security Risk." Plaintiff ignores that pre-hearing detention is also allowed under the policy. Exhibit A at 4, 10, 16.

13. Regarding Plaintiff's ¶ 24, Defendants agree that Wildermuth, Lucht, and Winklebauer were not the warden at the time, but it is undisputed that the Administrative Segregation Review and Report were both signed by the Warden. (Doc. 48-3, 48-4.) Plaintiff seemingly asserts that because Wildermuth did not explicitly state that his actions threatened the maintenance, security or control of the correctional facility that Plaintiff's actions did not do so. But actions described in a report can threaten the maintenance, security or control of the correctional facility without any particular magic words being used to describe them.

14. Plaintiff's ¶ 25 is a legal conclusion based upon what segregation status he thinks might be more appropriate based on his actions described in the ASR. While Plaintiff's actions may *also* have met the criteria for CBB, his actions nonetheless still met the criteria for OSR. What is more, Plaintiff incorrectly asserts that Defendant Wildermuth did not cite to the record because she could not establish that he had 3 disciplinary actions in a 12-month period. *See* Exhibit A at 6, 12, 18 Plaintiff was given disciplinary reports on December 31, 2014 for dangerous contraband, on July 12, 2015, for possession of an unauthorized communication devise (which is contraband), and two separate write-ups on September 23, 2015, for possession of Tobacco contraband, and possession of dangerous contraband. (Doc. 76-2 at 4-5.) Even if both write-ups on September 23, 2015, were from the same factual situation, Plaintiff would still have had 3 write-ups in a 12-month period for contraband. Contraband is a substantial threat to the safety and security of the institution. *See, e.g., AlAmiin v. Morton*, 528 F. App'x 838, 843 (10th Cir. 2013) (finding "a compelling governmental interest" in "enhancing prison security through minimizing contraband"). Therefore, Plaintiff had at least three disciplinary actions in a 12-month period that threatened the safety and security of the institution and which arose from separate fact situations.

15. Regarding Plaintiff's ¶ 26, Defendants admit that there was some incorrect information in the report, but Defendants contest Plaintiff's characterization of the ASR as containing "a lot" of incorrect information. Defendants do not contest for purposes of this summary judgment motion that Plaintiff informed Wildermuth through a Form 9 that there was false information on the report. Defendants contest Plaintiff's characterization that Wildermuth

"proceeded with it anyway" because Wildermuth took no additional actions, and the report had already been written prior to Plaintiff informing Wildermuth.

16. Regarding Plaintiff's ¶ 27, Plaintiff fails to cite to the record showing that the information in the EAI system was incorrect. Plaintiff also fails to support with any references to the record that Lucht has anything to do with the classification process.

17. Regarding Plaintiff's ¶ 28, Defendants admit that on May 12, 2022, EAI Gift issued an affidavit. (Doc. 76-2.) Defendants contest that "a lot" of the ASR was incorrect for the same reasons they dispute that assertion in Plaintiff's ¶ 26.

18. Plaintiff's ¶ 29 makes a minor distinction regarding whether certain disciplinary reports should be combined. This is irrelevant to Defendants' arguments and is not how KDOC counts disciplinary reports. The affidavit of James Gift (Doc. 76-2 at 1-2) shows that Plaintiff received 26 disciplinary reports between 1999 and 2015.

19. Regarding Plaintiff's ¶ 30, Defendants do not contest that Plaintiff was not placed in segregation in 1999 for a relationship with staff. But the document Plaintiff cites (Doc. 76-2 at 3) does not support Plaintiff's allegation that he was not disciplined in that case. Regardless, that fact was not necessary to support his classification as OSR.

20. Plaintiff's ¶¶ 31-35 are contested. Each paragraph asserts that EAI Gift's affidavit "should have stated" something it did not state. Rather than support his assertions with the record, Plaintiff has pointed out that his assertions are not supported by the record.

21. Plaintiff's ¶ 36 makes a conclusory, hearsay allegation about the punishments of other inmates found in possession of contraband, of which Plaintiff has no personal knowledge, without citing to any support in the record. Plaintiff also states that Captain Ayala told him he would be released from segregation, which Defendants contest.

22. Plaintiff's ¶ 37 seemingly attempts to say that all of his segregation placements described in the ASR were incorrect. But Plaintiff has failed to controvert and therefore has admitted that four of these placements did indeed occur in January 2008, February 2010, May 2014, and September 2015. *See* Defendants' ¶ 7 (citing Doc. 76-2 at 2). Further, Plaintiff has admitted to at least three of these instances of administrative segregation (Doc. 25 at 6-7) and his blanket assertion is unsupported by the record as a whole, as Plaintiff has never directly contested these specific placements (despite having directly contested the others) and still has not done so. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007).

23. Defendants do not contest Plaintiffs' ¶ 38 and ¶ 39. Plaintiff's family may have looked up those issues of Wired Magazine and found no information censorable. However, KDOC staff did review the material and did find censorable material.

24. Plaintiffs' ¶ 40 is a conclusory, hearsay allegation unsupported by the record. Further, Plaintiff does not address whether the supposed "thousands of pictures of women in sexy bikinis" meet the relevant definition of "nudity" in K.A.R. § 44-12-313(b)(1).

25. Defendants dispute Plaintiff's ¶ 41 for the same reasons they dispute Plaintiff's ¶ 18.

26. Plaintiff only makes legal arguments in Plaintiff's ¶ 42, and it contains no assertions of fact.

### 3.  Arguments and Authorities

Defendants incorporate herein, as if set forth in full, the arguments and authorities in Defendants' Motion for Summary Judgment (Doc. 76 at 5-15.) Defendants' motion should be granted for the reasons previously stated in addition to the arguments below.

### A. Plaintiff failed to exhaust his administrative remedies

The process to challenge a custody classification is set forth in KDOC's IMPP 11-106 §

III.B.3. (Doc. 48-5 at 4.) An inmate must submit a Form 9 to the warden through the unit team

counselor within 72 hours after receiving the custody classification decision. (Doc. 48-5 at 4.)

Sperry received a copy of his administrative segregation report on November 4, 2015. (Doc. 48-4

at 1.) He did not file a classification appeal as required by the IMPP. (Doc. 48-7, Peterson Affidavit

at ¶ 3.) The only Form 9 addressed to the warden that Plaintiff provides clearly shows that Plaintiff

grieved not receiving his paperwork rather than the classification itself. (Doc. 87-1 at 6.) It was

also submitted *before* Plaintiff received the classification decision, not after. (Doc. 87-1 at 6.)

Sperry failed to comply with the procedure for challenging custody classification in IMPP 11-106

(Doc. 48-5 at 4) and K.A.R. § 44-15-101a(d)(2), so he failed to exhaust administrative remedies.

### B. Plaintiff provides no evidence that Defendants' alleged retaliatory motives caused them to place him in administrative segregation.

Plaintiff also has not shown that he was placed in segregation in retaliation for engaging in

a constitutionally protected activity. Plaintiff fails to show that he was engaged in a constitutionally

protected activity. Plaintiff assert that *Brooks v. Colorado Department of Corrections* is bad law,

but *Brooks* has not been overturned or abrogated and it remains good law in the Tenth Circuit. *See*

*Brooks v. Colo. Dep't of Corr.*, 762 F. App'x 551 (10th Cir. 2019). The cases cited by Plaintiff to

support the proposition that he was engaged in constitutionally protected activity were addressed

in *Brooks*. *Id.* at 559 (citing *Johnson v. Avery*, 393 U.S. 483, 490 (1969) and *Shaw v. Murphy*, 532

U.S. 223, 231 (2001)).

Plaintiff claims that the prison violated its own policies, claiming that under KDOC

policies long-term segregation is only allowed for threats of violence. Nothing in IMPP 20-104

suggests that CBB or OSR are limited to instances of violence. *See* Exhibit A at 6, 12, 18. Plaintiff

quotes extensively from IMPP 20-104 and the word violence cannot be found in these quotes. Rather, threats to safety and security are mentioned, which legally includes contraband incidents. *See, e.g., AlAmiin v. Morton*, 528 F. App'x 838, 843 (10th Cir. 2013) (finding "a compelling governmental interest" in "enhancing prison security through minimizing contraband"). Plaintiff also claims that the warden did not make or explain the custody classification, but it is undisputed that the warden signed the ASR, meaning the warden authorized the classification and the explanation. (Doc. 48-4.) Regardless, even if KDOC did not follow its policies perfectly, "a defendant's violation of a prison policy does not a constitutional violation make." *Williams v. Miller*, 696 F. App'x 862, 869 n.14 (10th Cir. 2017).

Plaintiff makes other arguments with regards to his retaliation claim. Plaintiff suggests that the facility allowing him to assist other inmates with their lawsuits means that Plaintiff has a constitutional right to engage in that conduct, which does not logically follow. Plaintiff suggests that Defendants have never "repudiate[d] that defendants lied in the ASR, and that they did so knowingly." But Plaintiff misunderstands the burden of proof. Defendants do not need repudiate a fact that Plaintiff has not met his burden to prove. Plaintiff suggests that incorrect statements in the ASR mean that summary judgment must be denied to Defendants and be instead granted *sua sponte* to Plaintiff. But the cases Plaintiff cite only establish that the Court can grant summary judgment *sua sponte*, not that those circumstances are met here,[2] and that if the plaintiff produces sufficient evidence for all elements of the plaintiff's claim (which may coincidentally include that

---

[2] *Holmes v. Utah Dep't of Workforce Servs.*, 483 F.3d 1057, 1066-67 (10th Cir. 2007).

a false statement was made) then summary judgment should be denied.[3] But here Plaintiff has not produced sufficient evidence to support the elements of his claim.

Temporal proximity between the remand by the Kansas Court of Appeals and the placement into administrative segregation fails to establish retaliation. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1204 (10th Cir. 2008) ("[A] three-month period of time between the protected activity and this first alleged instance of retaliation is insufficient to establish a causal connection as a matter of law."). And Plaintiff having criminal charges potentially raised against him does not establish a case of retaliation as those charges are beyond the scope of this case and the charges do not establish that Plaintiff was engaged in a protected activity.

Plaintiff was not placed in segregation as retaliation but because officers found contraband in his cell, for which they sent him to segregation and issued a disciplinary report. (*See* Doc. 25 at 6.) Sperry pled no contest to that disciplinary report. (Doc. 25 at 6.) Plaintiff has not met his burden of proof to establish that he was placed administrative segregation as retaliation.

### C. Plaintiff does not raise a triable issue regarding his claim of retaliation through seizure and censorship of his mail.

Plaintiff alleges with no supporting evidence that because his mail was censored and seized, while other prisoners' mail was allowed to go through, he was being retaliated against. Plaintiff does not allege that the allegedly allowed mail was identical to the mail that was censored and seized, and he offers no evidence to support his allegation that other prisoners are able to receive in the mail the materials he was denied. Plaintiff's newly alleges that *The Target* is available in the prison library, but this does not establish that the book could not lawfully be

---

[3] *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 537 (8th Cir. 2015); *S.E.C. v. Jorissen*, 470 F. Supp. 2d 764, 774 (E.D. Mich. 2007).

censored from incoming mail under K.A.R. § 44-12-601. Plaintiff cites vaguely to U.S. Supreme Court cases about censorship outside of prisons. Plaintiff cites *Procunier v. Martinez*, 416 U.S. 396 (1974), but it was overruled for incoming mail by *Thornburg v. Abbot*, 490 U.S. 401 (1989).

Plaintiff has not established that Defendants failed to follow in good faith the standards in K.A.R. § 44-12-601 under the discretion afforded to prison administrators under *Thornburgh*. *Thornburg*, 490 U.S. at 414; *see also Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1156 (10th Cir. 2007) ("to allow inmates to possess 'sexually explicit material' and 'technical publications' concerning weapons, contraband and escapes would have a significant impact on the safety and security of prison personnel and other inmates"). Plaintiff has not shown any evidence that KDOC policy was violated in the censorship of his materials, much less a breach rising to the level of a constitutional violation. *See Williams*, 696 F. App'x at 869 n.14.

Plaintiff's materials were seized because they posed a danger to the safety and security of the facility. Plaintiff has provided this Court with nothing more to consider than his own conclusory allegations of unfair seizure and censorship, which are insufficient to establish retaliation. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009) ("A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact" establishing retaliation).

## Conclusion

Because Defendants facts have already been deemed admitted for purposes of deciding this motion as ordered by this Court, and because Plaintiff has otherwise failed to meaningfully controvert Defendants' facts or rebut Defendants' arguments, Defendants ask that this Court grant Defendants' Motion for Summary Judgment.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

/s/ Matthew L. Shoger
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December, 2022, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all registered parties and interested parties. I also hereby certify that on the 2nd day of December, 2022, a copy of the above was served by means of first-class mail, postage prepaid, addressed to:

Jeffrey Sperry, #47031
Lansing Correctional Facility
P.O. Box 2
Lansing, KS 66043-0002
*Plaintiff, pro se*

/s/ Matthew L. Shoger
Matthew L. Shoger
Assistant Attorney General

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JEFFREY J. SPERRY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case. No. 16-3222-JAR |
| | ) | |
| LINDSEY WILDERMUTH, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>DECLARATION OF RYAN REECE</u>

I, Ryan Reece, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1. I am currently the Deputy Warden of Programs at Lansing Correctional Facility.

2. As part of my job duties, I have access to past official policy records of KDOC.

3. True and correct copies of the versions in effect since July 21, 2004, are attached to this declaration as Exhibit 1. They are in the same or substantially the same condition as they were when they were in effect as reflected in the effective dates on the documents.

4. I attest that LCF has been following and currently follows Kansas Department of Corrections (KDOC) Internal Management Policies and Procedures (IMPP's) 20-104A since at least January 1, 2015.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 1, 2022.

Ryan Reece
Deputy Warden of Programs
Kansas Department of Corrections

# KANSAS DEPARTMENT OF CORRECTIONS

| **I**NTERNAL **M**ANAGEMENT **P**OLICY AND **P**ROCEDURE | SECTION NUMBER 20-104 | PAGE NUMBER 1 of 5 |
|---|---|---|
| | SUBJECT: SEGREGATION: Purpose of Administrative Segregation & Appropriate Placements | |

| Approved By: *[signature]* Secretary of Corrections | Original Date Issued: 02-15-02 |
|---|---|
| | Current Amendment Effective: 07-21-04 |
| | Replaces Amendment Issued: 07-21-03 |

| Reissued By: *[signature]* Policy & Procedure Coordinator | The substantive content of this IMPP has been reissued as per the appropriate provisions of IMPP 01-101. The only modifications within the reissue of this document concern technical revisions of a non substantive nature. Date Reissued: 08-12-11 |
|---|---|

## POLICY

Administrative segregation procedures shall be established for the control of inmates for necessary administrative purposes other than punishment. Procedures shall be effectively related to the control of the inmate for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control.

## DEFINITIONS

None.

## PROCEDURES

I.      **Types of Inmates or Situations for Use of Administrative Segregation**

A.      Inmates may be confined in administrative segregation for any of the reasons or conditions articulated under procedure I.B. of this IMPP.

1.      Any inmate may be held in administrative segregation under any subsection or combination of subsections of this IMPP simultaneously.

a.      If the inmate is held under more than one subsection, that fact shall be stated in the administrative segregation report.

B.      Independent criteria for placement of an inmate into administrative segregation include:

1.      Protective custody (P.C.).

a.      Any inmate who requests security segregation for personal safety, or who the warden has reason to believe to be in serious and imminent danger, may be placed in administrative segregation if:

(1)     The warden explains the reason in writing, and refers to the documents or other basis for the administrator's knowledge.

**EXHIBIT 1**

(2)     Documentation that protective custody is warranted and that reasonable alternatives are not available shall be provided. A denial of protective custody shall be fully documented.

2.     Pending results of investigation.

a.     Inmates may be placed in administrative segregation pending the completion of an investigation to determine whether charges should be brought.

b.     Any inmate held in administrative segregation pending results of an investigation shall be charged or released within three working days, unless a continued holding in administrative segregation under this section is justified in writing and approved by the warden.

(1)     This notice and explanation shall be given to the inmate in writing.

3.     To prevent:

a.     Communication and collaboration between inmates involving an attempt to improperly or dishonestly coordinate the testimony which might be given;

b.     The possible intimidation of witnesses or accusers; or

c.     Further disruption, if a threat to security and control, including danger to other inmates, continues to exist in the judgment of the warden.

4.     Pre-hearing detention.

a.     If necessary to maintain security and control, any inmate who has been charged with an alleged violation of law or a class I or II offense may be held in administrative segregation pending a hearing before the institution disciplinary board, or pending a trial by a court.

(1)     Credit for this time shall be given against any sentence of disciplinary segregation which might result from that hearing.

(2)     The inmate's status shall be reviewed by the warden or designee within three working days.

5.     Communicable disease.

a.     Any inmate whom a doctor of medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any inmate who refuses to participate in testing for communicable disease, may be placed in administrative segregation status until any danger of contagion is past.

6.     Critical monitoring inmate.

a.     Administrative segregation may be applied to the following types of inmates:

(1)     Any inmate accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative segregation.

(a)     The history shall be verified and documented, or a psychiatrist or psychologist shall verify, after any such occurrence, that a recurrence is probable.

(2)     Any inmate with suicidal tendencies may be placed in administrative segregation if the condition is verified by a qualified mental health professional before, or within three working days after placement in administrative segregation.

7.     Any inmate who inflicts any self-injury may be placed in administrative segregation for up to three working days, for observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

a.     The shift supervisor may make the initial placement and determine the level of observation required, but shall make immediate and continuing efforts to consult with the assigned mental health professional, who shall thereafter make this determination.

(1)     These attempts shall be documented.

b.     At or prior to the end of the three working day period, the mental health professional shall recommend to the administrative segregation review board the appropriate placement for the inmate.

(1)     In the event such placement is made without a hearing, pursuant to I.B. of IMPP 20-105, then the warden or the warden's designee shall review the placement within three working days.

8.     Inmates with a history of self-mutilation or self-injury may be placed in administrative segregation after a demonstration has been made from the inmate's record that this history exists.

a.     The shift supervisor may make the initial placement and determine the level of observation required, but shall make immediate and continuing efforts to consult with the assigned mental health professional, who shall thereafter make this determination.

(1)     These attempts shall be documented.

b.     In the event such placement is made without a hearing, pursuant to I.B. of IMPP 20-105, then the warden or his/her designee shall review the placement within three working days.

9.     Inmates with mental or emotional problems which cause them to be a threat to themselves or others, when that mental or emotional problem has been verified by a psychiatrist or psychologist may be placed in administrative segregation.

a.     The shift supervisor may make the initial placement and determine the level of observation required, but shall make immediate and continuing efforts to consult with the assigned mental health professional, who shall thereafter make this determination.

(1)     These attempts shall be documented.

b.     In the event such placement is made without a hearing, pursuant to I.B. IMPP 20-105, then the warden or the warden's designee shall review the placement within three working days.

10.     Any inmate may be placed in administrative segregation in an emergency situation in which the violent behavior of the inmate indicates that the inmate is potentially dangerous to the

inmate's self, or others.

    a.        Segregation in this case may continue for three working days.

11.    Any inmate who has been determined by the warden or, in the warden's absence, by the deputy warden, to be an extreme risk of escape may be placed in administrative segregation.

    a.        The reason shall be explained in writing and reference made to the documents or other basis for the placement by the warden or deputy warden, unless already apparent from the information shown in the inmate's record.

    b.        When these officers are absent during an emergency, segregation may be authorized by the highest ranking officer on duty.

        (1)      The warden or the deputy warden shall review the placement within three working days, and shall either approve continued placement in administrative segregation or direct some other appropriate placement.

12.    Consistent bad behavior.

    a.        Any inmate may be placed in administrative segregation indefinitely when the inmate's record has shown consistent bad behavior, as evidenced by three documented instances of bad behavior within the preceding 12 months, and when:

        (1)      The instances are a substantial threat to the safety and security of the institution or facility; and

        (2)      The instances arise from separate fact situations.

    b.        Placement under this ground shall be with the prior written approval of the warden.

13.    Other security risk.

    a.        The warden may place in administrative segregation, or secure confinement in the inmate's own cell, any inmate or group of inmates if the inmate or inmate's have engaged in behavior which has threatened the maintenance of security or control in the correctional facility.

        (1)      The warden shall, within three working days of the placement, explain, in writing, the threat to security and show justification for effecting either segregation or secure confinement under these circumstances.

        (2)      A copy of this explanation and justification shall be provided to the Secretary of Corrections.

14.    Holdovers.

    a.        The warden or his designee may place in administrative segregation inmates who are identified as holdovers.

        (1)      Holdover inmates are those inmates who fall into one of the following categories:

            (a)      Any newly committed inmate awaiting transportation to    Topeka or El Dorado Correctional Facility reception and diagnostic unit;

            (b)      Any inmate who is otherwise being held in a facility temporarily while in transit between one facility and another; or

(c)     Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

(2)     An individual shall not be held on holdover status for a period longer than reasonably necessary to accomplish the transfer to another facility.

15.     An inmate may be placed in administrative segregation when the inmate refuses to participate in an identification procedure, including fingerprinting and photographing.

16.     An inmate may be placed in administrative segregation if the inmate has been sentenced to death subsequent to his or her conviction of a capital offense, and such inmates shall not be subject to the periodic Program Management Committee reviews required within the provisions of IMPP 20-106 unless there is some departure from their capital status due to any substantive action taken by the courts.

**II.     Timeframes Related to Administrative Segregation**

A.     For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the governor.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them.  They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties.  Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards.  Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None

**REFERENCES**

KSA 75-5210, 75-5251, 75-7552
ACI 3-4128-2, 3-4223, 3-4238, 3-4239, 3-4268-M

**ATTACHMENTS**

None



**KANSAS**

**Department of Corrections**

# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Applicability:   X  ADULT Operations Only    _ JUVENILE Operations Only   _ DEPARTMENT-WIDE**

| | |
|---|---|
| **IMPP #:  20-104A** | **PAGE #: 1 of 6** |

**SEGREGATION/RESTRICTIVE HOUSING: Purpose of Administrative Restrictive Housing and Appropriate Placements**

**Original Date Issued: 10-11-21    Replaces IMPP Issued: N/A    CURRENT EFFECTIVE DATE: 10-11-21**

**Approved By:** [signature]  **Secretary    Next Scheduled Review:** 04/2023

---

## POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff.  Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment.  Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise.  Only residents who require restrictive housing are to be assigned there.  Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control.  When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

## DEFINITIONS

Restrictive Housing: A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

Administrative Restrictive Housing: A form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents; or when a resident's continued presence threatens the secure and orderly operation of the facility.

Disciplinary Restrictive Housing: A form of restrictive housing to which a resident can be sentenced following conviction of a rule violation through disciplinary proceedings.

Short-Term Administrative Restrictive Housing: Restrictive housing placement less than 15 days.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Disciplinary Restrictive Housing
- Pending Results of an Investigation (PI)
- To prevent further collaboration, intimidation, or disruption
- Pre-Hearing Detention (PHD)
- Communicable Disease
- Critical Monitoring
- Emergency Situations
- Hold Overs
- Refusing to participate in identification procedures

Long-Term Administrative Restrictive Housing: Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general

population setting. For purposes of accounting days, the date of admission to restrictive housing is considered day one (1):  Classification categories include:

- Protective Custody (PC) refer to IMPP 20-108D [Protective Custody]
- Consistent Bad Behavior (CBB)
- Other Security Risk (OSR)
- Capital Punishment

<u>Long-Term Restrictive Housing Committee:</u> A committee comprised of the sending facility Warden, KDOC Risk Manager, KDOC Classification Manager, Enforcement, Apprehension, and Investigations (EAI) Director or designee, and the KDOC Deputy Secretary of Facility Management.

<u>Severe and Persistent Mental Illness (SPMI):</u> A mental health illness that is prolonged and recurrent, impairs activities of daily living and requires long-term treatment.

<u>Single Event:</u>  A situation or instance involving a single or series of related actions or behaviors defining a single incident.

## PROCEDURES

I.      **General Procedures**

    A.      Residents may be confined in administrative restrictive housing for any of the reasons or conditions articulated within this policy.

        1.      Any resident may be held in administrative restrictive housing under any subsection or combination of subsections of this policy simultaneously.

            a.      If the resident is held under more than one (1) subsection, that fact is to be stated in the administrative restrictive housing report in accordance with IMPP 20-105A.

    B.      Residents with disabilities must be placed in cells that accommodate their disability.

        1.      Residents must not be placed in restrictive housing solely due to their disability or due to the lack of available accessible cells.

    C.      Juveniles, pregnant women or women who recently gave birth, and residents with a severe and persistent mental illness (SPMI) must be considered for alternative placement in the infirmary, a mental health unit or in a unit on a suicide watch or crisis level placement.

        1.      Residents considered to be severely and persistently mentally ill for the purpose of this policy are to be assessed for placement in restrictive housing pursuant to short-term restrictive housing categories only.

II.     **Guidelines for Use of Short-Term Administrative Restrictive Housing**

    A.      The time a resident may be placed in any combination of short-term restrictive housing classifications must not exceed 15 days based on a single event.  The Warden/Deputy Secretary of Facility Management must approve any placement considered to be Short Term Restrictive Housing resulting in more than 15 days within a 30-day period.

    B.      The conditions of confinement for residents in short-term restrictive housing are to be followed according to IMPP 20-101D.

    C.      Restraints are to be utilized during movement that occurs outside a resident's cell and/or unit, unless the use of restraints worsens a resident's condition, or the use of restraints is unwarranted.

        1.      Exceptions to the use of restraints is to be granted by the Warden, or Chief of Security in the Warden's absence.

        2.      Facility Wardens may establish procedures in General Orders for limited movement

without restraints for residents housed in double-bunked cell assignments, to activities such as showers and recreation.

III.   **Classification Categories and Independent Criteria for Placement in Short-Term Administrative Restrictive Housing**

    A.   Pending results of investigation:

        1.   Residents may be placed in administrative restrictive housing pending the completion of an investigation to determine whether charges are to be brought.

        2.   Any resident held under pending results of an investigation is to be charged or released within three (3) working days, unless a continued holding in administrative restrictive housing under this section is justified in writing and approved by the Warden.

            a.   This notice and explanation is to be provided to the resident in writing.

    B.   To prevent the following:

        1.   Further disruption, if a threat to security and control, including danger to others, continues to exist in the judgment of the Warden.

        2.   The possible intimidation of witnesses or accusers; or

        3.   Communication and collaboration between residents involving an attempt to improperly or dishonestly coordinate the testimony which might be given.

    C.   Pre-hearing detention:

        1.   If necessary to maintain security and control, any resident who has been charged with an alleged violation of law, or a class I or II rule violation, may be held in administrative restrictive housing pending a hearing before the facility disciplinary board, or pending a trial by a court.

            a.   Time served in restrictive housing under pre-hearing detention is to be credited towards a sanction of disciplinary restrictive housing resulting from a disciplinary conviction.

            b.   The resident's status is to be reviewed by the Warden or designee within three (3) working days.

    D.   Communicable disease:

        1.   Any resident whom a Doctor of Medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any resident who refuses to participate in testing for communicable disease, may be placed in administrative restrictive housing status until any danger of a contagion is past.

    E.   Critical monitoring resident:

        1.   As applicable administrative restrictive housing may be applied to the following types of residents.  In the event such placement is made without a hearing, pursuant to Section I.B. of IMPP 20-105A, the Warden or his/her designee is to review the placement. Residents are to be assessed for application of the Offender Companion Program pursuant to IMPP 10-144A for constant observation.

            a.   Any resident accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative restrictive housing.

            b.   Any resident with suicidal tendencies may be placed in administrative restrictive

housing under appropriate observation providing the condition is verified by a qualified behavioral mental health professional and a clinical observation is not available.

c.    Any resident exhibiting self-injurious behavior under appropriate observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

d.    Residents with behavioral, mental health, or emotional problems which cause them to be a threat to themselves or others, when that behavioral, mental health or emotional problem has been verified by a psychiatrist or psychologist, may be placed in administrative restrictive housing under appropriate observation when clinical observation is not available.

e.    Residents suspected to be under the influence of an illicit substance may be placed in restrictive housing under appropriate observation when clinical or unit observation is not available and or not appropriate.

F.    Emergency situations:

1.    Any resident, or group of residents, may be placed in administrative restrictive housing or secure confinement in the resident(s) own cell(s) if the resident, or residents, engaged in behavior that threatened the maintenance, security, or control of the facility creating an emergency situation that presents a danger to the resident or others.

    a.    A copy of this explanation and justification shall be provided to the Deputy Secretary of Corrections of Facilities Management.

    b.    Placement may continue for up to three (3) working days.

2.    Any resident who has been determined by the Warden or, in the Warden's absence, by the Deputy Warden, to be an extreme risk of escape may be placed in administrative restrictive housing.

    a.    The reason is to be explained in writing and reference made to the documents or other basis for the placement unless already apparent from the information shown in the resident's record.

    b.    When these staff are absent during an emergency, restrictive housing may be authorized by the highest-ranking officer on duty.

        (1)    The Warden or the Deputy Warden is to review the placement within 24-hours and must either approve continued placement in administrative restrictive housing or direct other appropriate housing.

G.    Holdovers:

1.    The Warden or designee may place residents in administrative restrictive housing who are identified as holdovers.

    a.    Holdover residents are those residents who fall into one (1) of the following categories:

        (1)    Any newly committed resident awaiting transportation to Topeka or El Dorado Correctional Facility reception and diagnostic unit.

        (2)    Any resident who is otherwise being held in a facility temporarily while in transit between one facility and another; or,

        (3)    Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility

pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

    b.    A resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility.

H.    Refusal to participate:

    1.    A resident may be placed in administrative restrictive housing when the resident refuses to participate in an identification procedure, including fingerprinting and photographing.

## IV.    Guidelines for Use of Long-Term Restrictive Housing

A.    In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete and submit a long-term restrictive housing referral to the Warden for review and approval.

B.    Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.

    1.    Residents on long-term restrictive housing status are to have the same housing standards, conditions of confinement for short-term restrictive housing, and opportunities for three (3) hours or more a day out of cell time.

    2.    Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

## V.    Classification Categories and Independent Criteria for Placement in Long-Term Administrative Restrictive Housing

A.    Consistent bad behavior:

    1.    Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

        a.    The instances are a substantial threat to the safety and security of the institution or facility; and

        b.    The instances arise from separate fact situations.

    2.    Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B.    Other security risk:

    1.    The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security or control of the correctional facility.

        a.    The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

            (1)    An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

            (2)    A copy of this explanation and justification shall be provided to the

Secretary of Corrections.

C.    Protective Custody:

    1.    Pursuant to IMPP 20-108 [Protective custody] any resident who requests restrictive housing for personal safety, or who the Warden has reason to believe to be in serious and imminent danger, may be placed in administrative restrictive housing if:

        a.    Documentation that protective custody is warranted is provided in writing by the Warden and reasonable alternatives are not available.

        b.    A denial of protective custody is to be fully documented in the EAI file.

## VI.    Timeframes Related to Administrative Restrictive Housing

A.    For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the Governor.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

None.

## REFERENCES

IMPP 10-110D, 10-144A, 12-120A, 20-105A, 20-106, 20-108D

## HISTORY

10-11-21 Original

## ATTACHMENTS

None.



# INTERNAL MANAGEMENT POLICY & PROCEDURE

**Department of Corrections**

**Applicability:**  **X** ADULT Operations Only   _ JUVENILE Operations Only   _ DEPARTMENT-WIDE

---

**IMPP #:**  **20-104A**                                                                 **PAGE #: 1 of 6**

**SEGREGATION/RESTRICTIVE HOUSING: Purpose of Administrative Restrictive Housing and Appropriate Placements**

**Original Date Issued: 10-11-21**    **Replaces IMPP Issued: 10-11-21**    **CURRENT EFFECTIVE DATE: 05-13-22**

---

**Approved By:** _[signature]_ **, Secretary**    **Next Scheduled Review:** 06/2024

---

## POLICY

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff.  Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment.  Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise.  Only residents who require restrictive housing are to be assigned there.  Procedures are to be effectively related to the control of the resident for stated purposes.  These procedures may be increased in scope and extent as necessary to maintain effective control.  When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

## DEFINITIONS

Restrictive Housing: A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

Administrative Restrictive Housing: A form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents; or when a resident's continued presence threatens the secure and orderly operation of the facility.

Disciplinary Restrictive Housing: A form of restrictive housing to which a resident can be sentenced following conviction of a rule violation through disciplinary proceedings.

Short-Term Administrative Restrictive Housing: Restrictive housing placement less than 15 days.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Disciplinary Restrictive Housing
- Pending Results of an Investigation (PI)
- To prevent further collaboration, intimidation, or disruption
- Pre-Hearing Detention (PHD)
- Communicable Disease
- Critical Monitoring
- Emergency Situations
- Hold Overs
- Refusing to participate in identification procedures

Long-Term Administrative Restrictive Housing: Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general

population setting.  For purposes of accounting days, the date of admission to restrictive housing is considered day one (1):  Classification categories include:

- Protective Custody (PC) refer to IMPP 20-108D [Protective Custody]
- Consistent Bad Behavior (CBB)
- Other Security Risk (OSR)
- Capital Punishment

<u>Long-Term Restrictive Housing Committee:</u> A committee comprised of the sending facility Warden, KDOC Risk Manager, KDOC Classification Manager, Enforcement, Apprehension, and Investigations (EAI) Director or designee, and the KDOC Deputy Secretary of Facility Management.

<u>Severe and Persistent Mental Illness (SPMI):</u> A mental health illness that is prolonged and recurrent, impairs activities of daily living and requires long-term treatment.

<u>Single Event:</u> A situation or instance involving a single or series of related actions or behaviors defining a single incident.

**PROCEDURES**

I.      **General Procedures**

A.      Residents may be confined in administrative restrictive housing for any of the reasons or conditions articulated within this policy.

1.      Any resident may be held in administrative restrictive housing under any subsection or combination of subsections of this policy simultaneously.

a.      If the resident is held under more than one (1) subsection, that fact is to be stated in the administrative restrictive housing report in accordance with IMPP 20-105A.

B.      Residents with disabilities must be placed in cells that accommodate their disability.

1.      Residents must not be placed in restrictive housing solely due to their disability or due to the lack of available accessible cells.

C.      Juveniles, pregnant women or women who recently gave birth, and residents with a severe and persistent mental illness (SPMI) must be considered for alternative placement in the infirmary, a mental health unit or in a unit on a suicide watch or crisis level placement.

1.      Residents considered to be severely and persistently mentally ill for the purpose of this policy are to be assessed for placement in restrictive housing pursuant to short-term restrictive housing categories only.

II.     **Guidelines for Use of Short-Term Administrative Restrictive Housing**

A.      The time a resident may be placed in any combination of short-term restrictive housing classifications must not exceed 15 days based on a single event.  The Warden/Deputy Secretary of Facility Management must approve any placement considered to be Short Term Restrictive Housing resulting in more than 15 days within a 30-day period.

B.      The conditions of confinement for residents in short-term restrictive housing are to be followed according to IMPP 20-101A.

C.      Restraints are to be utilized during movement that occurs outside a resident's cell and/or unit, unless the use of restraints worsens a resident's condition, or the use of restraints is unwarranted.

1.      Exceptions to the use of restraints is to be granted by the Warden, or Chief of Security in the Warden's absence.

2.      Facility Wardens may establish procedures in General Orders for limited movement without

restraints for residents housed in double-bunked cell assignments, to activities such as showers and recreation.

III.    **Classification Categories and Independent Criteria for Placement in Short-Term Administrative Restrictive Housing**

A.    Pending results of investigation:

1.    Residents may be placed in administrative restrictive housing pending the completion of an investigation to determine whether charges are to be brought.

2.    Any resident held under pending results of an investigation is to be charged or released within three (3) working days, unless a continued holding in administrative restrictive housing under this section is justified in writing and approved by the Warden.

a.    This notice and explanation is to be provided to the resident in writing.

B.    To prevent the following:

1.    Further disruption, if a threat to security and control, including danger to others, continues to exist in the judgment of the Warden.

2.    The possible intimidation of witnesses or accusers; or

3.    Communication and collaboration between residents involving an attempt to improperly or dishonestly coordinate the testimony which might be given.

C.    Pre-hearing detention:

1.    If necessary to maintain security and control, any resident who has been charged with an alleged violation of law, or a class I or II rule violation, may be held in administrative restrictive housing pending a hearing before the facility disciplinary board, or pending a trial by a court.

a.    Time served in restrictive housing under pre-hearing detention is to be credited towards a sanction of disciplinary restrictive housing resulting from a disciplinary conviction.

b.    The resident's status is to be reviewed by the Warden or designee within three (3) working days.

D.    Communicable disease:

1.    Any resident whom a Doctor of Medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any resident who refuses to participate in testing for communicable disease, may be placed in administrative restrictive housing status until any danger of a contagion is past.

E.    Critical monitoring resident:

1.    As applicable administrative restrictive housing may be applied to the following types of residents.  In the event such placement is made without a hearing, pursuant to Section I.B. of IMPP 20-105A, the Warden or his/her designee is to review the placement.  Residents are to be assessed for application of the Offender Companion Program pursuant to IMPP 10-144A for constant observation.

a.    Any resident accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative restrictive housing.

b.    Any resident with suicidal tendencies may be placed in administrative restrictive

housing under appropriate observation providing the condition is verified by a qualified behavioral mental health professional and a clinical observation is not available.

c.      Any resident exhibiting self-injurious behavior under appropriate observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

d.      Residents with behavioral, mental health, or emotional problems which cause them to be a threat to themselves or others, when that behavioral, mental health or emotional problem has been verified by a psychiatrist or psychologist, may be placed in administrative restrictive housing under appropriate observation when clinical observation is not available.

e.      Residents suspected to be under the influence of an illicit substance may be placed in restrictive housing under appropriate observation when clinical or unit observation is not available and or not appropriate.

F.      Emergency situations:

1.      Any resident, or group of residents, may be placed in administrative restrictive housing or secure confinement in the resident(s) own cell(s) if the resident, or residents, engaged in behavior that threatened the maintenance, security, or control of the facility creating an emergency situation that presents a danger to the resident or others.

a.      A copy of this explanation and justification shall be provided to the Deputy Secretary of Corrections of Facilities Management.

b.       Placement may continue for up to three (3) working days.

2.      Any resident who has been determined by the Warden or, in the Warden's absence, by the Deputy Warden, to be an extreme risk of escape may be placed in administrative restrictive housing.

a.      The reason is to be explained in writing and reference made to the documents or other basis for the placement unless already apparent from the information shown in the resident's record.

b.      When these staff are absent during an emergency, restrictive housing may be authorized by the highest-ranking officer on duty.

(1)     The Warden or the Deputy Warden is to review the placement within 24-hours and must either approve continued placement in administrative restrictive housing or direct other appropriate housing.

G.      Holdovers:

1.      The Warden or designee may place residents in administrative restrictive housing who are identified as holdovers.

a.      Holdover residents are those residents who fall into one (1) of the following categories:

(1)     Any newly committed resident awaiting transportation to Topeka or El Dorado Correctional Facility reception and diagnostic unit.

(2)     Any resident who is otherwise being held in a facility temporarily while in transit between one facility and another; or,

(3)     Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility

pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

    b.    A resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility.

H.    Refusal to participate:

    1.    A resident may be placed in administrative restrictive housing when the resident refuses to participate in an identification procedure, including fingerprinting and photographing.

I.    Disciplinary Restrictive Housing

    1.    Placement of any resident in disciplinary restrictive housing requires full compliance with all applicable provisions and requirements of the disciplinary procedures set forth within K.A.R. 44-13-101 *et seq.*

## IV.    Guidelines for Use of Long-Term Restrictive Housing

A.    In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete  and submit a long-term restrictive housing referral to the Warden for review and approval.

B.    Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.

    1.    Residents on long-term restrictive housing status are to have the same housing standards, conditions of confinement for short-term restrictive housing, and  opportunities for three (3) hours or more a day out of cell time.

    2.    Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

## V.    Classification Categories and Independent Criteria for Placement in Long-Term Administrative Restrictive Housing

A.    Consistent bad behavior:

    1.    Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

        a.    The instances are a substantial threat to the safety and security of the institution or facility; and

        b.    The instances arise from separate fact situations.

    2.    Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B.    Other security risk:

    1.    The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility.

        a.    The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

        (1)     An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

        (2)     A copy of this explanation and justification shall be provided to the Secretary of Corrections.

C.     Protective Custody:

    1.     Pursuant to IMPP 20-108 [Protective custody] any resident who requests restrictive housing for personal safety, or who the Warden has reason to believe to be in serious and imminent danger, may be placed in administrative restrictive housing if:

        a.     Documentation that protective custody is warranted is provided in writing by the Warden and reasonable alternatives are not available.

        b.     A denial of protective custody is to be fully documented in the EAI file.

## VI.   Timeframes Related to Administrative Restrictive Housing

A.     For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the Governor.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

## REPORTS

None.

## REFERENCES

IMPP 10-110D, 10-144A, 12-120A, 20-105A, 20-108D

## HISTORY

10-11-21 Original
05-13-22 Revision 1

## ATTACHMENTS

None.