**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JEFFREY J. SPERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 16-3222-JAR** |
| | ) | |
| **LINDSEY WILDERMUTH,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

In accordance with D. Kan. Rule 7.1(a), Defendants K. Lee, Bill Shipman, Hannah Booth, and Robert Sapien ("Defendants") submit this memorandum, through Assistant Attorney General Matthew L. Shoger, in support of their motion under Fed. R. Civ. P. 56. Defendants respectfully request that this motion be granted and summary judgment be granted in their favor. Defendants attach six new exhibits, outlined in the table below, and state the following in support.

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | Declaration of Darcie Holthaus |
| B | Sealed Excerpts (for in-camera review) from Dec. 21, 2015 issue of Us Weekly |
| C | Sealed Excerpts (for in-camera review) from Jan. 2016 issue of Wired magazine |
| D | Sealed Excerpts (for in-camera review) from Apr. 2016 issue of Wired magazine |
| E | Sealed Excerpts (for in-camera review) from Pulchritudinous Assets |
| F | Sealed Excerpts (for in-camera review) from The Target by David Baldacci |

**NATURE OF THE CASE**

Plaintiff Jeffrey Sperry filed his original § 1983 complaint in this matter on November 7, 2016. (Doc. 1.) He filed an amended complaint on November 28, 2017, which included 14 counts, four of which were subsequently severed as improperly joined. (Doc. 25 at 5-21; Doc. 28 at 3; Doc. 63 at 1 & n.1.) Defendants moved for dismissal or, in the alternative, for summary

judgment. (Docs. 52-54.) In a December 30, 2020, Memorandum and Order, this Court granted

Defendants' motion, stating that all ten of Sperry's counts were "dismissed for failure to state a

claim upon which relief can be granted." (Doc. 63 at 1, 27.) On appeal, the Tenth Circuit Court

of Appeals affirmed the dismissal of eight of Sperry's counts, but reversed and remanded the

dismissal of two counts, although for only some of the defendants. *Sperry v. Wildermuth*, No. 21-

3009, 2022 WL 946936, at *9 (10th Cir. 2022). The Tenth Circuit encouraged this Court to

consider on remand "defendants' alternative argument for summary judgment." *Id.* at *9 n.15.

On remand, Defendants renewed their motion for summary judgment (Docs. 75-77), and this

Court granted the motion in part, dismissing one of the two remaining claims. (Doc. 91 at 15.)

The only remaining claim is a First Amendment claim against Defendants Lee, Shipman,

Booth, and Sapien for withholding of Sperry's mail. (Doc. 91 at 15); *see also Sperry*, 2022 WL

946936, at *5 to *6, *5 n.8, *9 (affirming dismissal of this claim as to other defendants and as to

one withheld book); (Doc. 25 at 10-12). The Court previously denied summary judgment on this

claim (without prejudice) because the withheld materials (or alternatively affidavits sufficiently

describing them) were not in the record and because the Defendants had not addressed the

*Turner* factors. (Doc. 91 at 14-15.)

This motion now provides the withheld materials under seal for in-camera review and

provides an analysis of the *Turner* factors as applied to this remaining claim. The withheld

materials show that the withholding was reasonably related to legitimate penological interests

and was not an exaggerated response to those concerns. No clearly established law establishes

otherwise, so Defendants are entitled to qualified immunity. Additionally, Sperry has not

presented any admissible evidence that Lee or Booth were actually involved in the withholding

of materials, he has failed to establish the required elements for any First Amendment retaliation

claim, and he has not shown a legal basis to support any of the remedies that he requests. For these reasons, the Court should grant Defendants' motion for summary judgment.

## STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE EXISTS

1. Jeffrey J. Sperry is an inmate in the custody of the Kansas Department of Corrections (KDOC) who from October 10, 1997, to present has been housed at Lansing Correctional Facility (LCF) and El Dorado Correctional Facility (EDCF). (Doc. 76-3 at 2.)

2. Sperry and other inmates are able to receive a wide variety of books, magazines, letters, and photographs, as well as other information and reading materials in the mail. *See* K.A.R. 44-12-601(d)(1) (providing limited grounds for censorship); (Doc. 48-14 at 2 (rejecting a magazine, but not because it was a magazine), Doc. 48-15 at 2 (same), Doc. 48-16 at 1-2 (same), Doc. 48-17 at 1 (rejecting photographs, but not because they were photographs), Doc. 48-18 at 2 (rejecting a book, but not because it was a book)).

3. When publications are censored from incoming mail, they are censored in their entirety. (Exhibit A at ¶ 23.)

4. Removing only the prohibited portions from each publication would require staff to examine each page of every incoming publication for prohibited content. This would require an exponential increase in staff in order to do this for all publications received by each of the nearly ten thousand inmates in the custody of KDOC. (Exhibit A at ¶ 23.)

### *Us Weekly – December 21, 2015 issue*

5. On December 14, 2015, Sperry was sent a notice by Defendant Shipman that the December 21, 2015 issue of Us Weekly had been rejected because contents of the magazine – specifically, drink recipes – posed a threat to the safety and security of correctional facilities, pursuant to K.A.R. § 44-12-601. (Doc. 48-14 at 2.)

6.  That December 21, 2015 issue of Us Weekly contained alcoholic drink recipes. (Exhibit B at 2; Exhibit A at ¶ 3.)

7.  Alcohol is considered contraband for inmates in the custody of KDOC as an intoxicant and a security risk. (Exhibit A at ¶ 7.)

8.  Alcohol-related materials such as drink recipes have been rejected from incoming mail, aiming to discourage the production of contraband alcohol. (Exhibit A at ¶ 8.)

### *Wired – January 2016 issue*

9.  On January 6, 2016, Sperry was sent a notice by Defendant Shipman that the January 2016 issue of Wired magazine had been rejected because contents of the magazine – specifically, DIY weapons – posed a threat to the safety and security of correctional facilities, pursuant to K.A.R. § 44-12-601. (Doc. 48-15 at 2.)

10. That January 2016 issue of Wired magazine contained instructions on how to create DIY weapons and armor. (Exhibit C at 3; Exhibit A at ¶ 4.)

11. Weapons and armor – and therefore instructions on how to make weapons and armor – are contraband for inmates in the custody of KDOC. This policy aims to prevent violence and to maintain the safety and security of the facility. (Exhibit A at ¶¶ 9-10.)

12. Some KDOC prison staff and inmates have been injured and some have even lost their lives to violent acts by inmates in the past. (Exhibit A at ¶ 11); *see also* KDOC, Officers on Kansas Law Enforcement Memorial (updated May 3, 2019), https://www.doc.ks.gov/newsroom/klem/kdoc; Gabe Swartz, *KBI rules 62-year-old inmate's death at Lansing Correctional Facility a homicide*, KCTV5, updated Jan. 7, 2023, https://www.kctv5.com/2023/01/07/62-year-old-inmate-dies-lansing-correctional-facility/.

*Wired – April 2016 issue*

13. In April 2016, Sperry was given notice by KDOC staff that the April 2016 issue of Wired magazine had been rejected because it posed a threat to the safety and security of the correctional facility, pursuant to K.A.R. § 44-12-601. (Doc. 48-16 at 1-2.)

14. That April 2016 issue of Wired magazine contained an article focused on and containing radical terrorist propaganda from ISIS. (Exhibit D at 3-4; Exhibit A at ¶ 5.)

15. Radical terrorist propaganda has been rejected from incoming mail, aiming to prevent radicalization of inmates, to keep radicalization from hindering rehabilitation, and to mitigate talking or planning of violent activity. (Exhibit A at ¶ 12.)

*Pulchritudinous Assets*

16. On April 8, 2016, Sperry was sent notice by Defendant Sapien that a picture of a "sexily dressed woman" (Doc. 25 at 11) from Pulchritudinous Assets was being censored on the basis that it "poses a threat to institutional safety, order or security," and it contains sexually explicit materials as described in K.A.R. § 44-12-313. (Doc. 48-17 at 1.)

17. The pictures of women in that issue of Pulchritudinous Assets show as less than completely and opaquely covered the following: (Exhibit A at ¶ 6)

    a.   the buttock (Exhibit E at 1-3),

    b.   the pubic region (Exhibit E at 1-2),

    c.   the breast at a point below the top of the areola (Exhibit E at 1-3).

18. KDOC's ban on sexually explicit materials aims to prevent violence, sexual harassment, lewd acts, and sexual assaults as well as unauthorized trading within the prison, and to promote offender rehabilitation. (Exhibit A at ¶¶ 13-17.)

### *The Target*

19. On May 24, 2016, Sperry was sent a notification by Bill Shipman that the book The
    Target by David Baldacci had been rejected because of content that posed a threat to the
    safety and security of correctional facilities, pursuant to K.A.R. § 44-12-601. (Doc. 48-18
    at 2.)

20. The book The Target contained the following:[1]

    a. A discussion between inmate characters about escaping from prison (p. 2).
       (Exhibit F at 3.)

    b. A suggestion by an inmate character that violence would be justified against
       "Jews or Presbyterians or coloreds" (p. 6). (Exhibit F at 4.)

    c. A description of how a man violently incapacitated someone in a fight (p. 16).
       (Exhibit F at 5.)

    d. A description of an inmate inappropriately lusting after a prison staff member (pp.
       41-42). (Exhibit F at 6-7.)

    e. A description of an inmate imagining sexual acts with a prison staff member (p.
       41). (Exhibit F at 6.)

    f. A description of an inmate masturbating at the sight of a prison staff member (pp.
       41-42). (Exhibit F at 6-7.)

21. Materials discussing escaping from prison have been rejected from incoming mail
    because they could lead to an increase in inmates planning escape attempts. (Exhibit A at
    ¶ 18.)

_____

[1] The undersigned counsel obtained a copy of the book, scanned the relevant pages, and attached
them to this motion as Exhibit F (sealed for in-camera review).

22. Racially and religiously motivated violence is a known problem in prisons. KDOC actively tries to prevent such violence from occurring. (Exhibit A at ¶ 19.)

23. Materials containing support for racially or religiously motivated violence have been rejected from incoming mail because they could lead to an increase in such violence. (Exhibit A at ¶ 20.)

24. Materials that describe how to violently incapacitate someone have been rejected from incoming mail because they could lead to inmates attempting the behavior, leading to increased violence in the prison. (Exhibit A at ¶ 21.)

25. Materials describing inappropriate, sexualized relationships between inmates and prison staff have been rejected from incoming mail because they could lead to an increase in sexual harassment toward staff, lewd acts, sexual assault of staff through inappropriate touching, or increased pressure from inmates to staff to participate in conversations of undue familiarity. (Exhibit A at ¶ 22.)

## QUESTIONS PRESENTED

I.     Are Defendants Lee and Booth entitled to summary judgment when no admissible evidence establishes their involvement in the censorship actions?

II.    Are Defendants entitled to summary judgment on any First Amendment retaliation claim when Sperry fails to establish a constitutionally protected activity or a retaliatory motive?

III.   Are Defendants entitled to qualified immunity because the censorship actions, in light of the evidentiary record, did not violate clearly established law of which reasonable state officials would have known?

IV.    Is Sperry entitled to compensatory damages under the Prison Litigation Reform Act when he does not allege physical injury?

V.    Is Sperry entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his federal constitutional rights?

VI.   Is Sperry entitled to his requested injunctive relief when it is unrelated to the alleged violations?

## ARGUMENTS AND AUTHORITIES

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When there is no genuine dispute of material fact on an essential element of the nonmovant's claim, then summary judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be identified by reference to affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. Relying on mere pleadings without supporting facts in the record is not enough. *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (citation omitted). What is more, "while courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also McCoy*, 887 F.3d at 1044 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[2] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). When a § 1983 defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.*; *see also Grissom v. Roberts*, 902 F.3d 1162, 1167-68 (10th Cir. 2018) ("only if the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant . . . " (comma omitted)). When qualified immunity is raised at the summary judgment

---

[2] Federal statutory rights enforceable under § 1983 are limited in number. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124-25 (2005) ("a few § 1983 claims are based on statutory rights"). They are not relevant to this case (and are generally not relevant to inmate cases), so the rest of this memorandum refers only to "constitutional rights" as shorthand for the full phrase "statutory or constitutional rights."

stage, courts look at the defendant's conduct according to the evidence in the light most favorable to the plaintiff. *Thomas*, 765 F.3d at 1194 (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). And "[t]he court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom*, 902 F.3d at 1167 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Simply put, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). In order to overcome the KDOC Defendants' qualified immunity, Leek must show not only that the KDOC Defendants violated his federally secured rights, but also that objectively reasonable officials could not have thought the conduct constitutionally permissible. *Park v. Gaitan*, 680 F. App'x 724, 738 (10th Cir. 2017) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (saying the clearly established right must have been "sufficiently clear that every reasonable official would have understood that what he is doing violates that right"); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (saying clearly established case law must answer the "constitutional question beyond debate"). If a plaintiff fails to satisfy either prong of the qualified immunity test, a court must grant the defendant qualified immunity. *Grissom*, 902 F.3d at 1167.

Federal precedent offers two avenues for determining whether challenged conduct violates clearly established constitutional rights: "the plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness

must be apparent." *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (citation omitted). The Supreme

Court recently re-emphasized that "the clearly established right must be defined with

specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "This Court has

repeatedly told courts not to define clearly established law at a high level of generality." *Id.*

I. **Defendants Lee and Booth are entitled to summary judgment because no admissible evidence establishes their involvement in the censorship actions.**

Sperry alleges Lee and Booth performed or participated in the initial seizures,

withholding the incoming magazines, book, and photograph from him. (Doc. 25 at 11.) And

Sperry signs his complaint under penalty of perjury, making it a verified complaint. (*See* Doc. 25

at 24; Doc. 1 at 47); *see also Vette v. Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) ("a verified

complaint may be treated as an affidavit"). Yet Sperry has not established any facts that

demonstrate the necessary foundation for how Sperry would know which prison employee

performed the initial seizure. So Sperry's conclusory statements that Lee and Booth performed

the initial seizure are not admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4), (e); Fed. R. Evid.

602; *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("conclusory and self-serving

affidavits are not sufficient"). Further, the rest of the evidentiary record does not show Lee's or

Booth's involvement. (*See* Docs. 48, 48-14, 48-15, 48-16, 48-17, 48-18.) Therefore, Lee and

Booth are entitled to summary judgment because no admissible evidence establishes their

involvement in the censorship actions.

II. **Defendants are entitled to summary judgment on any First Amendment retaliation claim for failure to establish a constitutionally protected activity or a retaliatory motive.**

As the Tenth Circuit has explained:

To establish a First Amendment retaliation claim, a plaintiff must show that (1) he
was engaged in constitutionally protected activity, (2) the government's actions
caused him injury that would chill a person of ordinary firmness from continuing

to engage in that activity, and (3) the government's actions were substantially
motivated as a response to his constitutionally protected conduct.

*Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009). "[A]n inmate

claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the

prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006)

(emphasis in original). For example, if a plaintiff fails to present evidence that the defendants'

alleged retaliatory motives were the "but for" cause of the defendants' actions, then the

plaintiff's allegations of retaliation must fail. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir.

1998).

Here, Sperry makes only a conclusory claim of retaliation. He claims Defendants seized

and censored his "non-pornographic publications, books and photographs in retaliation for his

complaints and litigation and/or based upon incompetence, [in] clear violation of his First . . .

Amendment rights." (Doc. 25 at 10). Although he argues here that his magazines, book, and

photograph were censored and seized "in retaliation for his complaints and litigation," he fails to

specify any particular complaints or litigation that may have sparked a retaliation. His vague

assertion is insufficient to create a triable issue regarding the first element: whether he was

engaged in a constitutionally protected activity.

Sperry's only suggestion of retaliatory motives is his assertion that "after [he] stirred up

the stink about the seizure of his Wired Magazine and *apparently* angered defendants Lee and

Sapien, these two defendants seized a photograph that [Sperry] had ordered out of a magazine of

a sexily dressed woman." (Doc. 25 at 11 (emphasis added).) But this assertion does not create a

genuine issue of material fact regarding retaliatory motives because it is speculative, conclusory,

and shows nothing more than Sperry's subjective belief about why the officials acted. *See*

*Lehman v. McKinnon*, No. 20-1312, 2021 WL 4129229, at *2 (10th Cir. 2021) (quoting *Bones v.*

*Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)) (summary judgment cannot be defeated "through 'mere speculation, conjecture, or surmise'"); *Nielander*, 582 F.3d at 1165 ("A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient" to establish retaliatory motive); *Guy v. Lampert*, 748 F. App'x 178, 181 (10th Cir. 2018) (mere temporal proximity between inmate's protected activity and alleged adverse action is insufficient). This is insufficient to create a triable issue regarding the third element: whether the government's actions were substantially motivated as a response to constitutionally protected conduct.

Therefore, no triable issue exists regarding the first and third elements, and Defendants are entitled to summary judgment regarding any First Amendment retaliation claim.

### III.    Defendants are entitled to qualified immunity because the censorship actions, in light of the evidentiary record, did not violate clearly established law of which reasonable state officials would have known.

Although "[i]nmates have a First Amendment right to receive information while in prison," it can be limited when "inconsistent with prisoner status or the legitimate penological objectives of the prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004). "[R]estrictions on First Amendment rights" to receive mail in prison "are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to those concerns." *Wardell v. Duncan*, 470 F.3d 954, 959-60 (10th Cir. 2006) (quoting *Beard v. Banks*, 548 U.S. 521, 528 (2006)). In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court set forth four factors to consider in assessing reasonableness:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest

available?

*Wardell*, 470 F.3d at 960 (quoting *Beard*, 548 U.S. at 529).

For the first factor, legitimate penological interests for withholding mail include when materials include sexually explicit content or encourage weapons, contraband or escapes. *See Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1156 (10th Cir. 2007) ("to allow inmates to possess 'sexually explicit material' and 'technical publications' concerning weapons, contraband and escapes would have a significant impact on the safety and security of prison personnel and other inmates"). Accordingly, K.A.R. § 44-12-601(d) gives prison officials discretion to censor incoming mail "when there is reasonable belief" that the mail poses "a threat to institutional safety, order, or security" or "[t]he mail contains sexually explicit material, as defined and proscribed by K.A.R. 44-12-313." Material is sexually explicit if its purpose is "sexual arousal or gratification and the material . . . either . . . [c]ontains nudity" ("defined as the depiction or display of any state of undress in which the human genitals, pubic region, buttock, or female breast at a point below the top of the aerola [sic] is less than completely and opaquely covered") or contains any display, actual or simulated, or description of sexual intercourse, sodomy, masturbation, bestiality, or sadomasochistic abuse. K.A.R. § 44-12-313(b). Legitimate penological interests also include promoting inmate rehabilitation and maintaining safety, security, order, and discipline in the prison.[3]

---

[3] *Hammons v. Saffle*, 348 F.3d 1250, 1254-55 (10th Cir. 2003) (holding that prison staff "had legitimate penological interests in . . . maintaining prison order and safety . . . and in inmate rehabilitation"); *see also Hale v. Fed. Bureau of Prisons*, 759 F. App'x 741, 751 (10th Cir. 2019) (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)) (holding that "maintaining institutional security and preserving internal order and discipline" justified mail restrictions challenged by the plaintiff).

When it comes to assessing whether legitimate penological interests are implicated, the United States Supreme Court "has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). The Supreme Court has even said that "[t]he task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328 (2012). In holding this, the Court has acknowledged "the expertise of these officials and that the judiciary is ill equipped to deal with the difficult and delicate problems of prison management." *Thornburgh*, 490 U.S. at 407-08. The Court noted that, when it comes to prisoners interacting with incoming written materials, "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Id.* at 407.

For the second factor, "alternatives need not be ideal," but rather "they need only be available. *Wardell*, 470 F.3d at 961. Thus, even if not the 'best method' from the inmate's point of view, if another means of exercising the right exists, the second *Turner* factor does not undercut the challenged restriction." *Id.* at 961-62. With regard to censored mail items specifically, the second factor is satisfied when inmates can receive a broad range of other incoming mail "as long as the incoming publication does not contain prohibited content." *Sperry v. Werholtz*, 413 F. App'x 31, 41 (10th Cir. 2011).

For the fourth factor, "this is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable method of accommodating the claimant's constitutional complaint." *Wardell*, 470 F.3d at 962 (quoting *Turner*, 482 U.S. at 90-

91). Rather, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91.

Here, in each case of censorship alleged by Sperry, the prison officials had a reasonable basis for their decision based on legitimate penological interests and state regulations. The censored materials are attached as sealed exhibits, and the Court can verify through in-camera inspection the truth of the facts contained in this analysis about those materials. *See Martinez v. True*, 128 F. App'x 714, 716 (10th Cir. 2005) (affirming summary judgment based on an in-camera review of "confidential prison materials").

**A. Us Weekly**

On December 14, 2015, Sperry was sent a notice by Defendant Shipman that the December 21, 2015 issue of Us Weekly had been rejected because contents of the magazine – specifically, drink recipes – posed a threat to the safety and security of correctional facilities, pursuant to K.A.R. § 44-12-601. (Doc. 48-14 at 2.) That December 21, 2015 issue of Us Weekly contained alcoholic drink recipes. (Exhibit B at 2; Exhibit A at ¶ 3.) Alcohol is considered contraband for KDOC inmates as an intoxicant and a security risk. (Exhibit A at ¶ 7); *see also Florence*, 566 U.S. at 332 ("Weapons, drugs, and alcohol all disrupt the safe operation of a jail."). Similarly, alcohol-related materials, such as drink recipes, have also been rejected from incoming mail because they can encourage inmates to make contraband alcohol. (Exhibit A at ¶ 8); *see also Florence*, 566 U.S. at 332 ("There are many . . . kinds of contraband. The textbook definition of the term covers any unauthorized item. Everyday items can undermine security if introduced into a detention facility." (citation omitted)).

Regarding the first *Turner* factor, prohibiting alcohol and related materials such as drink recipes helps the prison maintain safety and security. So the first factor weighs in favor of Defendants.

Regarding the second factor, inmates are free to receive a broad range of other information and reading materials in the mail. (*See* Statement of Materials Facts at ¶ 2 above.) Sperry may not consider these his ideal reading materials, but that does not undercut the challenged restrictions. The second factor weighs in favor of Defendants.

Regarding the third factor, providing Sperry's requested accommodations may result in an increase of contraband alcohol in the prison. (Exhibit A at ¶ 8.) This would compromise safety and security. The third factor weighs in favor of Defendants.

Regarding the fourth factor, Sperry says he should have received the magazine with the drink recipes, which is not an alternative with only de minimis cost to valid penological interests. And censoring only the offending portions would require an exponential increase in staff. (Exhibit A at ¶ 23); *see also Strope v. Collins*, No. 06-3150-JWL, 2008 WL 2435560, at *3 (D. Kan. June 12, 2008). The fourth factor weighs in favor of Defendants.

All four factors, then, weigh in favor of Defendants with regard to the censorship of the Us Weekly magazine.

**B.  Wired – January 2016 issue**

On January 6, 2016, Sperry was sent a notice by Defendant Shipman that the January 2016 issue of Wired magazine had been rejected because contents of the magazine – specifically, DIY weapons – posed a threat to the safety and security of correctional facilities, pursuant to K.A.R. § 44-12-601. (Doc. 48-15 at 2.) That January 2016 issue of Wired magazine contained instructions on how to create DIY weapons and armor. (Exhibit C at 3; Exhibit A at ¶ 4.) Weapons and armor – and therefore instructions on how to make weapons and armor – are

contraband for inmates in the custody of KDOC. (Exhibit A at ¶ 9); *see also Florence*, 566 U.S. at 332 ("Weapons, drugs, and alcohol all disrupt the safe operation of a jail."). This policy aims to prevent violence and to maintain the safety and security of the facility. (Exhibit A at ¶ 9.)

Regarding the first *Turner* factor, prohibiting weapons and instructions on how to make weapons helps the prison maintain safety and security. So the first factor weighs in favor of Defendants.

Regarding the second factor, inmates are free to receive a broad range of other information and reading materials in the mail. (*See* Statement of Materials Facts at ¶ 2 above.) Sperry may not consider these his ideal reading materials, but that does not undercut the challenged restrictions. The second factor weighs in favor of Defendants.

Regarding the third factor, providing Sperry's requested accommodations may result in an increase in DIY weapons and armor within the prison, which would likely result in violent incidents. (Exhibit A at ¶ 10.) These violent incidents could cause injuries or even death to inmates or staff. (*See* Exhibit A at ¶ 11); *see also* KDOC, Officers on Kansas Law Enforcement Memorial (updated May 3, 2019), https://www.doc.ks.gov/newsroom/klem/kdoc; Gabe Swartz, *KBI rules 62-year-old inmate's death at Lansing Correctional Facility a homicide*, KCTV5, updated Jan. 7, 2023, https://www.kctv5.com/2023/01/07/62-year-old-inmate-dies-lansing-correctional-facility/. This would compromise safety, order, and even potentially human life. *See Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (saying the government "has an unqualified interest in the preservation of human life"). The third factor weighs in favor of Defendants.

Regarding the fourth factor, Sperry says he should have received the magazine with the DIY weapons article, which is not an alternative with only de minimis cost to valid penological interests. And censoring only the offending portions would require an exponential increase in

staff. (Exhibit A at ¶ 23); *see also Strope*, 2008 WL 2435560 at *3. The fourth factor weighs in favor of Defendants.

All four factors, then, weigh in favor of Defendants with regard to the censorship of the January 2016 Wired magazine.

### C.  Wired – April 2016 issue

In April 2016, Sperry was sent a notice by KDOC staff that the April 2016 issue of Wired magazine had been rejected because it posed a threat to the safety and security of the correctional facility, pursuant to K.A.R. § 44-12-601. (Doc. 48-16 at 1-2.) That April 2016 issue of Wired magazine contained an article focused on and containing radical terrorist propaganda from ISIS. (Exhibit D at 3-4; Exhibit A at ¶ 5.) That propaganda could lead to radicalization of inmates. (Exhibit A at ¶ 12.) Radicalization of inmates would likely hinder inmates' rehabilitation or lead to increased talking or planning of violent activity within the prison. (Exhibit A at ¶ 12.)

Regarding the first *Turner* factor, prohibiting terrorist propaganda helps the prison prevent violence, maintain safety and security, and promote inmate rehabilitation. So the first factor weighs in favor of Defendants.

Regarding the second factor, inmates are free to receive a broad range of other information and reading materials in the mail. (*See* Statement of Materials Facts at ¶ 2 above.) Sperry may not consider these his ideal reading materials, but that does not undercut the challenged restrictions. The second factor weighs in favor of Defendants.

Regarding the third factor, providing Sperry's requested accommodations may result in radicalization of inmates within the prison, which would likely hinder inmates' rehabilitation or lead to talking or planning of violent activity by inmates. (Exhibit A at ¶ 12.) Violent incidents could cause injuries or even death to inmates or staff. (*See* Exhibit A at ¶ 11); *see also* KDOC, Officers on Kansas Law Enforcement Memorial (updated May 3, 2019),

https://www.doc.ks.gov/newsroom/klem/kdoc; Gabe Swartz, *KBI rules 62-year-old inmate's death at Lansing Correctional Facility a homicide*, KCTV5, updated Jan. 7, 2023, https://www.kctv5.com/2023/01/07/62-year-old-inmate-dies-lansing-correctional-facility/. This would compromise safety, order, and even potentially human life. *See Washington*, 521 U.S. at 728 (saying the government "has an unqualified interest in the preservation of human life."). The third factor weighs in favor of Defendants.

Regarding the fourth factor, Sperry says he should have received the magazine with the radical ISIS propaganda article, which is not an alternative with only de minimis cost to valid penological interests. And censoring only the offending portions would require an exponential increase in staff. (Exhibit A at ¶ 23); *see also Strope*, 2008 WL 2435560 at *3. The fourth factor weighs in favor of Defendants.

All four factors, then, weigh in favor of Defendants with regard to the censorship of the April 2016 Wired magazine.

### D.  Pulchritudinous Assets

On April 8, 2016, Sperry was sent notice by Defendant Sapien that a picture of a "sexily dressed woman" (Doc. 25 at 11) from Pulchritudinous Assets was being censored on the basis that it "poses a threat to institutional safety, order or security," and it contains sexually explicit materials as described in K.A.R. § 44-12-313. (Doc. 48-17 at 1.) In fact, the images in the publication depicted or displayed women in a "state of undress in which the . . . pubic region, buttock, or female breast at a point below the top of the aerola [sic] [was] less than completely and opaquely covered." K.A.R. § 44-12-313(b)(1) (definition of "sexually explicit materials" and "nudity"); (Exhibit E at 1-3; Exhibit A at ¶ 6). Although Sperry asserts that "it was not nude or otherwise pornographic," (Doc. 25 at 11), the publication contained "nudity" according to the definition in K.A.R. § 44-12-313.  From the poses, body language, and generally provocative

nature of the photos, as well as checkbox options on an order form for "Types of shots" including "Boobs," "Nude," and different ethnicities of scantily clad women, the Pulchritudinous Assets publication is plainly meant for "sexual arousal or gratification" under K.A.R. § 44-12-313(b). At the very least, such a determination is rational enough for the Court to defer to the "professional expertise of corrections officials" regarding the matter. *See Florence*, 566 U.S. at 328.

KDOC's ban on sexually explicit materials aims to prevent violence, sexual harassment, lewd acts, and sexual assaults as well as unauthorized trading within the prisons. (Exhibit A at ¶¶ 13-16); *see also Sperry v. Werholtz*, 413 F. App'x 31, 40-41 (10th Cir. 2011) (finding reducing violence, reducing sexual harassment, and reducing lewd acts to be legitimate governmental objectives justifying banning sexually explicit materials in Kansas prisons); *Salt Lake Cnty.*, 503 F.3d at 1155-56 & n.8 (finding reducing sexual assault and reducing sexual harassment to be legitimate governmental objectives justifying banning sexually explicit materials for jail inmates); *Wardell*, 470 F.3d at 960-61 (finding preventing unauthorized bartering to be a legitimate penological interest justifying rejecting incoming mail items). Further, allowing sexually explicit materials would be likely to result in those materials travelling as contraband within the prison to sex offenders, which would hinder or thwart their rehabilitation. (Exhibit A at ¶¶ 13, 17); *see also Sperry v. Werholtz*, 413 F. App'x at 41-42 (finding sex offender rehabilitation to be a legitimate governmental objective justifying banning sexually explicit materials).

Regarding the first *Turner* factor, prohibiting sexually explicit materials helps the prison prevent violence, sexual harassment, lewd acts, and sexual assaults as well as unauthorized trading in the prison. It also promotes rehabilitation for sex offenders within the prison. So the

first factor weighs in favor of Defendants.

Regarding the second factor, inmates are free to receive a broad range of other information and reading materials in the mail. (*See* Statement of Materials Facts at ¶ 2 above.) Sperry may not consider these his ideal reading materials, but that does not undercut the challenged restrictions. The second factor weighs in favor of Defendants.

Regarding the third factor, the Tenth Circuit has recognized that "to allow inmates to possess sexually explicit material . . . would have a significant impact on the safety and security of prison personnel and other inmates." *Salt Lake Cnty.*, 503 F.3d at 1156. Sperry has even previously litigated whether he should be able to receive sexually explicit materials in prison and he lost. *Sperry v. Werholtz*, 413 F. App'x at 39-42. The court can recognize the holding in that case through issue preclusion [4] that: "[a]ccommodating the exercise of plaintiff's right to possess sexually explicit material would have a negative effect on other prisoners, staff, and prison resources." *Sperry v. Werholtz*, 413 F. App'x at 42. The record in this case also shows that allowing sexually explicit material would likely result in an increase in violence, sexual harassment, lewd acts, and sexual assault as well as unauthorized trading within the prison, and would likely hinder or thwart sex offender rehabilitation. (Exhibit A at ¶¶ 13-17.) An increase in sexual harassment could also lead to an increase in staff complaints. *See Sperry v. Werholtz*, 413 F. App'x at 41 (finding staff complaints to be a valid concern underlying KDOC's legitimate penological interest in reducing sexual harassment). The third factor weighs in favor of

---

[4] *See Keller Tank Servs. II, Inc. v. Comm'r*, 854 F.3d 1178, 1193 (10th Cir. 2017) (discussing the elements of issue preclusion). Here, this (1) very issue has (2) previously been decided in a final adjudication on the merits through a grant of summary judgment, affirmed by the Tenth Circuit, (3) against Sperry himself, (4) who had a full and fair opportunity to litigate the issue at both the district and appellate court levels. The issue was also essential to the judgment because it was part of the *Turner* analysis in that case.

Defendants.

Regarding the fourth factor, Sperry says he should have received the publication with the "sexily dressed" women, which is not an alternative with only de minimis cost to valid penological interests. And censoring only the offending portions would (if any part of the publication would even be left in this case) require an exponential increase in staff. (Exhibit A at ¶ 23); *see also Strope*, 2008 WL 2435560 at *3. The fourth factor weighs in favor of Defendants.

All four factors, then, weigh in favor of Defendants with regard to the censorship of the Pulchritudinous Assets publication.

### E.  The Target

On May 24, 2016, Sperry was sent a notification by Bill Shipman that the book <u>The Target</u> by David Baldacci had been rejected because of content that posed a threat to the safety and security of correctional facilities, pursuant to K.A.R. § 44-12-601. (Doc. 48-18 at 2.) The book <u>The Target</u> contained the following:

- A discussion between inmate characters about escaping from prison (p. 2). (Exhibit F at 3.)

- A suggestion by an inmate character that violence would be justified against "Jews or Presbyterians or coloreds" (p. 6). (Exhibit F at 4.)

- A description of how a man violently incapacitated someone in a fight (p. 16). (Exhibit F at 5.)

- A description of an inmate inappropriately lusting after a prison staff member (pp. 41-42). (Exhibit F at 6-7.)

- A description of an inmate imagining sexual acts with a prison staff member (p. 41). (Exhibit F at 6.)

- A description of an inmate masturbating at the sight of a prison staff member (pp. 41-42). (Exhibit F at 6-7.)

Sperry's summaries of the material on the offending pages in <u>The Target</u> (Doc. 25 at 11-12) do not seem to match the content on those pages, so he may have been using a different version of the book, such a mass market paperback, which has a different number of pages than the regular paperback.[5]

Plaintiff has previously suggested that <u>The Target</u> was available in the prison library (Doc. 87 at 4, 8, 16), but this would not establish that the book could not lawfully be censored from incoming mail under K.A.R. § 44-12-601. Two different officials could come to opposite conclusions about whether materials should be censored, and both conclusions could be within the realm of agency discretion. *See Nanodetex Corp. v. Defiant Techs.*, 349 F. App'x 312, 319 (10th Cir. 2009) (citing *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 603 (10th Cir. 2008)) (saying the exercise of discretion implies "that reasonable minds might come to different conclusions when faced with the same facts"). Further, Plaintiff does not allege or establish that any of the Defendants knew the book was available in the library.

Regarding the first factor, the discussion in the book between inmates about escaping prison may encourage inmates to plan attempts to escape from prison. (Exhibit A at ¶ 18.) Reducing the risk of escape attempts is a legitimate governmental interest. *Salazar v. Seagrave*,

---

[5] *See* Amazon listing for <u>The Target</u> in paperback, https://www.amazon.com/Target-Will-Robie-David-Baldacci/dp/1455521183 (last visited Apr. 19, 2023) (saying the paperback has 464 pages); Amazon listing for <u>The Target</u> in mass market paperback, https://www.amazon.com/Target-Will-Robie-David-Baldacci/dp/1455521264 (last visited Apr. 19, 2023) (saying the mass market paperback has 592 pages); *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (citing Fed. R. Evid. 201) (holding that courts can take judicial notice of factual information on the world wide web).

CIV No. 00-841, 2002 WL 35650048, at *2 (D.N.M. Mar. 8, 2002) (citing *Block v. Rutherford*, 468 U.S. 576, 586-87 (1984)). The suggestion by an inmate character that violence would be justified against "Jews or Presbyterians or coloreds" may encourage racially or religiously motivated violence, which is a known problem in prisons. (Exhibit A at ¶¶ 19-20.) The description of a how a man violently incapacitated someone in a fight may encourage an inmate to attempt to duplicate the feat, encouraging or exacerbating violence in the prison. (Exhibit A at ¶ 21.)

The descriptions of an inmate inappropriately lusting after a prison staff member, of an inmate imagining sexual acts with a prison staff member, and of an inmate masturbating at the sight of a prison staff member all describe inappropriate, sexualized relationships between inmates and prison staff. These kinds of passages tend to increase pressure from inmates to staff to participate in conversations of undue familiarity. (Exhibit A at ¶ 22.) Accordingly, these kinds of passages can lead to undue familiarity. (Exhibit A at ¶ 22; *see also Czekalski v. Hanks*, No. 18-cv-592, 2020 WL 7231358, at *25 (D.N.H. Dec. 8, 2020) (citing *Moorehead v. Keller*, 845 F. Supp. 2d. 689, 692 (W.D.N.C. 2012)) (finding preventing undue familiarity to be a legitimate penological interest related to maintaining institutional security). These passages could also encourage sexual harassment toward staff, lewd acts, or sexual assault of staff through inappropriate touching. (Exhibit A at ¶ 22.)

Regarding the second factor, inmates are free to receive a broad range of other information and reading materials in the mail. (*See* Statement of Materials Facts at ¶ 2 above.) Sperry may not consider these his ideal reading materials, but that does not undercut the challenged restrictions. The second factor weighs in favor of Defendants.

Regarding the third factor, passages in the book may promote escape-attempt planning, general violence, and specifically racially or religiously motivated violence within the prison, which could result in harm to staff, inmates, or others. Other passages could encourage sexual harassment toward staff, lewd acts, sexual assault of staff through inappropriate touching, or undue familiarity. These consequences would compromise order, safety, and security, and could also lead to increased staff complaints. *See also Sperry v. Werholtz*, 413 F. App'x at 41 (finding staff complaints to be a valid concern underlying KDOC's legitimate penological interest in reducing sexual harassment). The third factor weighs in favor of Defendants.

Regarding the fourth factor, Sperry says he should have received the book with the problematic material, which is not an alternative with only de minimis cost to valid penological interests. And censoring only the offending portions would require an exponential increase in staff. (Exhibit A at ¶ 23); *see also Strope*, 2008 WL 2435560 at *3. The fourth factor weighs in favor of Defendants.

All four factors, then, weigh in favor of Defendants with regard to the censorship of the book The Target.

**F.   The *Turner* analyses supports a finding of qualified immunity.**

Defendants are entitled to qualified immunity because there is no clearly established law within this Circuit, or a robust consensus of cases outside of it, that Defendants' actions violated clearly established law, particularized to the facts of this case. The *Turner* analysis for each censored item resolves in favor of Defendants. All of the censorship events against which Sperry raises claims served a legitimate penological interest, such as maintaining prison order, safety, and security, preventing violence, sexual harassment, lewd acts, undue familiarity, sexual assaults, and unauthorized trading, reducing staff complaints, preserving human life, reducing the risk of escape attempts, and encouraging rehabilitation. A reasonable officer could in good

faith rely on these reasons to support the restrictions, especially in light of the lack of an unequivocal judicial holding in the Tenth Circuit holding any of these restrictions to be a violation. Accordingly, Defendants are entitled to summary judgment on Sperry's remaining claim.

**IV.** **Even if Sperry states a claim that would otherwise survive summary judgment, the Court should grant partial summary judgment on each of Sperry's requested remedies.**

Rule 56 of the Federal Rules of Civil Procedure allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense." Here, even if Sperry states a First Amendment claim that would otherwise survive summary judgment, the Court should grant partial summary judgment to the Defendants on each of Sperry's requested remedies.

**A. Sperry is not entitled to compensatory damages under the PLRA when he cannot show physical injury.**

Under the Prison Litigation Reform Act (PLRA), Leek cannot receive damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." Prison Litigation Reform Act, 42 U.S.C. § 1997e(e). Here, for the remaining claim before this Court, Sperry requests ten thousand dollars in compensatory damages "for the unlawful seizure of [materials] and chilling the exercise of his First Amendment right." (Doc. 25 at 23.) Sperry has not alleged a physical injury or the commission of a sexual act, so he cannot receive damages for mental or emotional injury in this case. Sperry has failed to allege or show a compensable injury. Therefore, Sperry is not entitled to compensatory damages.

**B.  Sperry is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Sperry is not entitled to punitive damages against Defendants for want of the requisite subjective intent. A § 1983 plaintiff claiming punitive damages must prove defendants' conduct either "is shown to be motivated by evil motive or intent" or "involves reckless or callous indifference to" his federal constitutional rights. *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Barring pleading and proof that a defendant "either acted with malice or knew [the] actions were unconstitutional," a § 1983 plaintiff cannot pursue a claim for punitive damages. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992).

Here, Sperry requests one million dollars in punitive damages. (*See* Doc. 25 at 24; Doc. 1 at 46.) Sperry has not alleged or provided any evidence of facts showing that any of Defendants acted with the required maliciousness, evil motive, or with reckless indifference to Sperry's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. Therefore, as a matter of law, Sperry cannot receive punitive damages.

**C.  Sperry is not entitled to his requested injunctive relief because it is unrelated to the alleged violations.**

Sperry requests injunctive relief ordering the Defendants to "stop seizing plaintiff's books, magazines, [and] pictures . . . that are not actually classified as pornographic material pursuant to federal law." (Doc. 25 at 22.) But if a violation were found in this case, it would be a violation of constitutional rights, not a federal definition of "pornographic material." Most of the censored materials were censored for reasons other than sexually explicit content. And for the rest, the scope of what sexually explicit content can be censored without violating Sperry's rights is not based on a definition of "pornographic material" (or even the definition of "obscenity" that

limits government censorship of publications for the general public[6]), but is based on the Constitution as applied to the circumstances through the *Turner* analysis. The government can constitutionally censor or otherwise restrict a broader range of sexually explicit content in a prison setting than it can for the general public:

> [T]he issue before the court is not whether government can censor such publications for the general public. Clearly, it cannot. . . . The question before the Court is whether state prison officials may constitutionally refuse delivery of copies of the [mailed material] to a prisoner . . . . Under *Turner*, the prison officials were acting properly and no violation of constitutional rights occurred if their refusal to deliver the [mailed material] was reasonably related to a legitimate penological interest.

*Jones-El v. Pollard*, No. 07-C-0504, 2010 WL 446057, at *5 (E.D. Wis. Feb. 2, 2010); *see also Wardell v. Duncan*, 470 F.3d 954, 959-60 (10th Cir. 2006) (quoting *Beard v. Banks*, 548 U.S. 521, 528 (2006)) ("[R]estrictions on First Amendment rights [to receive mail in prison] are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to those concerns.").

Accordingly, to grant such unrelated and extraneous injunctive relief as Sperry requests would go beyond the scope of any violation and infringe on the authority of both the executive and legislative branches of the state of Kansas. It would arbitrarily re-write rules and regulations that only KDOC or the Kansas Legislature has authority to write. *See Vainisi v. Comm'r*, 599 F.3d 567, 572 (7th Cir. 2010) (saying a court "cannot rewrite statutes and regulations merely because" the court has a different opinion regarding "wise social policy"); *see also* U.S. Const. amend. X. Accordingly, the Court lacks legal authority to grant the specific injunctive relief Sperry requests. Therefore, Sperry cannot receive that unrelated injunctive relief.

---

[6] *See Reno v. ACLU*, 521 U.S. 844, 872, 874-75 (1997).

So even if Sperry states a claim that would otherwise survive summary judgment, the Court should grant partial summary judgment to the Defendants limiting his requested remedies because he is not entitled to compensatory or punitive damages or his requested injunctive relief.

**CONCLUSION**

Defendants respectfully request that this Court enter summary judgment on their behalf because the material facts, which are not subject to genuine dispute, entitle Defendants to judgment as a matter of law on Sperry's remaining claim.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

/s/ Matthew L. Shoger
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of April, 2023, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all registered parties and interested parties. I also hereby certify that a copy of the above will be served by means of first-class mail on the 27th day of April, 2023, postage prepaid, addressed to:

Jeffrey Sperry, #47031
Lansing Correctional Facility
P.O. Box 2
Lansing, KS 66043-0002
*Plaintiff, pro se*

/s/ Matthew L. Shoger
Matthew L. Shoger
Assistant Attorney General